# Docket No. 22-16654

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

JOSEPH TAYLOR, EDWARD MLAKAR,
MICK CLEARY and EUGENE ALVIS,

*Plaintiffs-Appellants,*

v.

GOOGLE LLC,

*Defendant-Appellee.*

*Appeal from a Decision of the United States District Court for the Northern District of California, No. 5:20-cv-07956-VKD · Honorable Virginia Kay DeMarchi, Magistrate Judge*

## EXCERPTS OF RECORD


MARC A. WALLENSTEIN, ESQ.
RYAN Z. CORTAZAR, ESQ.
GEORGE A. ZELCS, ESQ.
KOREIN TILLERY, LLC
205 North Michigan Avenue, Suite 1950
Chicago, Illinois 60601
(312) 641-975 Telephone
mwallenstein@koreintillery.com
rcortazar@koreintillery.com
gzelcs@koreintillery.com

GLEN E. SUMMERS, ESQ.
ALISON WHEELER, ESQ.
BARTLIT BECK, LLP
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202
(303) 592-3100 Telephone
glen.summers@bartlit-beck.com
Alison.wheeler@bartlit-beck.com

CAROL O'KEEFE, ESQ.
MICHAEL E. KLENOV, ESQ.
KOREIN TILLERY, LLC
505 North 7th Street, Suite 3600
St. Louis, Missouri 63101-1625
(314) 241-4844 Telephone
cokeefe@koreintillery.com
mklenov@koreintillery.com

*Attorneys for Appellants Joseph Taylor, Edward Mlakar, Mick Cleary and Eugene Alvis*



COUNSEL PRESS · (213) 680-2300 PRINTED ON RECYCLED PAPER

## TABLE OF CONTENTS


| Docket Entry | Description | Page |
|---|---|---|
| 75 | Judgment<br>Filed September 30, 2022 | 3 |
| 74 | Order Granting Defendant's Motion to Dismiss First Amended Complaint Without Leave to Amend<br>Filed September 30, 2022 | 4 |
| 73 | Transcript of Proceedings of the Official Electronic Sound Recording 10:00 – 11:20 = 80 minutes held on March 29, 2022<br>Filed April 5, 2022 | 17 |
| 67 | Plaintiffs' Opposition to Google LLC's Motion to Dismiss Plaintiffs' First Amended Complaint (Excerpts of Cited Materials)<br>Filed February 21, 2022 | 25 |
| 60 | First Amended Class Action Complaint<br>Filed December 13, 2021 | 27 |
| 51 | Order Granting Defendant's Motion to Dismiss Complaint<br>Filed October 1, 2021 | 60 |
| 39 | Plaintiff's Opposition to Google LLC's Motion to Dismiss (Excerpts of Cited Materials)<br>Filed March 1, 2021 | 76 |
| 39-1 | Declaration of Ryan Cortazar | 79 |
| | Exhibit 1: Order after Hearing on July 17, 2020 | 82 |
| 1 | Class Action Complaint<br>Filed November 12, 2020 | 102 |
| 76 | Notice of Appeal<br>Filed October 25, 2022 | 125 |
| N/A | Civil Docket for Case No. 5:20-cv-07956-VKD<br>U.S. District Court, California Northern District (San Jose) | 129 |

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JOSEPH TAYLOR, et al.,<br>Plaintiffs,<br>v.<br>GOOGLE LLC,<br>Defendant. | Case No. 20-cv-07956-VKD<br><br>**JUDGMENT** |

On September 30, 2022, the Court granted defendant's motion to dismiss the first amended complaint, without leave to amend. Dkt. No. 74. Pursuant to Federal Rule of Civil Procedure 58, the Court hereby enters judgment of dismissal of this action in favor of defendant and against plaintiffs. The Clerk of Court shall close the file in this matter.

**IT IS SO ORDERED.**

Dated: September 30, 2022

Virginia K. DeMarchi

VIRGINIA K. DEMARCHI
United States Magistrate Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JOSEPH TAYLOR, et al.,<br>Plaintiffs,<br>v.<br>GOOGLE LLC,<br>Defendant. | Case No. 20-cv-07956-VKD<br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT WITHOUT LEAVE TO AMEND**<br>Re: Dkt. No. 65 |

Defendant Google LLC ("Google") moves pursuant to Rule 12(b)(6) to dismiss plaintiffs' first amended complaint ("FAC"). Plaintiffs oppose the motion. Upon consideration of the moving and responding papers,[1] as well as the oral arguments presented, the Court grants Google's motion to dismiss without leave to amend.[2]

## I. BACKGROUND

Plaintiffs Joseph Taylor, Edward Mlakar, Mick Cleary, and Eugene Alvis, each of whom are non-California residents and domiciliaries, filed this putative class action against Google, asserting claims for conversion and quantum meruit based on alleged "passive" data transfers performed by Google over its Android operating system. The alleged passive data transfers are made without plaintiffs' knowledge or consent, and at times when their mobile devices are idle,

[1] In resolving the present motion, the Court finds it unnecessary to consider the various terms of service and policies Google submitted for judicial notice (Dkt. No. 65-1), or the declaration of Marc A. Wallenstein submitted in support of plaintiffs' opposition (Dkt. No. 67-1). Google's request for judicial notice is denied as moot.

[2] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 16, 23.

United States District Court
Northern District of California

stationary, untouched and with all applications closed.[3] Plaintiffs assert their conversion and quantum meruit claims for themselves and on behalf of a putative class of "[a]ll natural persons in the United States (excluding citizens of the State of California) who have used mobile devices running the Android operating system to access the internet through cellular data networks operated by mobile carriers." Dkt. No. 60 ¶ 84.[4] Plaintiffs invoke federal jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). *Id.* ¶ 18.

On October 1, 2021, the Court granted Google's motion to dismiss the original complaint, with limited leave to amend. Google moved to dismiss that complaint pursuant to Rule 12(b)(1), arguing that plaintiffs lack Article III standing to pursue their claims because they did not allege facts indicating that they have suffered any injury. Even if plaintiffs have standing, Google argued that dismissal was warranted under Rule 12(b)(6) because the complaint failed to allege sufficient facts supporting claims for conversion or quantum meruit. Dkt. No. 33. With respect to their Article III standing, the Court noted that no plaintiff alleged any facts demonstrating injury, i.e., that he was charged an overage fee or experienced throttled connection speeds. Dkt. No. 51 at 5. The Court nonetheless addressed Google's Rule 12(b)(6) motion to dismiss the conversion and quantum meruit claims, finding that the issue of plaintiffs' Article III standing was intertwined with the parties' dispute about whether the complaint stated plausible claims for relief. *Id.* at 6.

The Court dismissed the conversion claim, finding that plaintiffs did not allege facts demonstrating that their "cellular data allowances" are personal property capable of exclusive possession or control. *Id.* at 7-13. The Court dismissed the quantum meruit claim as merely derivative of the conversion claim. *Id.* at 13-15. Although plaintiffs did not articulate any additional facts that could be alleged on amendment to support a plausible claim for conversion, the Court nonetheless granted leave to amend that claim. The Court also gave plaintiffs leave to

---

[3] The Court assumes the parties' familiarity with the general background facts as described in its prior order on Google's motion to dismiss plaintiffs' original complaint (Dkt. No. 51 at 1-3) and does not repeat those facts in this order.

[4] There is a parallel proceeding pending in the Santa Clara County Superior Court concerning a putative class of California citizens, *Csupo, et al. v. Alphabet, Inc.*, Case No. 19CV352557.

amend their quantum meruit clam to the extent plaintiffs believed they plausibly could assert such a claim based on their cellular data allowances. *Id*. at 15. However, plaintiffs were not given leave to amend their quantum meruit claim based on the alleged use of "personal information," because they "not only failed to articulate additional facts that could be asserted on amendment, but have also not explained why they did not plead those allegations in their original complaint." *Id*.

Plaintiffs' FAC names an additional plaintiff, Jennifer Nelson, identified as a resident and domiciliary of Wisconsin who has a data plan that requires her to pay a fixed price for up to one gigabyte of data per month, plus an additional charge for each additional gigabyte of data she uses in that month. *See* Dkt. No. 60 ¶ 16. The FAC reasserts a conversion claim, this time based on the theory that "cellular data" (rather than "cellular data allowances") is property subject to conversion. *Id*. ¶¶ 3-4, 28-34. The FAC also reasserts a quantum meruit claim, which plaintiffs contend is not a common count and is not derivative of their conversion claim. *See id*. ¶¶ 3, 5, 10, 77-83, 92-99. In plaintiffs' view, "[e]ither cellular data is property subject to conversion, or it is a contractual right of access to a service subject to quantum meruit. It may even be both—but it must at least be one or the other." *Id*. ¶ 5; *see also* Dkt. No. 67 at 1.

Google contends that the FAC must be dismissed pursuant to Rule 12(b)(6) because plaintiffs still fail to state sufficient facts supporting a plausible claim for conversion or quantum meruit. Although Google does not directly challenge plaintiffs' standing, Google maintains that plaintiffs have not alleged any facts demonstrating that they personally suffered any concrete injury resulting from Google's alleged conduct. *See* Dkt. No. 65 at 10 n.4.

## II. LEGAL STANDARD

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal is appropriate where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory. *Id*. (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)). In such a motion, all material allegations in the complaint must be taken as true and construed in the light most favorable to the claimant. *Id*.

United States District Court
Northern District of California

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, "the court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." This means that the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, only plausible claims for relief will survive a motion to dismiss. *Iqbal*, 556 U.S. at 679. A claim is plausible if its factual content permits the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* A plaintiff does not have to provide detailed facts, but the pleading must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678.

Documents appended to or incorporated into the complaint or which properly are the subject of judicial notice may be considered along with the complaint when deciding a Rule 12(b)(6) motion. *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 998 (9th Cir. 2018); *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

## III. DISCUSSION

### A. Conversion

"In California, conversion has three elements: ownership or right to possession of property, wrongful disposition of the property right and damages." *G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 906 (9th Cir. 1992); *see also Fremont Indem. Co. v. Fremont Gen. Corp.,* 148 Cal. App. 4th 97, 119 (2007) ("The basic elements of the tort [of conversion] are (1) the plaintiff's ownership or right to possession of personal property; (2) the defendant's disposition of the property in a manner that is inconsistent with the plaintiff's property rights; and (3) resulting damages."). Courts apply a three-part test to determine whether a property right exists: "First, there must be an interest capable of precise definition; second, it must be capable of exclusive possession or control; and third, the putative owner must have established

a legitimate claim to exclusivity." *GS Rasmussen*, 958 F.2d at 903 (footnotes omitted). "Although the question was once the matter of some controversy, California law now holds that property subject to a conversion claim need not be tangible in form; intangible property interests, too, can be converted." *Voris v. Lampert*, 7 Cal. 5th 1141, 1151 (2019); *see also Kremen v. Cohen*, 337 F.3d 1024, 1033 (9th Cir. 2003) (stating that insofar as "California retains some vestigial merger requirement, it is clearly minimal, and at most requires only *some* connection to a document or tangible object[.]").

In their original complaint, plaintiffs' conversion claim asserted a property right in "their purchased data allowances" created by contract with their respective service providers. *See* Dkt. No. 1 ¶¶ 6, 27, ¶ 60.b., 63. The Court dismissed the conversion claim because plaintiffs did not allege facts demonstrating exclusive possession of the "purchased data allowances" for which they contract:

> Although plaintiffs argue that their data plans confer ownership of "[p]urchased [b]ytes of [c]ellular [d]ata" (Dkt. No. 39 at 14), they have not plausibly alleged facts demonstrating a right to exclusive access to unique or specific bytes of data. Rather, the complaint's allegations indicate that plaintiffs' data allowances provide them with a contractual right to access their service provider's cellular data network—a right that is not exclusive of others' rights to access the same network. Plaintiffs confirm that they "use the term 'data allowances' to refer to the quantity of cellular data bytes that they have purchased" through contracts with their respective service providers. Dkt. No. 39 at 16 n.5. In other words, a data allowance provides subscribers, such as plaintiffs, with a contractual right of access to a service, i.e., access to a service provider's cellular data network that enables users "to send and receive information over the internet without a Wi-Fi connection." *See* Dkt. No. 1 ¶ 24. For some subscribers that right of access is limited to a certain volume of data transmission per month (measured in bytes of data), and for others it is unlimited. *See* Dkt. No. 1 ¶¶ 8-11. In any event, that right of access is not exclusive of others' right of access to the same network, and no subscriber possesses or controls a particular byte or bytes of data in the network. Indeed, plaintiffs acknowledge that the purported property right of access to a cellular data network grants them the ability to access "quantities of cellular data available to all of [a carrier's] customers." Dkt. No. 39 at 17.

Dkt. No. 51 at 9.

The FAC now bases the conversion claim on a purported property right in "cellular data," rather than "cellular data allowances," and alleges that "[c]ellular data is property subject to conversion because, just like electricity or water, cellular data is capable of exclusive possession." Dkt. No. 60 ¶¶ 3-4, 28-34.

The omission of "allowances" from the description of the claimed property interest does not change the nature of that alleged property interest or plaintiffs' claim, which continues to rest on their contractual right of access to a service that is measured in bytes of data. As noted above, plaintiffs previously confirmed that they used "the term '*data allowances*' to refer to the quantity of *cellular data* bytes that they have purchased' through contracts with their respective service providers." Dkt. No. 51 at 9 (citing Dkt. No. 39 at 16 n.5) (emphasis added). Plaintiffs have not persuasively demonstrated that they are using the term "cellular data" any differently now. The FAC states that "cellular data" does not include a users' underlying personal information, but rather "describes the *transmission* of such information over cellular networks *charged against consumers' cellular data plans*." Dkt. No. 60 ¶ 11 (emphasis added). This definition of "cellular data" refers to both the means of transmission of information over a cellular network and the measurement of that use of the cellular network, and thus appears to be identical to "cellular data allowance" alleged in the original complaint.

Plaintiffs nonetheless contend that even though all customers have non-exclusive access to their carriers' cellular network, cellular data is "capable of exclusive possession and control because it represents a unique quantum of energy that, once used, is gone." Dkt. No. 60 ¶ 73. Plaintiffs further assert that because cellular carriers' networks do not have infinite bandwidth, "the energy used to transmit a quantum of information over a cellular network is unique" and "cannot be consumed for transmission of a different byte." *Id.* ¶ 72. Plaintiffs argue that cellular data thus is analogous to the consumption of electricity and cite authority indicating that electricity is considered property under California law. *See id.* ¶¶ 63-76; *see also Terrace Water Co. v. San Antonio Light & Power Co.*, 1 Cal. App. 511, 513 (1905).

The FAC's allegations, however, indicate that a user does not actually possess cellular data until the user sends or receives a transmission of information. *See* Dkt. No. 60 ¶ 70 ("Similarly,



United States District Court
Northern District of California

United States District Court
Northern District of California

when a customer consumes cellular data, the information [sic] the customer deprives others of the ability to consume that exact same cellular data."); ¶ 71 ("One user's use and attribution of cellular data prevents another user (or Google) from using that same cellular data."); ¶ 72 ("Once a network consumes the energy needed to move a particular byte from an Android phone to Google's servers, the same energy cannot be consumed for transmission of a different byte."). Thus, as in the original complaint, the FAC suggests that there is nothing that customers possess that is separate and apart from their use of a particular or unlimited quantum of access to the network, which is measured in these bytes of data—i.e., a right of access that is entirely defined by their respective contracts with their cellular carriers. The FAC's allegations concerning an authentication process using SIM (subscriber identity module) cards and IMEI (international mobile equipment identity) numbers does not change that conclusion. Indeed, the FAC indicates that SIM cards and IMEI numbers are simply a way in which a customer's use of cellular data is measured. *See id.* ¶ 66 ("These unique identifiers allow carriers to precisely meter the amount of cellular data that each wireless device has consumed."). For the reasons discussed in the Court's prior order dismissing plaintiff's conversion claim, the Court again concludes that "the benefits of contractual rights are not personal property capable of conversion." *Monster Energy co. v. Vital Pharm., Inc.*, No. EDCV 18-1882 JGB (SHKx), 2019 WL 2619666, at *13 (C.D. Cal. May 20, 2019) (citing cases); *see also Boon Rawd Trading Int'l Co. Ltd. v. Paleewong Trading Co. Inc.*, 688 F.Supp.2d 940, 955 (N.D. Cal. 2010) (concluding that exclusive importation right "is an intangible *contractual* right protected under contract law, not tort law.").

In any event, the FAC still does not allege facts that any plaintiff suffered any injury. While the FAC alleges that carriers have moved toward providing customers with unlimited data plans, the FAC continues to assert that "[u]sers with limited data plans are typically charged an overage fee if they use more data than they have purchased in a given month" and that users with unlimited data plan may be "throttled" and experience reduced connection speeds and impaired or lost phone functions. *See* Dkt. No. 60 ¶¶ 31, 73. Yet nowhere does the FAC allege that any plaintiff had to pay more money for data or suffered a degradation in service because of Google's alleged passive data transfers. Indeed, at oral argument plaintiffs stated that they could not allege

such facts because they do not know whether they have been negatively affected by Google's alleged conduct. *See* Dkt. No. 73 at 28:24-29:6; *see also* Dkt. No. 60 ¶ 31.

Google's motion to dismiss plaintiffs' conversion claim is granted.

**B. Quantum Meruit**

Plaintiffs maintain that if their cellular data plans provide a right of access to a service, and not property subject to conversion, then Google's alleged passive transfers necessarily must be subject to a claim for quantum meruit. Dkt. No. 60 ¶ 5; *see also* Dkt. No. 67 at 1. The parties disagree whether the quantum meruit claim, as pled in the FAC, is merely derivative of the conversion claim. Google contends that the quantum meruit claim is a common count that falls with plaintiffs' conversion claim. Dkt. No. 65 at 16-18; Dkt. No. 68 at 7-11. Plaintiffs argue that their quantum meruit claim is not pled as a common count. They further contend that the quantum meruit claim is sufficiently pled as a separate and independent claim for relief based on a theory that cellular data represents a right of access to a service. *See* Dkt. No. 67 at 9-15.

Even assuming that the FAC does not plead quantum meruit as a common count that is merely derivative of plaintiffs' conversion claim, the Court agrees that plaintiffs have not sufficiently pled an independent claim for relief.

"Quantum meruit refers to the well-established principle that 'the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered.'" *Huskinson & Brown v. Wolf*, 32 Cal. 4th 453, 458 (2004) (quoting *Long v. Rumsey* (1938) 12 Cal. 2d 334, 342 (1938)). "To recover in quantum meruit, a party need not prove the existence of a contract, but it must show the circumstances were such that the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made." *Id.* (internal quotations and citations omitted).

Noting that quantum meruit is not the same as an implied-in-fact contract, plaintiffs contend that California law does not require plausible allegations of an expectation of payment for services to sustain a claim for quantum meruit. Dkt. No. 67 at 2-4. Quantum meruit, often referred to as quasi-contract, is indeed distinct from a contract implied in fact. "Unlike the 'quasi-contractual' quantum meruit theory which operates *without* an actual agreement of the parties, an

implied-in-fact contract entails an actual contract, but one manifested in conduct rather than expressed in words." *Maglica v. Maglica*, 66 Cal. App. 4th 442, 455 (1998). However, the Court disagrees that a claim for quantum meruit does not require an expectation of compensation. Plaintiffs' argument is based on a mischaracterization of *In re De Laurentiis Entm't Group, Inc.*, 963 F.2d 1269 (9th Cir. 1992). In *De Laurentiis*, the National Broadcasting Co. ("NBC") sought to recover in quantum meruit the reasonable value of advertising, contracted through an intermediary and provided to the De Laurentiis Entertainment Group, for which NBC had not been paid. The Ninth Circuit held that the law does "not require that a plaintiff expect compensation *from the defendant himself* in order to prove a quantum meruit claim." *Id.* at 1273. Drawing a distinction between quantum meruit and implied-in-fact contracts, the Ninth Circuit further explained that "[t]o require a plaintiff seeking quantum meruit recovery to prove that the parties intended that the defendant compensate her *directly* for her services would conflate quantum meruit with implied-in-fact contracts by requiring the plaintiff to prove an implicit agreement to pay for services." *Id.* (emphasis added). "The whole point of quantum meruit recovery is to compensate plaintiffs who have provided a benefit to defendants but who do not have a contract—express or implied—with those defendants." *Id.* To the extent plaintiffs contend that *De Laurentiis* stands for the principle that no expectation of compensation is required *at all*, their arguments are not persuasive. *See Chavez v. City of Hayward*, No. 14-cv-00470-DMR, 2015 WL 3562166 at *6 n.6 (N.D. Cal. June 8, 2015) ("In *De Laurentiis*, the Ninth Circuit held that a plaintiff is not required to 'expect compensation *from the defendant himself* in order to prove a quantum meruit claim' under California law. Instead, a plaintiff may recover under a quantum meruit theory even when he or she expected payment or compensation from a different party, and not from the defendant.") (quoting *De Laurentiis*, 963 F.2d at 1273).

Plaintiffs are not aided by their reliance on *Precision Pay Phones v. Qwest Commc'ns Corp.*, 210 F. Supp. 2d 1106 (N.D. Cal. 2002) or *Jordan v. Wonderful Citrus Packing LLC*, No. 1:18-CV-00401-AWI-SAB, 2018 WL 4350080 (E.D. Cal. Sept. 10, 2018). The circumstances in both cases indicate that there was an expectation of compensation for the services in question. *See Jordan,* 2018 WL 4350080 at *2 (stating that the defendant employer allowed employees to use its

United States District Court
Northern District of California

field workers and farming goods for the employees' personal farms, but required that employees pay the employer for those workers and goods); *Precision Pay Phones*, 210 F. Supp. 2d at 1109 (noting the passage of laws enacted "to ensure that [payphone service providers] would get paid for use of their payphones for 'dial-around' calls to non-contracted [interexchange carriers]" and which required the Federal Communications Commission to establish "'a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone.'") (quoting 47 U.S.C. § 276(b)(1)(A)). Here, plaintiffs do not allege that they expected compensation for services (i.e. passive data transfers) provided to Google or that Google had knowledge of circumstances indicating that plaintiffs did not intend to provide such services without compensation. By contrast, in *Precision Pay Phones* the complaint reflected that the defendant "has acquired benefits conferred by Plaintiff with full knowledge of the circumstances," which included regulations requiring payment and the plaintiff's invoices specifically requesting payment. *See* 210 F. Supp. 2d at 1109-1110, 1112. Similarly, in *Jordan* the employer's allegations detailed not only its expectation of compensation, but also the circumstances showing that the employee knew of his employer's expectation and "deceitfully" took his employer's field labor and farming goods so as to avoid compensating the employer. *See* 2018 WL 4350080 at *2, *4. Plaintiffs argue that they could not be expected to plead an expectation of compensation because they did not know, and could not have known, about Google's passive data transfers. *See* Dkt. No. 73 at 49:13-14. However, this argument is not particularly helpful here where the complaint does not plausibly allege that *anyone* (including Google) had knowledge of circumstances giving rise to an expectation of compensation owed to plaintiffs.

Equally unpersuasive is plaintiffs' contention that an expectation of compensation is an affirmative defense for which Google bears the burden of proof. Indeed, one of plaintiffs' cited cases reaffirms the general principle, stated by the California Supreme Court in *Huskinson*, that to recover in quantum meruit, "a party need not prove the existence of a contract [citations], but it must show the circumstances were such that the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made.'" *Miller v. Campbell,*

*Warburton, Fitzsimmons, Smith, Mendel & Pastore*, 162 Cal. App. 4th 1331, 1344 (2008) (quoting *Huskinson*, 32 Cal. 4th at 458). *Miller* also affirms that "[t]he burden is on the person making the quantum meruit claim to show the value of his or her services and that they were rendered at the request of the person to be charged." *Id.*

Plaintiffs point out that *Miller* further noted that "unless the parties are near relatives, the recipient of the services has the burden to prove the defense that the services were rendered gratuitously or without obligation on his part to pay." *Id.* (citing *Sowash v. Emerson*, 32 Cal. App. 13, 18 (1916)). The Court does not read *Miller* and *Sowash* as establishing a general rule that an expectation of compensation is an affirmative defense to be raised and proved by the defendant. Both *Miller* and *Sowash* concerned disputes over services of a "special" nature, allegedly rendered outside the services for which the parties expressly contracted. *See Miller*, 162 Cal. App. 4th at 1344 (stating, in dispute over legal services rendered to executor of estate allegedly in her individual capacity, that "a defense that the work was performed under a *special contract* is affirmative in character and the recipient the services has the burden of proof") (emphasis added); *Sowash*, 32 Cal. App. at *14 (noting that plaintiff's claims concerned personal care services "of a special character" that allegedly were not part of the parties' contract for room and board). Indeed, *Sowash*, too, affirms that facts should always be pleaded that the services in question were not performed gratuitously. *See Sowash*, 32 Cal. App. at 17 ("*If the pleaded facts show, as should always be shown or pleaded to avoid the implication that the services were to be performed gratuitously*, that there was an agreement by one of the parties to employ the personal services of another, and it is further shown that there was no agreement as to the compensation to be paid for such services, then an implied, and not an express, contract is disclosed, and to recover thereon the plaintiff must count upon a quantum meruit, or sue for the reasonable value of his services, or, as the words describing that common count plainly signify, for whatever his services may reasonably deserve or merit.") (emphasis added). Plaintiffs argue that, at most, they need only show that services were not intended to be gratuitous—a showing that they claim is significantly different from affirmatively proving an expectation of compensation. But plaintiffs merely state two sides of the same requirement: if services are not rendered gratuitously, then compensation is expected.

United States District Court
Northern District of California

*See De Laurentiis*, 963 F.2d at 1273 ("Compensation must be 'expected' only in the sense that the services rendered must not have been intended to be gratuitous.").

Even assuming that the FAC's allegations, viewed most favorably to plaintiffs, gives rise to an inference that plaintiffs did not intend to allow Google to gratuitously use their cellular data, Google maintains that, more fundamentally, plaintiffs' "grievances simply do not fit this framework of quantum meruit." Dkt. No. 68 at 11. Indeed, plaintiffs have not pled facts demonstrating that they provided a service to Google in the sense contemplated by a quantum meruit theory. At oral argument, plaintiffs asserted that "[t]he services rendered are the cellular data," i.e., "[t]he right of access" to cellular networks that plaintiffs say they acquire through their contracts with their cellular carriers. *See* Dkt. No. 73 at 40. Although plaintiffs allege that Android users may "explicitly grant others access to their cellular data by creating a mobile 'hotspot,'" and "can also sell unused cellular data" (Dkt. No. 60 ¶ 34), there is no allegation that plaintiffs provided any such "services" to Google. It is therefore difficult to construe the passive data transfers of which plaintiffs complain as "services rendered by" plaintiffs, as opposed to services rendered by the carriers themselves.

In any event, the fact remains that the FAC does not allege that all plaintiffs, who each have separate data plans with various cellular carriers, were affected alike—or at all. As with the conversion claim, the lack of allegations of injury dooms their claim for quantum meruit. *See generally, e.g., In re Apple Inc. Device Performance Litig.*, — F.4th —, Nos. 21-15758, 21-15761, 21-15762, 21-15763, 2022 WL 4492078, at *7 (9th Cir. Sept. 28, 2022) (observing at class settlement stage that "[i]f a class member did not perceive and could not otherwise detect the throttling, then the class member's inability to make the attestation relinquished a valueless claim."); *Wade v. OnePlus USA Corp.*, No. 21-cv-05811-BLF, 2022 WL 3549590, at *1 (N.D. Cal. Aug. 17, 2022) (dismissing complaint for lack of Article III standing where "the throttling is alleged to affect only certain applications and functions, and therefore it is not clear that each named Plaintiff was affected alike."). *Cf. In re Apple Inc. Device Performance Litig.*, 386 F. Supp. 3d 1155, 1174 (N.D. Cal. 2019) (concluding that plaintiffs had standing to pursue computer intrusion claims, where they alleged that operating system updates affected all plaintiffs alike).

Because the FAC does not allege facts from which it may be inferred that plaintiffs provided services to Google that were not provided gratuitously and for which compensation was expected to be made, the Court finds that plaintiffs fail to state a claim for quantum meruit.

## IV. LEAVE TO AMEND

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend "shall be freely given when justice so requires," because "the court must remain guided by the underlying purpose of Rule 15 . . . to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (alterations and internal quotation marks omitted). "The decision of whether to grant leave to amend nevertheless remains within the discretion of the district court," which may deny leave to amend if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the party seeking amendment has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiffs have already been given leave to amend and have provided no basis for the Court to conclude that there are additional facts that could be alleged on a further amendment that would state a plausible claim for relief. Accordingly, the Court finds that amendment would be futile and therefore dismisses the FAC without leave to amend.

## V. CONCLUSION

Based on the foregoing, the Court grants Google's motion to dismiss the FAC without leave to amend. The Clerk shall enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

Dated: September 30, 2022

Virginia K. DeMarchi
VIRGINIA K. DEMARCHI
United States Magistrate Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Virginia K. DeMarchi, Judge

| | | |
|---|---|---|
| TAYLOR, et al., | ) | No. C 20-07956-VKD |
| Plaintiffs, | ) | |
| vs. | ) | |
| GOOGLE, LLC, | ) | |
| Defendant. | ) | |

San Jose, California
Tuesday, March 29, 2022

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING 10:00 - 11:20 = 80 MINUTES

APPEARANCES:

For Plaintiffs:

Korein Tillery, LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
BY: MARC A. WALLENSTEIN, ESQ.

For Defendant:

Cooley, LLP
3 Embarcadero Center
20th Floor
San Francisco, California 94111
BY: WHITTY SOMVICHIAN, ESQ.

Transcribed by:

Echo Reporting, Inc.
Contracted Court Reporter/ Transcriber
echoreporting@yahoo.com

enrichment. So, based -- just like the pay phone owners had no idea that Quest was causing pay phone users to free ride off of the pay phone owner's pay phones here, Plaintiff in this case had no idea that Google was free riding on their cellular data. The case is on all fours with our case. It resolves any Article 3 standing issues that it may have. And it's important because it's the only case where nobody, not the Defendant, not a third party, had any expectation of payment for the services at issue because Quest had no relationship with the pay phone operator whatsoever, yet there was still a quantum meruit claim.

THE COURT: Okay. So, I -- I am interested in the quantum meruit claim. But, just before we leave the converging claim, I did have one other question, because I --

MR. WALLENSTEIN: Sure.

THE COURT: -- noticed that you added a Plaintiff who has a fixed-price plan or a -- you know, for a certain number of gigabytes and then they have to pay more if they exceed that. But what I didn't see and the opposition didn't really respond on this point is an allegation that any of the Plaintiffs, including that new one, actually suffered an injury because of that arrangement.

So, in other words, did any Plaintiff have to pay more for data or suffer some degradation in service because of

the -- I'm going to call it free riding, the free riding that you allege Google did on the data plan that that subscriber had?

MR. WALLENSTEIN: It's a great question, your Honor. And the answer is we didn't allege it because you don't know. So, when Plaintiff Nelson is her -- Jennifer Nelson is her name. When Plaintiff Nelson uses her cellular phone, she doesn't know what's causing her to exceed the one-gigabyte threshold, just like someone on a unlimited plan doesn't know that they've been throttled. You don't -- if you -- this is an important point, and it's related to the point you made if you'd just -- if you'd let me -- if you'd let me make it, your Honor, even though it's not squarely responsive.

All -- this is something that I know your Honor understands, but I don't know if you fully grasped the import last time around. Unlimited plans are not unlimited. They are 20-gigabyte or 25-gigabyte plans. Once you hit that cap, which is in the fine print, your connection slows down. On some services you can't use video. On others you can. Your service is degraded. That makes each increment of that 20 gigabytes that you've purchased precious to you. And when Google uses any increment of it, it is using -- it is converting your valuable property.

THE COURT: But that -- that actually doesn't make -- like, if I -- if I say I have a not infinite but so big quantum of, you know, available access to the network, 25 gigabytes -- I don't know if that's it, but whatever it is, I'm like never going to get there if I'm a normal subscriber. Then there really isn't an injury is the -- is the Defendant's point. You -- I would expect that any plaintiff would know if it suffered a degradation in service. You could tell if your video got throttled. You could tell if you couldn't actually use video on a particular service. There would be -- you would experience an injury. Otherwise, what's the point of filing a lawsuit.

On the question of do you know if you've exceeded the threshold, if you're someone like Ms. Nelson, because of whatever Google is doing with data transfer, you might not know which actual transmission or reception of information put you over the -- the hump, but you would know based on your information about how much on average is being used by Google independent -- allegedly independent of active use. And you could say in this month or whatever it is, we exceeded the -- she exceeded the threshold by this increment which, look, it matches what we have itemized as the level -- I mean, you gave me all kinds of information about how much Google is taxing the use of -- of the service.

So, you ought to be able to at least say, well, you

know, but for that, she would have been within her threshold, and I don't see those allegations.

MR. WALLENSTEIN: Your Honor, respectfully, I disagree with that as a matter of fact.

THE COURT: And why is -- why is that?

MR. WALLENSTEIN: So, the complaint alleges that Plaintiffs don't know when they're being throttled. That is an allegation in the complaint, and it is actually true. The --

THE COURT: Then why does it matter?

MR. WALLENSTEIN: -- providers -- the providers -- because, so, take for -- take a wage and hour case. If an employer doesn't keep records of time sheets, that doesn't mean you can't recover against them, in the -- in the same way --

THE COURT: But you know if you've worked -- as an employee, you know if you've worked for hours for which you haven't been paid. That's how much cases are litigated. So you should be able to say -- I'm sorry that I find this just kind of remarkable, but you should be able to say as a user, I was trying to watch this video, and it kept, you know, stalling, and I couldn't get it and, you know, my service was degraded.

MR. WALLENSTEIN: Our allegation --

THE COURT: If nothing happens, why do you have an

injury?

MR. WALLENSTEIN: But, so, a typical user may experience a degradation in service not because of throttling, at any point in the month. Sometimes you have bad service. The allegation in the complaint is that users -- and this is true for me personally. I don't know whether I've been throttled or whether I just have bad service in a given month, if it's at the end of the month and I've had a -- you know, maybe a little more usage than normal.

THE COURT: Okay.

MR. WALLENSTEIN: We've alleged in the complaint that the users don't actually know, and they don't. You just use your phone. You don't get a notice. You could -- you could get a notice from Google that you're being throttled, but they don't tell you that. So, users don't know when they've been throttled and when they haven't.

And, to your point about the quantum of data that's used, so Plaintiff Nelson buys by the gigabyte. Our allegation I believe in the complaint is that the log file piece of the case at least is about eight megabytes a day. So, why we think that's very significant and it's a very important injury, relative to the total usage of a user in -- over the course of a month, it's pretty small. So, it's actually impossible to let you know whether that increment is what put you over the top or didn't. If your use in a

particular month was eight megabytes more than a gigabyte, well -- well, those eight megabytes might have been from watching a video. If your usage was nearly two gigabytes, there could be eight megabytes in there that mattered. You just -- you don't know because it's all one pot. It's not divided up.

THE COURT: Right. I guess what I was thinking of -- and possibly this is not the right way to think about it -- is a sort of but-for theory. So, but for Google's activities, you wouldn't have to pay for the extra gigabyte.

MR. WALLENSTEIN: And in -- we submit in some cases that's true, but we don't know which ones they are.

THE COURT: Okay.

MR. WALLENSTEIN: And it's because of the way Google does it. If they told us that you were throttled, we'd know.

THE COURT: Okay. So, let's get to quantum meruit.

MR. WALLENSTEIN: Yes, your Honor. Thank you.

THE COURT: Well, I do -- I -- I take your point about Precision Pay, but it seems to me that the Ninth Circuit case we should be looking at is In Re De Laurentiis (phonetic).

MR. WALLENSTEIN: And Precision Pay quotes and interprets In Re Delaurentiis.

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Tuesday, April 5, 2022

ANN RAVEL (62139)
aravel@mcmanislaw.com
McMANIS FAULKNER
a Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone: (408) 279-8700
Facsimile: (408) 279-3244

GLEN E. SUMMERS (176402)
glen.summers@bartlitbeck.com
KARMA M. GIULIANELLI (184175)
karma.giulanelli@bartlitbeck.com
ALISON G. WHEELER (180748)
alison.wheeler@bartlitbeck.com
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140

GEORGE A. ZELCS
gzelcs@koreintillery.com
MARC A. WALLENSTEIN
mwallenstein@koreintillery.com
RYAN Z. CORTAZAR
rcortazar@koreintillery.com
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

CAROL O'KEEFE (*pro hac vice*)
cokeefe@koreintillery.com
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

*Attorneys for Plaintiffs,*
*Joseph Taylor, Edward Mlakar, Mick Cleary, Eugene Alvis, and Jennifer Nelson*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

JOSEPH TAYLOR, EDWARD MLAKAR, MICK CLEARY, EUGENE ALVIS, and JENNIFER NELSON, individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

GOOGLE LLC,

Defendant.

Case No. 5:20-cv-07956-VKD

**PLAINTIFFS' OPPOSITION TO GOOGLE LLC'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

Date: March 29, 2022
Time: 10:00 a.m.
Judge: Hon. Virginia K. DeMarchi

*particular certificate*, the court found that the plaintiff could exclusively possess the rights to that particular certificate to gain government approval. The same is true here, where Plaintiffs' entitlement to the *particular cellular data that they consume* prevents others from utilizing that same cellular data.

**B. Plaintiffs Exclusively Possess Their Cellular Data**

Plaintiffs meet the second *G.S. Rasmussen* element because cellular data is property capable of exclusive possession and control. The Amended Complaint explains that each byte of cellular data is unique and can be possessed and consumed by only one device at one moment in time, because once the energy necessary to encode and transmit the cellular data is consumed, that quantum of energy is gone forever and cannot be used again. FAC ¶ 71–73. Each transmission can thus "plausibly be said to consume a discrete quantum of [energy] in a manner that makes the specific quantum . . . unavailable to any other customer." ECF No. 51 at 10.

The Amended Complaint alleges that cellular data is attributed to each person once, not shared across users or even across devices. FAC ¶¶ 65–66, 69-70. The FAC further alleges that each quantum of cellular data sent over the network "occupies its portion of network capacity for the length of time that it takes to move the information from one part of the cellular network to another." FAC ¶ 70. So if a user and the user's spouse both watch the same video at the same time on their respective devices using cellular connections, they each consume different, distinct cellular data that occupies distinct portions of network capacity, even if they are on the same cellular data plan. Each device's unique SIM card and IMEI ensure that each byte of cellular data going to and from each of their respective devices is separately captured, tallied, and charged against the consumer's account. FAC ¶¶ 65-66, 69-70.

The FAC also meets the third element of the *G.S. Rasmussen* test by showing that Plaintiffs have legitimate claims to exclusivity. They pay the carriers each month for the cellular data that is used to transmit information to and from their devices. *Id.* ¶¶ 28–34. As part of those contracts, Plaintiffs have the right to ensure that no one else can charge the use of cellular data against their customer accounts with the carriers. *Id.* ¶¶ 34, 67–69. Because this third element focuses on the Plaintiffs' "degree of investment—monetary or otherwise" in the property right

ANN RAVEL (62139)
aravel@mcmanislaw.com
McMANIS FAULKNER
a Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone: (408) 279-8700
Facsimile: (408) 279-3244

GLEN E. SUMMERS (176402)
glen.summers@bartlitbeck.com
KARMA M. GIULIANELLI (184175)
karma.giulanelli@bartlitbeck.com
ALISON G. WHEELER (180748)
alison.wheeler@bartlitbeck.com
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140

GEORGE A. ZELCS
MARC A. WALLENSTEIN
ROBERT E. LITAN
RYAN Z. CORTAZAR
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

MICHAEL E. KLENOV (277028)
CAROL O'KEEFE
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

*Attorneys for Plaintiffs,
Joseph Taylor, Edward Mlakar, Mick
Cleary, Eugene Alvis, and Jennifer Nelson*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| JOSEPH TAYLOR, EDWARD MLAKAR, MICK CLEARY, EUGENE ALVIS, and JENNIFER NELSON individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No.: 5:20-CV-07956-VKD<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1. Defendant Google LLC ("Google") designed the Android operating system to collect vast amounts of information about its users, which Google uses to generate billions of dollars in profit annually by selling targeted digital advertisements and improving products like Google Maps. There are privacy implications for an operating system specifically designed to surveil mobile device users in order to refine Google's targeted advertising business. But there is also an unlawful free-riding problem because Google collects this information by consuming the cellular data that its Android users purchase from their cellular providers every month. Google effectively forces these users to subsidize its surveillance by secretly programming Android devices to constantly transmit user information to Google in real time, thus appropriating the valuable cellular data users have purchased. Google does this, in large measure, for its own financial benefit, and without informing users or seeking their consent.

2. This case involves the application of long-standing common law principles to seek redress for Google's secret appropriation of Android users' cellular data. Pursuing separate claims under both quantum meruit and conversion, Plaintiffs seek to represent a nationwide class of consumers (excluding California residents) who own Android mobile devices that secretly use their costly cellular data to enable Google's surveillance activities.

3. Consumers pay mobile carriers for cellular data, and they consume that data through their mobile devices. Cellular data is property subject to conversion. But even if cellular data were a service rather than property, Google's misappropriation of that service gives rise to a quantum meruit claim—a claim that does not depend on cellular data being property.

4. Cellular data is property subject to conversion because, just like electricity or water, cellular data is capable of exclusive possession. Just like electricity or water passing through a meter attached to a home, every singly byte of cellular data transmitted by a wireless device is metered by the carrier. Just like the use of electricity or water, the amount of data transmitted by a wireless device has ramifications for the consumer, who can be charged for the additional use or suffer restrictions on further use. And just as electricity and water are provided by utilities, it

makes no difference that cellular data is transmitted by a wireless carrier. Just like electricity delivered through a wire into a home is property, and just as the water passing through a pipe into a home is property, so too is the cellular data transported over a wireless carrier's network to and from a user's cellular device.

5. Even if cellular data is not property subject to conversion, and is instead a contractual right of access to a service, it is still a valuable right that Google has misappropriated, and the misappropriation of a service is precisely the sort of wrong that quantum meruit is meant to redress. ***The quantum meruit claim pleaded in this Amended Complaint is not a common count derivative of the conversion claim.*** It is a separate cause of action, with a separate theory of recovery that the consumer class has a right to pursue regardless of whether cellular data is or is not property. The quantum meruit claim does not rise and fall with the conversion claim—quite the opposite. Either cellular data is property subject to conversion, or it is a contractual right of access to a service subject to quantum meruit. It may even be both—but it must at least be one or the other.

6. Much of the information-gathering by Google takes place without any action at all by Android device owners. While Plaintiffs' Android devices are in their purses and pockets, and even while sitting seemingly idle on Plaintiffs' nightstands as they sleep, Google's Android operating system secretly appropriates cellular data paid for by Plaintiffs to perform "passive" information transfers which are not initiated by any action of the user and are performed without their knowledge. The transmission of this data to and from Google is not time-sensitive and could be delayed until Plaintiffs are on a Wi-Fi network, to avoid consuming Plaintiffs' cellular data. However, Google deliberately designed and coded its Android operating system and Google applications to indiscriminately consume Plaintiffs' cellular data and passively transfer information at all hours of the day—even after Plaintiffs move Google apps to the background, close the programs completely, or disable location-sharing.

7. Plaintiffs had no say in Google's continual misappropriation of their cellular data and remain largely powerless to stop it. Google designed its Android operating system and apps

to prevent users from changing the settings to disable these transfers completely or to restrict them to Wi-Fi networks. Because of Google's deliberate design decisions, these passive information transfers using cellular data purchased by Plaintiffs are mandatory and unavoidable burdens shouldered by Android device users for Google's financial benefit.

8. Plaintiffs at no time consented to these transfers, and were given no warning or option to disable them. Google has crafted its various terms of service and policies in ways that purport to create binding contracts with the users of its technologies. But Plaintiffs and other consumers purchased their Android devices with little choice but to accept Google's terms and policies, which are contracts of adhesion. Even if Google's policies and terms of service are valid contracts, they do not alert users that Android devices will needlessly consume their cellular data. While Google informs the users of certain transfers of personal information when they are actively engaged with their devices, its extensive "privacy" policies are silent on mandatory, passive information transfers and the means by which they occur.

9. These information transfers are not mere annoyances—they interfere with Plaintiffs' property interests, depriving them of data for which they, not Google, paid. Each month, mobile device users pay their mobile carriers for cellular data that enable them to transmit and receive information on the carriers' cellular data networks. Whether Plaintiffs pay for a specific number of gigabytes, pay a fixed price per GB, or pay for unlimited access subject to speed restrictions above a certain data usage threshold, the contracts between Plaintiffs and their mobile carriers create for Plaintiffs concrete property interests in their purchased cellular data. When it initiates passive transfers of information utilizing Plaintiffs' cellular allowances, Google wrongfully interferes with Plaintiffs' exclusive possession of this property and commits the longstanding tort of conversion.

10. If cellular data is viewed as a contractual right of access to a service instead of property, then Google has unjustly enriched itself by misappropriating Plaintiffs' right to transmit cellular data over their carriers' networks for its own purposes, without the knowledge or consent of the users whose right of access Google is coopting. If that misappropriation does not state a

claim for conversion, it must state a claim for quantum meruit. That is because the passive transfers of cellular data confer a valuable benefit to Google at Plaintiffs' expense. Google sends and receives information without bearing the cost of transferring that information between consumers and Google. Indeed, the information transmitted through this practice supports the company's product development and lucrative targeted advertising business. In the absence of contractual provisions disclosing and permitting Google to utilize Plaintiffs' cellular data, Google must compensate Plaintiffs for that use.

11. This case is not about privacy. In this Amended Complaint, Plaintiffs do not challenge Google's underlying practice of harvesting personal information about users from their interactions with mobile devices or apps. Rather, Plaintiffs challenge Google's practice of effectively making mobile device users *pay* for the *transfer* of that information from their mobile devices to Google. As used by the carriers, and as used in this Amended Complaint, the term "cellular data" does not describe the underlying personal information that Google secretly causes Android mobile devices to transmit to it; rather, "cellular data" describes the transmission of such information over cellular networks charged against consumers' cellular data plans. To avoid confusion, this Amended Complaint typically refers to cellular data as "data" and the underlying information transferred via the cellular network as "information."

## PARTIES

12. Plaintiff Joseph Taylor, who is a resident and domiciliary of Illinois, bought an Android mobile device that he uses with a monthly unlimited cellular data plan purchased from carrier Metro by T-Mobile. Plaintiff Taylor was injured in fact and has been deprived of his property as a result of Google's unlawful conversion of his cellular data.

13. Plaintiff Edward Mlakar, who is a resident and domiciliary of Illinois, bought an Android mobile device that he uses with a monthly unlimited cellular data plan purchased from carrier Sprint Solutions, Inc. Plaintiff Mlakar was injured in fact and has been deprived of his property as a result of Google's unlawful conversion of his cellular data.

14. Plaintiff Mick Cleary, who is a resident and domiciliary of Wisconsin, bought an Android mobile device that he uses with a monthly unlimited cellular data plan purchased from carrier Verizon. Plaintiff Cleary was injured in fact and has been deprived of his property as a result of Google's unlawful conversion of his cellular data.

15. Plaintiff Eugene Alvis, who is a resident and domiciliary of Iowa, bought Android mobile devices that he has used with a monthly limited cellular data plan purchased from carrier Verizon from 2013 through approximately November 2019 and a monthly unlimited cellular data plan from U.S. Cellular from approximately November 2019 through the present. Plaintiff Alvis changed his Verizon monthly data limit from time to time, and at various times it was 4GB, 6GB, 8GB, 12GB, or 25GB, depending on the plan that he chose. Plaintiff Alvis was also briefly on an unlimited Verizon data plan from July to October 2019. Plaintiff Alvis was injured in fact and has been deprived of his property as a result of Google's unlawful conversion of his cellular data.

16. Plaintiff Jennifer Nelson, who is a resident and domiciliary of Wisconsin, bought an Android mobile device that she uses with a monthly pay-per-GB data plan purchased from carrier Spectrum Mobile. She pays a fixed price for up to 1GB of data per month, and whenever she exceeds 1GB of data usage (which she does from time to time), she pays an additional charge for each additional 1GB of data. Plaintiff Nelson was injured in fact and has been deprived of her property as a result of Google's unlawful conversion of her cellular data.

17. Defendant Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Google created the Android operating system and continues to control all aspects of Android's programming and operation.

## JURISDICTION

18. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), because (1) this action is a "class action," which contains class allegations and expressly seeks certification of a proposed class of individuals; (2) the Class defined below consists of more than one hundred proposed class members; (3) the citizenship of at least one class member is different from Google's

citizenship;[1] and (4) the aggregate amount in controversy of the claims of Plaintiffs and the putative Class exceeds $5,000,000, exclusive of interest and costs.

19. This Court has personal jurisdiction over Google because it maintains its headquarters in California and in this District, and the illegal conduct alleged herein was conceived and implemented in whole or in part within California and this District.

20. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c).

21. Google's terms of service provide that all claims arising out of or relating to Google's products and services will be litigated in federal or state courts in Santa Clara County, California, USA, and that Google consents to personal jurisdiction in those courts.

## I. GOOGLE'S ANDROID SYSTEM IS UBIQUITOUS

22. Google owns and programs the most popular mobile platform in the world: the Android operating system. Android works on a variety of mobile devices, including smartphones and tablets.

23. The Android operating system includes an interface that provides the principal means by which users interact with their devices. The interface allows consumers to access and to use applications and widgets on the devices.

24. In addition to the Android operating system, Plaintiffs' devices come with various Google applications and widgets pre-installed, including the Google search application, Chrome browser, Gmail email application, Google Maps, and YouTube.

---

[1] Because jurisdiction is based on the Class Action Fairness Act, 28 U.S.C. § 1332(d), even though Google LLC is a limited liability company, it is a citizen of the states "where it has its principal place of business and…under whose laws it is organized." 28 U.S.C. § 1332(d)(10). In other words, while in traditional non-class diversity cases the citizenship of a limited liability company would be determined by the citizenship of its members, that principle does not apply to this case. *See, e.g., Erie Ins. Exch. V. Erie Indemn. Co.*, 722 F.3d 154, 161 n.7 (3d Cir. 2013) (explaining that the Class Action Fairness Act "evinces an intent that suits by unincorporated associations be treated like suits by corporations in that the citizenship of the association for diversity purposes is determined by the entity's principal place of business and not by the citizenship of its members").

25. Android has been available on mobile devices since 2008 and has been the most dominant mobile operating system since 2011.[2] It currently has about a 54.4 percent share of the U.S. smartphone market.[3]

26. All or virtually all mobile carriers sell cellular data to customers via cellular data plans that allow Android devices to connect to their cellular networks in order to send and receive internet communications. These mobile carriers sell mobile devices directly to consumers. Among the mobile carriers that sell Android devices for connection to their cellular networks are Verizon, AT&T, Sprint, T-Mobile, and U.S. Cellular.

27. Many of the most popular mobile-device manufacturers sell devices with Android preinstalled as the operating system and often with a suite of Google's mobile apps preinstalled. These manufacturers include Samsung, Motorola, LG, Kyocera, Sonim, Huawei, ZTE, and HTC.

## II. PLAINTIFFS HAVE A PROPERTY INTEREST IN THEIR CELLULAR DATA

28. Plaintiffs purchased mobile devices preloaded with Google's Android operating system and suite of mobile apps and widgets.

29. To use their mobile devices, Plaintiffs contracted with mobile carriers. As part of these contracts, Plaintiffs purchase cellular data from their mobile carriers through cellular data plans that allow Plaintiffs to access the carriers' cellular data networks, thereby providing users with the ability to send and receive information over the internet without a Wi-Fi connection.

30. Though cellular data networks provide a critical resource for mobile devices, they are not necessary for the mobile device to send and receive information through the internet. When users do not wish to use their cellular networks or when they are unable to use them, mobile devices can also transfer and receive information over the internet through Wi-Fi connections. Indeed,

---

[2] Charles Arthur, *The History of Smartphones: Timeline*, GUARDIAN (Jan. 24, 2012), https://www.theguardian.com/technology/2012/jan/24/smartphones-timeline.

[3] *Subscriber Share Held by Smartphone Operating Systems in the United States: 2012 to 2018*, STATISTA, https://www.statista.com/statistics/266572/market-share-held-by-smartphone-platforms-in-the-united-states/.

many cost-conscious users maximize their time on Wi-Fi whenever possible and use their cellular networks only when Wi-Fi connections are unavailable in order to "save" the cellular data available under their monthly carrier plans.

31. Cellular data plans vary by carrier, but they function in essentially the same way. The users pay the carrier a certain price each month, and in exchange, they purchase cellular data, which they can use to send and receive information on their devices through the carrier's cellular network. Some users purchase limited data plans, meaning a fixed amount of cellular data for a fixed price, *e.g.*, 8GB per month. Users with limited data plans are typically charged an overage fee if they use more data than they have purchased in a given month, *e.g.*, if they exceed the 8GB limit. Other users buy cellular data incrementally, on a pay-per-GB basis, meaning that they pay a fixed amount for 1GB of data, and if they use more than 1GB of data that month, they pay another fixed amount for a second GB of data. Users with such "pay-per-GB" plans pay a fixed charge (though not labeled an "overage") for each additional GB of data that they use each month. Still other users have unlimited plans, essentially requirements contracts, which appear to offer unlimited data usage, but in reality are still nearly always subject to quotas on their usage and will have their cellular connection speeds throttled if they exceed such quotas. For example, a typical "unlimited" data plan actually has a data cap of, *e.g.*, 20GB per month. If the user exceeds that data cap, the user is "throttled," which means the speed at which he or she can access the cellular network is greatly reduced. When throttled to reduced speeds, a number of functionalities are typically lost entirely (such as video streaming), and the overall performance of the device is significantly impaired. Users who are throttled typically notice a network slowdown or an inability to use their device, but often do not realize that they have been throttled, and instead attribute the slowdown or lack of access to general network issues.

32. Some users do not have data plans at all—instead, they purchase prepaid SIM cards (or prepaid cellular phones) that have a particular allocation of data associated with the SIM card (or phone) at the time of purchase, *e.g.*, 25GB. When the user purchases that SIM card (or phone),what they are buying is the advertised amount cellular data, *e.g.* 25GB. Once that data is

used up, it is gone. Sometimes the user has the opportunity to purchase additional data at that point, but the original cellular data that the user purchased has been used up.

33. The purchase of data plans from mobile carriers creates a property interest for Plaintiffs in their cellular data. Each megabyte or gigabyte of the cellular data has a fair market value, determined by market forces. By contracting for the purchase of their cellular data, Plaintiffs obtain access to send and receive information on the carriers' networks in the amounts provided by the terms of the contract. This access includes the right to exclude other persons and entities from using Plaintiffs' cellular data. Plaintiffs have the right to determine precisely how to use their cellular data and to grant others access to those allowances through their mobile device activity.

34. For example, Android users may explicitly grant others access to their cellular data by creating a mobile "hotspot," in which the mobile device shares its cellular network connection with other nearby devices so that those devices can access the internet once they are given the hotspot's password. Similarly, "tethering" (either through a USB cable, Wi-Fi sharing or a Bluetooth connection) allows users to connect their mobile device with a computer to share the device's cellular network connection and grant the computer access to their cellular data. Users can also sell unused cellular data. *See, e.g.*, https://www.simplify.network/ (mobile app enabling Android users to sell their excess data via hotspot).

## III. MOBILE DEVICE USERS ONLY CONSENT TO GOOGLE'S USE OF THEIR CELLULAR DATA WHEN THEY ACTIVELY USE GOOGLE'S PRODUCTS

35. Under certain circumstances, mobile device users consent to the use of their cellular data. For example, when users actively engage with applications that require internet access while connected only to their cellular network, they instruct the applications to use some of their cellular data, thus authorizing such use. For example, when a user is in an area without Wi-Fi, opens a browser, and types in a web address, the user consents to use her cellular data to send information to the website's server and to allow the website to send information over the mobile carrier's cellular network to the device. Similarly, when that user opens a video app and requests to view a

video, she consents to allow the app to send a video to her device over her mobile carrier's cellular network and for that usage to count toward her allowance.

36. These active transfers of information that are initiated by the user engaging an application are not at issue in this lawsuit. Plaintiffs do not contest Google's right to use Plaintiffs' cellular data pursuant to their consent when Plaintiffs are actively using Google's various products on their mobile devices.

37. Plaintiffs instead challenge Google's misappropriation of their cellular data, without Plaintiffs' consent, based on "passive transfers," meaning information transfers that occur in the background or that do not result from Plaintiffs' direct engagement with Google products on their devices. These passive transfers, described in more detail below, occur in a variety of ways—including when Google applications are open (though not in active use) and operating in the background, and even when a user has closed out all Google applications on her device and the device is stationary and seemingly dormant. In none of the Google policies discussed below does Google notify users that its operating system, applications, and widgets cause users' mobile devices to indiscriminately consume Plaintiffs' cellular data, even when users are not using an app or widget on their devices.

## IV. GOOGLE'S MISAPPROPRIATION OF PLAINTIFFS' CELLULAR DATA

38. Google designed and implemented its Android operating system and apps to extract and transmit large volumes of information between Plaintiffs' cellular devices and Google using Plaintiffs' cellular data. Google's misappropriation of Plaintiffs' cellular data through passive transfers occurs in the background, does not result from Plaintiffs' direct engagement with Google's apps and properties on their devices, and happens without Plaintiffs' consent.

39. These passive transfers occur in a variety of ways. First, such transfers occur when mobile devices are in a completely idle state, meaning they are stationary, untouched, and with all apps closed. To confirm this, an analysis commissioned by Plaintiffs' counsel tested a new Samsung Galaxy S7 mobile device with the standard default settings accepted and standard pre-loaded set of apps, which was connected to a brand-new Google account and was not connected

to Wi-Fi. The analysis found that when the device was left in an idle state, the device sent and received 8.88 MB per day of data, with 94% of those communications occurring between Google and the device. In all, the device transferred information to and from Google approximately 389 times in 24 hours, for an average of more than 16 times per hour. The frequency of passive information transfers in this experiment was striking given the source: a stationary and untouched Android device, with all apps closed.

40. Many of those communications were comprised of LOG files, which are automatically-produced files that contain a record of certain background information such as the networks that are available, apps that are open, and metrics about the operating system. LOG files are typically not time-sensitive, and transmission of them could easily be delayed until Wi-Fi is available. Google could also program Android to allow users to enable passive transfers only when they are on Wi-Fi connections, but it has chosen not to do so. Instead, Google has chosen to simply take advantage of Plaintiffs' cellular data so that it can get information from Plaintiffs at all hours of the day, no matter where they are or what they are doing.

41. Second, a higher volume of passive transfers occurs when mobile devices are stationary and untouched, but with one or more apps open and unused. Vanderbilt University Professor Douglas C. Schmidt performed a study of Google's data collection efforts in 2018. *See* Ex. 1, Douglas C. Schmidt, *Google Data Collection* (Aug. 15, 2018). He found that both Android and Chrome transmit information to Google "even in the absence of *any* user interaction." *Id.* at 3 (emphasis in original). Professor Schmidt conducted an experiment with an Android device that was outwardly dormant and stationary but with Chrome open and in the background, and he found passive transfers[4] to Google occurred approximately *900 times in 24 hours*, *id.* at 14, for an average of *38 times per hour*.

---

[4] Professor Schmidt consistently defined "passive" information transfers as "information exchanged in the background without any obvious notification to the user," in contrast to "active" transfers, which he defined as "information directly exchanged between the user and a Google product." (*Id.* at 7.)

42. In comparison, a stationary and untouched iPhone device with the Safari browser open in the background communicated virtually no information to Google, and its information transfers to Apple amounted to only about 1/10th of the information transferred to Google from the Android device. *Id.* at 3, 14.




(Ex. 1 at p. 14, Figure 6, Traffic data sent from idle Android and iPhone mobiles.)

43. The Android device passively transferred 4.4 MB of data each day, or around 130MB each month, to Google servers, while the iPhone device transferred around 1/6th that volume of data to Google servers. *Id.* at 14.

44. The contrast between the number of requests made to the two devices, as well as the volume of data transferred from the devices, confirms that Google's products play critical roles in passive information transfers to Google—and that the vast majority or all of these transfers are unnecessary.

45. Third, even more passive transfers occur once users begin moving around with their Android devices, or interacting with them by visiting web pages, or using apps, despite also

eschewing the use of any preloaded Google apps such as Google Search, YouTube, Gmail, or Google Maps. *Id.* at 3, 23. This increased activity was driven by Google's publishing and advertising products including Google Analytics, DoubleClick (now Google Ad Manager), and AdWords (now Google Ads). *Id.* at 3, 15. Passive information transfers represented 46% of requests to Google servers from the device in the Schmidt experiment. *Id.* at 3–4.

46. An iPhone device (again, without the Android operating system or Google's applications) in comparable active use communicated with Apple far less frequently than Android devices communicated with Google's servers. *Id.* at 24. (The two devices did have a comparable number of contacts with Google's advertising domains, as was expected in light of the similar usage on both devices of third party websites and apps which provide information to Google. *Id.*) The iPhone device also transferred a small fraction of information to Apple's servers, compared to the information transferred to Google from the Android device, as shown below. *Id.*




Ex. 1 at p. 24, Figure 12, Information requests from mobile devices during a day of typical use.

47. With active use, the Android device passively transferred to Google servers 11.6 MB of data each day, or around 350MB each month, while the iPhone device transferred around half that amount to Google servers. *Id.* at 24.

48. Google's publishing and advertising products drive passive information transfers from Android devices to Google in a variety of ways. For example, Android devices transmit "tokens" that identify devices and users (and provide other information) with each connection to Google's servers. Google uses this information to determine which users it communicates with on which specific devices and to serve targeted ads. *Id.* at 16–23. These tokens are frequently sent alongside requests to send ads to the device.

49. Google's publishing and advertising products also drive passive information transfers from Google to Android devices. For example, Google tracks and predicts user behavior to pre-load targeted ads containing text, audio, games or other interactives, and even video onto Android devices. Users often never view these pre-loaded ads, even though their cellular data was already consumed to download the ads from Google. And because these pre-loads can count as ad impressions, Google is paid for transmitting the ads.

50. Google instigates these transfers of information by designing and implementing its Android operating system and apps to mandate that transfer, regardless of whether a user has access to a Wi-Fi connection or instead has only her cellular data to transmit information to and from her device.

51. In one of many examples, Google designed Android so that it frequently collects the user's location at times when the user is not actively using the phone, including whenever the user is walking around or driving in a car. This location information is transmitted to Google, often over a cellular network, even though it could just as easily have been transferred over a Wi-Fi network at a later time.

52. Whenever a user uses a third-party application that requests the user's location, such as a weather application, Google gratuitously collects an additional copy (and sometimes multiple copies) of that location information for itself and sends it to Google's servers, often over

a cellular network, expending the user's cellular data, even though the information could just as easily have been sent over a Wi-Fi network. To be clear, this gratuitous transfer to Google consumes a quantum of the user's cellular data <u>on top of and in addition to</u> the quantum of cellular data used by the third-party application. This type of information transfer has nothing to do with the functioning of the third-party application—the user could have successfully used the application without it. And the user never consented to these additional, gratuitous transfers of location information. Google uses that location information, which it collects by utilizing users' cellular data, for its own benefit, including to improve products like Google Maps, traffic, and advertising. In other instances, Google directly monetizes location information by selling it to automotive manufacturers, ride-hailing companies, and through Google's advertising products. Google could just as easily collect the data needed to power or improve its products over Wi-Fi networks, which are both cheaper than cellular and ubiquitous.

## V. MOBILE DEVICE USERS DO NOT CONSENT TO GOOGLE'S USE OF THEIR CELLULAR DATA WHEN THEY ARE NOT USING GOOGLE'S PRODUCTS

53. Users of Android must accept standardized form contracts to use the company's various policies ("Google Agreements"). But none of those agreements discloses that Google appropriates Plaintiffs' cellular data to transmit information when Plaintiffs are not actively using Google's products. Instead, they notify Plaintiffs that they may incur charges to third parties (the wireless carriers) when they *use* Google's products.

54. The Google Agreements include four general policies relevant to this suit: the Terms of Service; the Privacy Policy; the Managed Google Play Agreement; and the Google Play Terms of Service.[5] Google's master policy is its Terms of Service. The Terms of Service themselves incorporate by reference the company's Privacy Policy. In addition, according to the

---

5 These policies are posted online at: https://policies.google.com/terms?hl=en-US (Terms of Service); https://policies.google.com/privacy (Google Privacy Policy); https://www.android.com/enterprise/terms/ (Managed Google Play Agreement); https://play.google.com/about/play-terms/index.html (Google Play Terms of Service).

Managed Google Play Agreement, use of the Android operating system is governed by the Google Play Terms of Service. Nothing in these policies suggests that Google uses Plaintiffs' data to transmit information when Plaintiffs are not actively engaged with Google's products.

55. Specifically, Google's Privacy Policy states, "We collect information about the apps, browsers, and devices you use to access Google services… We collect this information when a Google service on your device contacts our servers—for example, when you install an app from the Play Store or when a service checks for automatic updates. If you're using an Android device with Google apps, your device periodically contacts Google servers to provide information about your device and connection to our services."[6]

56. The Google Play Terms of Service is the only policy that even mentions cellular data usage. It applies to the company's Google Play online store, where users can download software applications for their mobile devices. The policy has a disclaimer targeted specifically at Google Play's usage of cellular data. The disclaimer, however, applies only to active usage in connection with the use of Google Play and apps available through Google Play. The Play terms provide: "You are responsible for any access or data fees incurred from third parties (such as your Internet provider or mobile carrier) in connection with *your use and viewing* of Content and Google Play"[7] (emphasis added). The disclaimer is silent on Google's misappropriation of cellular data when users are not "using and viewing" Google's products.

57. The Google Agreements also include Google policies that apply specifically to individual mobile apps. None of those policies disclose Google's passive data usage. For example, the Google Maps terms provide that "[c]ontent you upload, submit, store, send, or receive through Google Maps/Google Earth is subject to Google's Terms of Service."[8] The policy is silent about

---

[6] Google Privacy Policy, https://policies.google.com/privacy.

[7] Google Play Terms of Service, https://play.google.com/about/play-terms/index.html.

[8] Google Maps/Google Earth Additional Terms of Service, https://www.google.com/help/terms_maps/.

how that information is sent and does not provide Google with the authority to use Plaintiffs' cellular data for passive information transfers.

58. The same is true of the Google Chrome browser policy. Despite the policy's specificity, it still does not obtain users' consent to Google accessing users' cellular data for passive information transfers. Instead, the Google Chrome policy merely discloses that Chrome unilaterally transmits various types of information to Google. For example, the policy states that Chrome "periodically sends information to Google to check for updates, get connectivity status, validate the current time, and estimate the number of active users." It further states that "information that Chrome stores [locally on your device] won't be sent to Google unless you choose to store that data in your Google Account." The policy also provides that "[s]ites and Android apps can also ask the browser to preload the pages you might visit next" when using Chrome and that "[p]reloading requests from Android apps are controlled by the same setting as Chrome-initiated predictions." Moreover, "on mobile devices, Chrome automatically shares your location with your default search engine if the Chrome app has permission to access your location and you haven't blocked geolocation for the associated website." Finally, the policy states that "usage statistics and crash reports are sent to Google to help us improve our products."[9] But again, no language in the policy discloses that Google accesses users' cellular data to initiate passive information transfers.

## VI. GOOGLE HAS CONCEALED ITS MISAPPROPRIATION OF PLAINTIFFS' CELLULAR DATA

59. Upon information and belief, Google's misappropriation of cellular data began with the very first sale of the Android operating system. And from that time on, Google has actively and fraudulently concealed its misappropriation of Plaintiffs' cellular data.

60. Instead of notifying Plaintiffs and obtaining their consent to its usage of their cellular data, Google has misled Plaintiffs by informing them that they are responsible for access

[9] Google Chrome Privacy Notice, https://www.google.com/chrome/privacy/.

or data fees incurred from third parties (such as the mobile carriers) "in connection with *your use and viewing* of Content and Google Play"[10] (emphasis added). This provision misrepresents the true nature of Google's cellular data consumption because this purported disclosure suppresses the material fact that access or data fees may be incurred *even when users are neither using nor viewing Content or Google Play.*

61. Google has also misled users through its location history settings. While Google allowed users to turn off the "location history" and "web and app activity" settings to prevent Google from tracking users' locations, disabling these settings did not prevent Google from collecting this information passively. This practice remained hidden from users until an August 13, 2018 report from the Associated Press.[11]

62. Google's fraudulent concealment tolls the statute of limitations—Plaintiffs are entitled to recover from Google the value of their misappropriated data from the beginning of Google's scheme to use Plaintiffs' data without their consent or even knowledge.

## VII. USERS EXCLUSIVELY POSSESS AND CONTROL THEIR CELLULAR DATA

63. California law defines property as anything that is subject to ownership, and recognizes that there may be ownership of all inanimate things which are capable of appropriation or of manual delivery, or of exclusive possession and control. Electricity is considered property under California law, and cellular data is analogous to electricity.

64. Cellular data, like electricity, is metered and attributed to a particular user. Like a pipeline that serves as a conduit for the gas or oil moving through it, and the electric grid through which electricity is transmitted, the cellular network is a conduit for cellular data, which consists

---

10 Google Play Terms of Service, https://play.google.com/about/play-terms/index.html.

11 Google Records Your Location Even When You Tell It Not To, The Guardian (Aug. 13, 2018) *available at* https://www.theguardian.com/technology/2018/aug/13/google-location-tracking-android-iphone-mobile (last visited December 10, 2021).

of measured units—existing in the physical world—that are transferred over the network. That makes each unit of cellular data unique and capable of exclusive possession and control.

65. Plaintiffs possess and control their cellular data. When a mobile device connects to the cellular network, it must be properly authenticated before any transfer actually takes place. The authentication process uses unique information stored on the SIM card, in tandem with a unique identifier assigned to each physical cellular device called an International Mobile Equipment Identity (IMEI) number, and other associated identifiers, to authenticate the user. Through this authentication process, the carrier uses unique identifiers to track and tally all consumption of cellular data as information is transmitted to or from a mobile device, so that all cellular data consumption can be attributed to (and charged to) a particular user.

66. These unique identifiers allow carriers to precisely meter the amount of cellular data that each wireless device has consumed. Much as an electrical utility uses an electricity meter to measures every kilowatt-hour of electricity consumed by a customer, a cellular carrier uses SIM cards, IMEI numbers, and related identifiers to measure every unit of cellular data as it is consumed by a particular wireless device.

67. Consumers reasonably expect that others will not be able to hijack their valuable cellular data. Just as consumers expect that others will not tap into their electrical, gas or water lines, consumers also reasonably expect that third parties will not misappropriate their cellular data.

68. Consider, again, electricity. After electricity is generated at a power plant, it moves over power lines through a meter and into a customer's home, where the customer uses the electricity to power myriad devices, systems, and appliances. Once the electricity passes through the meter, it is associated with the customer, and the customer owns it. If a neighbor taps into the customer's power line without the customer's knowledge or consent, and uses electricity that has already passed through that customer's meter, then the neighbor has converted the customer's electricity. It is irrelevant that the customer may not have experienced any interruption in electrical

service, or any less ability to power the customer's home, because the meter shows that the customer has consumed the electricity, when in reality it was the neighbor who consumed it.

69. In cellular networks, carriers meter the cellular data consumed by every single transmission to or from a wireless device. Cellular data used to transmit information from the device to Google's servers is metered by the carrier using the identifying information stored in the SIM card and on the device itself, which allows the carrier to associate that particular consumption of cellular data with a particular user, rendering it possessed by that user. The cellular provider measures that cellular data consumption in bytes. Because those bytes of cellular data are identifiable, uniquely attributable, owned by that user, and controllable by that user, they are capable of exclusive possession and control. When Google hijacks a consumer's cellular data in order to transmit information from the user's device to Google's servers, that cellular data is metered (allocated to the user) and treated by the carrier as data that the customer has consumed. It is irrelevant that the user may not have experienced any interruption in cellular data service, or any less ability to utilize the user's mobile device, because the meter shows that the user has consumed the cellular data, when in reality it was Google who consumed it.

70. When a customer consumes electricity, gas, or water from a utility network, the customer deprives other customers of the ability to consume that exact same electricity, gas, or water. Even though *access* to the utility network may be unlimited and non-exclusive, *consumption* of the commodity provided by the utility network is exclusive. That is why the commodities provided by public utilities—electricity, gas, and water—are property, rather than merely access to a service. Similarly, when a customer consumes cellular data, the information the customer deprives others of the ability to consume that exact same cellular data. Even though all customers have non-exclusive access to the cellular network, the consumption of cellular data, through the transmission of the underlying information over the network, is exclusive. If the customer sends a particular piece of information over a cellular network, that information occupies its portion of network capacity for the length of time that it takes to move the information from one part of the cellular network to another. Otherwise, cellular networks would be limitless, which

is not the case. Cellular networks have finite capacity, and transmitting information over cellular networks occupies that network capacity exclusively, such that other information cannot occupy that same network capacity.

71. Moreover, because consumption of cellular data in order to transfer information over the network requires the expenditure of energy, that possession and control is exclusive. One user's use and attribution of cellular data prevents another user (or Google) from using that same cellular data.

72. Networks operated by cellular carriers utilize electricity to transmit information from mobile devices to servers, computers or other networks elsewhere on the internet. Each byte of cellular data transmitted over a cellular network is unique. This is because the energy used to transmit a quantum of information over a cellular network is unique. Once a network consumes the energy needed to move a particular byte from an Android phone to Google's servers, the same energy cannot be consumed for transmission of a different byte. Like all commercial products, cellular data (and its corresponding value) internalizes all of the costs incurred in its production including the energy expended in the transmission, network maintenance, and overhead. In this way, cellular carriers are like electrical utilities who internalize in the price of a kilowatt-hour the energy expended, grid maintenance, and overhead.

73. The type of cellular plan offered by the carrier does not change the nature of the thing sold, it merely changes the pricing. Originally, cellular data was commonly sold by the gigabyte, and consumers were charged a fee when they consumed excess amounts. As cellular data capacity and usage has increased, the industry has largely moved towards providing consumers with requirements contracts, *i.e.* unlimited plans where the consumer pays a fee to consume as much cellular data as desired over a discrete time period. However, the terms of the transaction of sale do not dictate whether or not the product sold is property. The sale of limited or unlimited data is a matter of business discretion. The sale of a prepaid SIM card or prepaid cellphone, too, is a matter of business discretion. A power company may choose to sell energy to an industrial customer through a requirements contract rather than a fixed amount of kilowatt-hours over a given

period of time for a fixed price, but that does not change the underlying nature of the electricity as capable of exclusive possession and control, should an evil neighbor siphon off the customer's electricity. The same is true here, where customers' requirements contracts for unlimited cellular data from their carriers do not change the essential nature of the purchased product, which is capable of exclusive possession and control because it represents a unique quantum of energy that, once used, is gone.

74. Users who purchase cellular data through limited or pay-per-GB data plans possess the same property interest in their cellular data as users who have unlimited data plans, but the fact that they have bought and paid for a particular amount of data for a particular price makes their property interest easier to discern. A user who purchases 8GB of data per month for a fixed price owns that 8GB of data, and the value of each incremental unit of data is reflected by the price paid divided by the quantity purchased. When Google uses part of that 8GB through the passive information transfers described above, Google has stolen that amount of cellular data from the user, and prevented the user from using that amount of cellular data. The value of the stolen data is simply a function of the unit price of the data times the amount of data that Google stole.

75. A user on a pay-per-GB data plan has even more clearly purchased each GB of cellular data, because such a user pays a fixed charge for each additional GB of data used each month. When Google converts some of that user's cellular data through passive information transfers about which the user is unaware and to which the user has not consented, Google is quite literally taking dollars out of the user's pocket, because each additional GB of data costs an additional fixed amount of money.

76. A user, who purchases a prepaid SIM card or prepaid cellphone that has a fixed amount of data associated with it, *e.g.*, 25GB, has paid a fixed price for a particular amount of data. When Google uses some of that 25GB of cellular data for its own purposes, without the user's knowledge or consent, Google has stolen that amount of cellular data from the user, and owes the user the value of the stolen data.

## VIII. PASSIVE TRANSFERS OF CELLULAR DATA CONFER A VALUABLE BENEFIT ON GOOGLE

77. If users' cellular data is not recognized as a convertible property interest under California law, then it must be a service that is subject to a quantum meruit claim for misappropriation. A contractual right to a service has value that, if unlawfully appropriated, supports a claim for quantum meruit, regardless of the viability or non-viability of a parallel conversion claim. In California, the measure of damages in quantum meruit is the market value of the services. Cellular data is either property that is subject to a conversion claim, or it is a contractual right of access to a service that is subject to a quantum merit claim.

78. Plaintiffs bought and paid for the right to access their cellular providers' cellular networks. The three Plaintiffs on unlimited data plans bought a requirements contract—the right to all the cellular data that they require in a given month. The two Plaintiffs on limited or pay-per-GB data plans bought the right to use a particular amount of cellular data each month for a particular price. Either way, Google has unlawfully appropriated those contractual rights by utilizing Plaintiffs' right of access to their carriers cellular networks for Google's own purposes, without Plaintiffs' knowledge or consent.

79. When Google executes passive information transfers as described above, it commandeers the users' phones, forcing their carriers to log cellular data usage as if it has been consumed by the users themselves, even though it has not. When these transfers occur over cellular networks, Plaintiffs unwittingly perform a valuable service for Google, because they ultimately foot the bill for these transfers of information to and from Google.

80. Users with unlimited cellular data plans may not pay an additional cost, but the amount of data used by Google is falsely attributed to the user, rather than to Google. Users with limited or pay-per-GB plans necessarily lose the ability to exercise their right to access the cellular network by the exact amount of data that Google has used for its own purposes. For example, a user with an 8GB limited data plan expects to be able to use 8GB worth of data each month in exchange for the monthly fee they pay to their cellular carrier. But because Google causes passive

transfers of cellular data, and those passive transfers count towards the 8GB limit, the user has less data available to use for his or her own purposes that month. That confers a benefit to Google. If that benefit is viewed as a contractual right to a service rather than property, then Google has unjustly enriched itself at the user's expense and owes the user the market value of the service that it misappropriated. That is the essence of quantum meruit: damages for unpaid services determined by the market rate.

81. The case of a pay-per-GB user is even more clear. Consider a user, like Plaintiff Nelson, who purchases 1GB of data each month for a fixed rate. In her case, that rate is currently $14 per month. Google's passive information transfers—about which she is unaware and to which she has not consented—eat up some portion of that 1GB of data each month. In months where her data usage exceeds 1GB, in part because of Google's passive information transfers, her plan charges her an additional $14 for an additional 1GB of data, for a total of 2GB of data in exchange for $28. In months where her data usage exceeds 2GB, her plan charges her an additional $14 for an additional 1GB of data, for a total of 3GB of data in exchange for $42. If Google stole all or part of one of those GB of data from her, Google owes her $14 (or whatever part of $14 corresponds to the amount of data Google stole).

82. By commandeering users' right to utilize their cellular carriers' cellular networks as they see fit, Google avoids any cost for accessing these cellular networks. Instead, Google feeds on the users' accounts. This avoidance of transfer costs is a direct benefit to Google. As aggregated across its millions of Android users, Google has forced Plaintiffs to give it a free ride on wireless networks using Plaintiffs' accounts. Without this free ride, Google would have to bargain with the users to pay its fair share. And part of the costs internalized in the price of cellular data sold to customers is the volume and/or traffic of information on the cellular networks. Even if users do not pay an overage fee, Google's passive transfers are costs that are internalized by the carrier and ultimately passed on to customers.

83. Google ultimately exploits users' information for its own direct and significant benefit. Google takes the information that it receives through the passive information transfers

described above and uses it to improve the quality of its products, such as Google Maps, and to improve the quality of targeted advertising services that it sells to online advertisers and publishers, and from which it reaps immense profits. Consistent with the Court's order dismissing the prior version of this Complaint, Plaintiffs no longer seek recovery of the value of the underlying information to Google. But Plaintiffs do seek recovery of the market value of their cellular data, which if viewed as a right of access to a service, is their entitlement to use cellular networks, which they purchased from cellular carriers, and which Google has misappropriated for itself. Plaintiffs seek recovery of the market value of the amount of cellular data that Google used without users' knowledge or consent.

## CLASS ALLEGATIONS

84. Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a), and 23(b)(1), 23(b)(2), 23(b)(3), and/or 23(c)(4) on behalf of the following proposed class:

> All natural persons in the United States (excluding citizens of the State of California) who have used mobile devices running the Android operating system to access the internet through cellular data networks operated by mobile carriers.[12]

85. The Class excludes (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; and (b) any judges or justices involved in this action and any members of their immediate families or their staff.

86. Numerosity. Plaintiffs do not currently know the exact number of persons in the Class, but they number in the millions and are geographically dispersed throughout the United States. Joinder of all Class members before this Court would be impracticable. The names, contact information, and other unique identifiers of the members of the Class are readily obtainable from

12 Plaintiffs reserve the right to modify this class definition before moving for class certification, whether based on information gleaned in discovery, or otherwise.

Google, which requires users to log in to their Google accounts to download apps from the Google Play store and sets up profiles for users of Android phones who do not have Google accounts. This information about class members is also obtainable from nonparty mobile carriers, which maintain lists of customers who have mobile devices with Android technology.

87. Typicality. Plaintiffs' claims are typical of and fairly encompass the claims of the Class members. Plaintiffs are members of the Class. Plaintiffs have used Android devices to access the internet using their carriers' cellular networks during the Class Period, including the past three years. The members of the Class are similarly harmed by Google's conversion of their cellular data and / or unjust enrichment of itself through misappropriating their right to access their carriers' cellular networks.

88. Adequacy. Plaintiffs and their counsel will fairly, adequately, and vigorously protect the interests of the members of the Class. There are no material conflicts between the claims of Plaintiffs and the members of the Class making class certification inappropriate. Counsel for the Class will vigorously assert Plaintiffs' claims and those of the members of the Class. Plaintiffs are represented by Counsel who are competent and experienced in the prosecution of consumer class action litigation.

89. Superiority. A class action is superior to all other available means for the fair and efficient adjudication of the claims of the members of the Class. The damages suffered by some individual members of the Class may be relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation required to recover from Google. It would be virtually impossible or impractical for most, if not all, Class members to redress the wrongs done to them on an individual basis. Furthermore, individual litigation would be unmanageable for the Court system as it would result in thousands or millions of individual lawsuits creating the risk of inconsistent or contradictory judgments and increasing the delay and expense to all parties and the court system. In contrast, a class action would present far fewer management difficulties. Class action treatment provides the benefits of a single adjudication, economies of scale, and supervision by a single court.

90. Existence and Predominance of Common Questions of Law and Fact. Numerous questions of law and/or fact are common to Plaintiffs and all members of the Class. These common questions derive common answers for all Class members that impact the resolution of the claims on grounds equally applicable to all Class members. The common questions of law and fact for the Class include, but are not limited to:

a. Whether Google misappropriates the cellular data of Android mobile-device users to conduct passive information transfers, which occur in the background and do not result from Plaintiffs' direct engagement with their mobile devices or applications;

b. Whether the cellular data that Plaintiffs purchase are property interests recognized by California conversion law, which governs Plaintiffs' conversion claim under the choice-of-law provision contained in the terms and conditions governing Plaintiffs' use of the Android operating system;

c. Whether the cellular data that Plaintiffs purchase is a contractual right to use the cellular networks owned and operated by Plaintiffs' cellular carriers recognized by California quantum meruit law, which governs Plaintiffs' quantum meruit claim under the choice-of-law provision contained in the terms and conditions governing Plaintiffs' use of the Android operating system;

d. Whether Plaintiffs consent to allow Google limited use of their cellular data through contractual terms in Google's policies;

e. Whether Google's passive transmission of information and use of Plaintiffs' cellular data exceeded the scope of any limited consent to allow Google access to the cellular data;

f. Whether Plaintiffs are entitled to recover damages for Google's conversion of their cellular data under California law;

g. Whether Plaintiffs are entitled to recover damages through quantum meruit for Google's unjust enrichment through misappropriation of their right to access their carriers' cellular networks under California law;

h. Whether the passive information transfers provided Google with a valuable benefit at Plaintiffs' expense;

i. The value of data converted by Google and the benefit conferred on Google at Plaintiffs' expense;

j. The amount of damages due to individual class members, which is readily ascertainable through economic analysis of the fair market value of cellular data based on market transactions; and

k. Whether Google fraudulently concealed its scheme to misappropriate Plaintiffs' contracted for and purchased cellular data.

91. Certification is also appropriate under Fed. R. Civ. P. 23(b)(1) and/or (b)(2) because:

a. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Google.

b. The prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c. Google has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the entire Class.

## COUNTS AND REQUESTED RELIEF

## COUNT ONE: QUANTUM MERUIT

92. Plaintiffs re-allege and incorporate by reference each of the allegations set forth above.

93. Google used valuable cellular data services that Plaintiffs purchased in order to send information between Plaintiffs' devices and Google.

94. Google has used Plaintiffs' cellular data to collect and transmit information through passive transfers to develop and support its advertising business and other ventures.

95. The cellular data services usurped through the passive transfers conferred on Google a valuable benefit to its business.

96. The use of Plaintiffs' cellular data was at the expense of Plaintiffs, who paid for the cellular data that Google used to send and receive information between its servers and Plaintiffs' Android devices through passive transfers.

97. Plaintiffs did not consent to these passive transfers using Plaintiffs' cellular data. No contract between Plaintiffs and Google authorized information transfers that benefited Google.

98. Plaintiffs suffered injury and damages when their cellular data were used to transfer to Google information that benefited Google.

99. Plaintiffs are entitled to recover the reasonable value of the cellular data usurped by Google to transfer information that benefited Google.

**COUNT TWO: CONVERSION**

100. Plaintiffs re-allege and incorporate by reference each of the allegations set forth above.

101. Plaintiffs have property interests in the cellular data that they purchase from their mobile carriers.

102. Plaintiffs at no time consented to Google appropriating their cellular data to transfer information between Plaintiffs' Android devices and Google when Plaintiffs were not actively using their mobile devices.

103. Google wrongfully disposed of Plaintiffs' property by causing information to be transferred between Plaintiffs' Android devices and Google using Plaintiffs' cellular data without Plaintiffs' consent. Google initiated these passive transfers when Plaintiffs were not directly engaged with Google products on their devices.

104. As a result of Google's conversion, Plaintiffs have suffered injury and damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment against Google as follows:

105. Determining that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23 and directing that reasonable notice of this action be provided to the Class pursuant to Rule 23(c)(2).

106. That the Court adjudge and decree that Google has converted Plaintiffs' property in the form of their cellular data.

107. That the Court award Plaintiffs and the Class:

A. The fair market value of the cellular data converted by Google;

B. The reasonable value of the cellular data misappropriated and used by Google for its own benefit;

C. Pre- and post-judgment interest on their damages;

D. Injunctive relief directing Google to stop using cellular data purchased by consumers without their consent;

E. The costs of this action and reasonable attorneys' fees; and

F. Such other and further relief as the Court deems just and proper.

///

///

///

///

///

///

///

///

///

///

**DEMAND FOR A JURY TRIAL**

In accordance with Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: December 13, 2021

Respectfully submitted,

/s/ *Ann Ravel*

Ann Ravel
McMANIS FAULKNER
a Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone: (408) 279-8700
Facsimile: (408) 279-3244

Glen E. Summers (176402)
Karma M. Giulianelli (184175)
Alison G. Wheeler (180748)
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140

George A. Zelcs (*pro hac vice*))
Marc A. Wallenstein (*pro hac vice*)
Robert E. Litan (*pro hac vice*)
Ryan Z. Cortazar (*pro hac vice*)
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

Michael Klenov
Carol O'Keefe (*pro hac vice*)
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

*Attorneys for Plaintiffs*
Joseph Taylor, Edward Mlakar, Mick Cleary, Eugene Alvis, and Jennifer Nelson

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JOSEPH TAYLOR, et al.,<br>Plaintiffs,<br>v.<br>GOOGLE LLC,<br>Defendant. | Case No. 20-cv-07956-VKD<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS COMPLAINT**<br><br>Re: Dkt. No. 33 |

Plaintiffs sue Google LLC ("Google"), individually and on behalf of a putative class of Android mobile device owners, for conversion and quantum meruit based on alleged "passive" data transfers performed by Google over its Android operating system without consent. Google moves pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint. Plaintiffs oppose the motion. Upon consideration of the moving and responding papers, as well as the oral arguments presented, the Court grants Google's motion to dismiss with leave to amend as discussed below[1]

## I. BACKGROUND

According to the complaint's allegations, plaintiffs Joseph Taylor, Edward Mlakar, Mick Cleary, and Eugene Alvis are non-California residents[2] who own Android mobile devices that they use with a monthly cellular data plan purchased from various service providers, including T-

[1] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 16, 23.

[2] The complaint states that Messrs. Taylor and Mlakar are residents and domiciliaries of Illinois, Mr. Cleary is a resident and domiciliary of Wisconsin, and Mr. Alvis is a resident and domiciliary of Iowa. Dkt. No. 1 ¶¶ 8-11.

Mobile, Verizon and U.S. Cellular. Dkt. No. 1 ¶¶ 8-11. Messrs. Taylor, Mlakar, and Cleary each have unlimited data plans. Mr. Alvis has a limited data plan he purchased from one service provider, as well as an unlimited data plan he purchased from another service provider. *Id.*

Plaintiffs allege that Google "designed the Android operating system to collect vast amounts of information about users, which Google uses to generate billions in profit annually by selling targeted digital advertisements." *Id.* ¶ 1. Much of this information-gathering activity, say plaintiffs, takes place "secretly," is "not initiated by any action of the user" and is "performed without their knowledge," including at times when their devices are seemingly idle. *Id.* ¶¶ 3, 33. Indeed, according to the complaint, "Google deliberately designed and coded its Android operating system and Google applications to indiscriminately take advantage of Plaintiffs' data allowances and passively transfer information at all hours of the day—even after Plaintiffs move Google apps to the background, close the programs completely, or disable location-sharing." *Id.* ¶ 3. In performing these so-called "passive" data transfers, plaintiffs allege that Google "secret[ly] appropriate[es] . . . Android users' cellular data allowances," even though the transfers are "not time-sensitive and could be delayed until Plaintiffs are in Wi-Fi range to avoid consuming Plaintiffs' cellular data allowances." *Id.* ¶¶ 2, 3. Plaintiffs further allege that they never consented to these data transfers, and that Google's various policies and terms of service are contracts of adhesion that do not in any way provide users with notice of these passive data transfers. Instead, say plaintiffs, mobile device users only consent to Google's use of their cellular data when they are actively using Google's products. *Id.* ¶¶ 4, 5, 29-31, 45-50.

Claiming that they have property interests in their cellular data allowances, plaintiffs contend that the alleged passive data transfers "depriv[e] them of data for which they, not Google, paid" and benefit "[Google]'s product development and lucrative targeted advertising business" at plaintiffs' expense. *Id.* ¶¶ 6, 7. As noted above, plaintiffs assert claims for conversion and quantum meruit for themselves and on behalf of a proposed class of "[a]ll natural persons in the United States (excluding citizens of the State of California) who have used mobile devices running the Android operating system to access the internet through cellular data plans provided by mobile

carriers." *Id.* ¶ 54.[3] The complaint asserts jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), on the grounds that the amount in controversy exceeds $5 million, exclusive of interest and costs, there are 100 or more class members, and the parties are minimally diverse. *Id.* ¶ 13. Plaintiffs seek an injunction "directing Google to stop using cellular data purchased by consumers without their consent," as well the "fair market value of the cellular data converted by Google," the "reasonable value of the cellular data used by Google to extract and deliver information that benefited Google," and fees and costs. *Id.* ¶ 78.

Google moves to dismiss the complaint pursuant to Rule 12(b)(1), arguing that plaintiffs lack standing to pursue their claims because they have not alleged facts indicating that they have suffered any injury. Even if plaintiffs have standing, Google moves to dismiss pursuant to Rule 12(b)(6), arguing that (1) plaintiffs' conversion claim fails because the complaint does not allege a cognizable property interest, interference, or damages and because plaintiffs consented to the alleged data use and (2) plaintiffs' quantum meruit claim fails because it is merely derivative of plaintiffs' conversion claim. For the reasons discussed below, the Court grants Google's motion to dismiss with leave to amend as specified below.[4]

## II. DISCUSSION

### A. Rule 12(b)(1) Motion to Dismiss

Google argues that plaintiffs lack standing to bring their claims because they have not alleged an injury-in-fact. Standing is a jurisdictional issue properly addressed under a Rule 12(b)(1) motion. *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004). A Rule 12(b)(1) motion to dismiss challenges a federal court's jurisdiction over the subject matter of a plaintiff's complaint. A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the

[3] The proposed class excludes Google, "its officers, directors, management, employees, subsidiaries, and affiliates" and "any judges or justices involved in this action and any members of their immediate families or their staff." *Id.* ¶ 55.

[4] In resolving the present motion, the Court finds it unnecessary to consider the various terms and policies Google submitted and the Form 10-K, and website materials submitted by plaintiffs (Dkt. No. 39-1, Exs. 3-5). The parties' respective motions for judicial notice of those materials (Dkt. Nos., 33-7, 39-2) are denied as moot.

pleadings (a "facial attack") or by presenting extrinsic evidence (a "factual attack"). *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

Because Google's arguments focus on the sufficiency of the complaint's allegations, the Court construes the present motion as a facial attack on plaintiffs' standing. As such, the record is limited to the complaint and materials that may be judicially noticed. *See Hyatt v. Yee*, 871 F.3d 1067, 1071 n.15 (9th Cir. 2017). Additionally, the Court must accept well-pled allegations of the complaint as true, draw all reasonable inferences in plaintiffs' favor, and determine whether their allegations are sufficient to support standing. *See id.* As the parties asserting federal subject matter jurisdiction, plaintiffs bear the burden of establishing its existence. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

Under Article III of the Constitution, federal courts have jurisdiction to decide only actual "Cases" or "Controversies," U.S. Const., art. III, § 2, and plaintiffs have standing to sue if they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs' claimed injury must be both "particularized" and "concrete." A "particularized" injury is one that "'affect[s] the plaintiff in a personal and individual way.'" *Spokeo, Inc.*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560 n.1). A "concrete" injury is not limited to one that is tangible. *Id.* at 1549. "Various intangible harms can also be concrete," and "[c]hief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," such as "reputational harms, disclosure of private information and intrusion upon seclusion." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). Nevertheless, a "concrete" injury "must actually exist" and must be "real, and not

United States District Court
Northern District of California

abstract." *Spokeo, Inc.*, 136 S. Ct. at 1548.

"The Art[icle] III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally," and "[a] federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered some threatened or actual injury resulting from the putatively illegal action." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (internal quotations and citation omitted). Thus, in the class action context, plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other unidentified members of the class to which they belong and which they purport to represent." *Id.* at 502.

Google argues that the complaint merely speculates about harms that other Android device users may have experienced, and fails to allege facts demonstrating that the plaintiffs themselves have suffered any injury. For example, Google points out that while the complaint alleges that individuals with limited data plans typically are charged an overage fee if they exceed their data allowances, Mr. Alvis (the only plaintiff with a limited data plan) does not allege that he was ever charged such fees. *See* Dkt. No. 33 at 7; *see also* Dkt. No. 1 ¶¶ 11, 26. Similarly, Google notes that the complaint alleges that individuals with unlimited data plans are "typically subject to quotas on their usage and will have their cellular connection speeds throttled if they exceed such quotas," resulting in lost functionalities, such as video streamlining, or in significantly impaired device performance. *See* Dkt. No. 33 at 7; *see also* Dkt. No. 1 ¶¶ 8-11, 26. However, no plaintiff alleges that his unlimited data plan was subject to such quotas or that his connection speed was ever throttled.

Citing *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020), plaintiffs argue that their "interest in disgorging Google's unjust enrichment" is sufficient to establish Article III standing. Dkt. No. 39 at 13-14. In *Facebook Internet Tracking*, Facebook admittedly used plug-ins to track logged-out users' browsing histories, and compiled those browsing histories into personal profiles that Facebook sold to advertisers to generate revenue. 956 F.3d at 596. The district court dismissed several common law claims, including trespass to chattels and fraud, for lack of standing on the ground that the plaintiffs failed to allege that they

United States District Court
Northern District of California

suffered any economic injury deemed necessary to assert such claims. *Id.* at 599. Noting that the plaintiffs alleged that Facebook was unjustly enriched through the company's admitted use of their browsing histories, the Ninth Circuit rejected Facebook's argument that plaintiffs' allegations regarding Facebook's unjustly earned profits were insufficient to confer Article III standing. In reaching that conclusion, the Ninth Circuit explained that "'state law can create interests that support standing in federal courts,'" and "California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss." *Id.* at 599 (quoting *Cantrell v. City of Long Beach*, 241 F.3d 674, 684 (9th Cir. 2001)). The Ninth Circuit found that the plaintiffs sufficiently alleged that Facebook profited from their personal data by citing to studies valuing users' browsing histories at $52 per year, as well as research panels that pay users for access to their browsing histories, and by alleging that Facebook's ad sales constituted over 90% of the company's revenue during the relevant period. *Id.* at 600-01.

The Court does not read *Facebook Internet Tracking* to stand for the proposition that simply alleging a demand for disgorgement of profits or an unjust enrichment theory is, by itself, sufficient to establish Article III standing where plaintiffs have not otherwise pled sufficient facts establishing that they personally suffered a particular and concrete injury. Here, plaintiffs also argue that allegations regarding the deprivation of their "property interest in the bytes [of cellular data] they purchased" are sufficient to establish standing because deprivation of a property interest is a particularized, concrete injury. Dkt. No. 39 at 13-14. They seek both monetary relief (the value of the cellular data used by Google) and injunctive relief (an order directing Google to stop using plaintiffs' cellular data allowances without their consent). Dkt. No. 1 at 21-22. "Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, it often turns on the nature and source of the claim asserted." *Warth*, 422 U.S. at 500 (citation omitted). It is clear from the parties' arguments that the issue of plaintiffs' Article III standing turns on the parties' fundamental disagreement about whether plaintiffs' cellular data allowances properly are the subject of a conversion claim or a claim for quantum meruit, and that the questions of standing and failure to state a claim are intertwined.

For the reasons discussed below, the Court finds that plaintiffs do not have a property interest in their cellular data allowances that was harmed by Google's alleged conduct, and therefore do not state a claim for conversion or for quantum meruit.

**B. Rule 12(b)(6) Motion to Dismiss**

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal is appropriate where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory. *Id.* (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)). In such a motion, all material allegations in the complaint must be taken as true and construed in the light most favorable to the claimant. *Id.*

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, "the court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." This means that the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, only plausible claims for relief will survive a motion to dismiss. *Iqbal*, 556 U.S. at 679. A claim is plausible if its factual content permits the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* A plaintiff does not have to provide detailed facts, but the pleading must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678.

Documents appended to or incorporated into the complaint or which properly are the subject of judicial notice may be considered along with the complaint when deciding a Rule 12(b)(6) motion. *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

**1. Conversion Claim**

As noted above, the parties dispute whether plaintiffs have a property interest in their

cellular data allowances that provides a cognizable basis for a conversion claim under California law. *See* Dkt. No. 1 ¶ 60.b. (stating that an issue common to the putative class is "[w]hether the cellular data allowances that Plaintiffs purchase are property interests recognized by California law[.]"). "In California, conversion has three elements: ownership or right to possession of property, wrongful disposition of the property right and damages." *G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 906 (9th Cir. 1992); *see also Fremont Indem. Co. v. Fremont Gen. Corp.,* 148 Cal. App. 4th 97, 119 (2007) ("The basic elements of the tort [of conversion] are (1) the plaintiff's ownership or right to possession of personal property; (2) the defendant's disposition of the property in a manner that is inconsistent with the plaintiff's property rights; and (3) resulting damages.").

Google argues that plaintiffs cannot state a conversion claim because they do not have personal property rights in their cellular data allowances. Courts apply a three-part test to determine whether a property right exists: "First, there must be an interest capable of precise definition; second, it must be capable of exclusive possession or control; and third, the putative owner must have established a legitimate claim to exclusivity." *GS Rasmussen*, 958 F.2d at 903 (footnotes omitted). "Although the question was once the matter of some controversy, California law now holds that property subject to a conversion claim need not be tangible in form; intangible property interests, too, can be converted." *Voris v. Lampert*, 7 Cal. 5th 1141, 1151 (2019); *see also Kremen v. Cohen*, 337 F.3d 1024, 1033 (9th Cir. 2003) (stating that insofar as "California retains some vestigial merger requirement, it is clearly minimal, and at most requires only some connection to a document or tangible object[.]").

As alleged in their complaint, plaintiffs assert a property right in "their purchased data allowances" created by contract with their respective service providers. *See* Dkt. No. 1 ¶ 6 ("Whether Plaintiffs pay for a specific number of gigabytes or unlimited access subject to speed restrictions above a certain data usage threshold, the contracts between Plaintiffs and their mobile carriers create for Plaintiffs concrete property interests in their purchased data allowances."); ¶ 27 ("The purchase of data plans from mobile carriers creates a property interest for Plaintiffs in their cellular data allowances."); ¶ 63 ("Plaintiffs have property interests in the cellular data allowances

that they purchase from their mobile carriers."). The parties dispute whether, in view of the fact that data plans may provide for limited or unlimited data allowances, these "purchased data allowances" represent a precisely defined property interest that is capable of exclusive possession or control. *See* Dkt. No. 33 at 11-13; Dkt. No. 39 at 15-19. Even assuming, without deciding, that plaintiffs' purported property right is precisely defined, their conversion claim fails because they do not allege facts demonstrating exclusive possession of the "purchased data allowances" for which they contract.

Although plaintiffs argue that their data plans confer ownership of "[p]urchased [b]ytes of [c]ellular [d]ata" (Dkt. No. 39 at 14), they have not plausibly alleged facts demonstrating a right to exclusive access to unique or specific bytes of data. Rather, the complaint's allegations indicate that plaintiffs' data allowances provide them with a contractual right to access their service provider's cellular data network—a right that is not exclusive of others' rights to access the same network. Plaintiffs confirm that they "use the term 'data allowances' to refer to the quantity of cellular data bytes that they have purchased" through contracts with their respective service providers. Dkt. No. 39 at 16 n.5. In other words, a data allowance provides subscribers, such as plaintiffs, with a contractual right of access to a service, i.e., access to a service provider's cellular data network that enables users "to send and receive information over the internet without a Wi-Fi connection." *See* Dkt. No. 1 ¶ 24. For some subscribers that right of access is limited to a certain volume of data transmission per month (measured in bytes of data), and for others it is unlimited. *See* Dkt. No. 1 ¶¶ 8-11. In any event, that right of access is not exclusive of others' right of access to the same network, and no subscriber possesses or controls a particular byte or bytes of data in the network. Indeed, plaintiffs acknowledge that the purported property right of access to a cellular data network grants them the ability to access "quantities of cellular data available to all of [a carrier's] customers." Dkt. No. 39 at 17.

Thus, while plaintiffs assert that their service provider contracts give them "a possessory interest in cellular data that exists independent of the contacts" (Dkt. No. 39 at 9), the complaint's allegations indicate that plaintiffs' purported property right in "purchased data allowances" is a right to obtain services conferred by their contracts with the service providers. Courts have held





United States District Court
Northern District of California

United States District Court
Northern District of California

"that the benefits of contractual rights are not personal property capable of conversion." *Monster Energy co. v. Vital Pharm., Inc.*, No. EDCV 18-1882 JGB (SHKx), 2019 WL 2619666, at *13 (C.D. Cal. May 20, 2019) (citing cases). While plaintiffs allege that their right of access nonetheless "includes the right to exclude other persons and entities from using Plaintiffs' cellular data allowances" (Dkt. No. 1 ¶ 27), the same could be said of other rights granted by contract that do not provide a basis for a conversion claim. *See, e.g., Boon Rawd Trading Int'l Co. Ltd. v. Paleewong Trading Co. Inc.*, 688 F.Supp.2d 940, 955 (N.D. Cal. 2010) (concluding that exclusive importation right "is an intangible *contractual* right protected under contract law, not tort law."). In some contexts, contract provisions may inform whether a plaintiff has a possessory right. For example, in a suit over non-payment of wages the California Supreme Court observed that "[c]ontractual provisions may, of course, determine whether the plaintiff has a possessory right to certain funds in the defendant's hands." *Voris*, 7 Cal. 5th at 1152. Here, however, for the reasons discussed, plaintiffs have not plausibly alleged facts demonstrating a right to exclusive access to unique or specific bytes of cellular data.

Plaintiffs nonetheless contend that access to a service provider's cellular data network is akin to the consumption of public utilities such as water, natural gas, or electricity that can be subject to a conversion claim. Here, plaintiffs argue that "users consume discrete bytes of cellular data on demand" in much the same way people use water or other utilities and that "each cellular byte that a device uses" is allocated specifically to that device and is not available for use by any other device. Dkt. No. 39 at 16-17, 20. Plaintiffs thus contend that they have a property interest in a product (i.e., bytes of data), not a service. Plaintiffs further argue that once accessed, each byte of data becomes the personal property of the user. *Id.* at 17, 20. The Court finds plaintiffs' analogy to the use of water, gas, or electricity unpersuasive. A utility customer may plausibly be said to consume a discrete quantum of water, gas, or electricity in a manner that makes that specific quantum of water, gas, or electricity unavailable to any other customer. The allegations of the complaint do not plausibly establish that use of a cellular data network involves the exclusive consumption of a quantum of data or that plaintiffs have exclusive possession or control of unique or specific bytes of data; rather, the plaintiffs allege non-exclusive access to a service provider's

United States District Court
Northern District of California

network, where the extent of such access is simply measured in bytes of data. *See* Dkt. No. 1 ¶¶ 6, 27, 63.

Maintaining that "bytes of cellular data are property" independent of a contract, plaintiffs further analogize to a small grocer's purchase of apples from a commercial farmer. Dkt. No. 39 at 16. In plaintiffs' analogy, apples are the grocer's property, whether the grocer pays the farmer on a per-apple basis, or whether the grocer pays a fixed sum under a requirements contract for all the apples the grocer can sell in a given month. Plaintiffs argue that "bytes of cellular data" similarly "are property regardless of whether they are acquired through a pay-as-you-use plan, a monthly cap plan, or a monthly requirements plan." *Id.* The problem with plaintiffs' argument is that apples, by their nature, can be possessed and controlled as property and exist independently of the contract. By contrast, plaintiffs' claimed property interest is not in "bytes of cellular data," which is simply the measure of a user's access to a given network. Rather, the alleged property right is "purchased data allowances," an interest that is based solely on the contractual right to use a service, i.e., to "access the carriers' cellular data networks, thereby providing users with the ability to send and receive information over the internet without a Wi-Fi connection." Dkt. No. 1 ¶¶ 6, 24.

The parties have not cited, and the Court has not found, cases addressing the question of whether cellular service subscribers have a property interest in their cellular data allowances. Plaintiffs, however, note that in a parallel proceeding in the Santa Clara County Superior Court concerning a putative class of California citizens, the court overruled Google's demurrer to the complaint and concluded that the plaintiffs stated a claim for conversion based on an alleged property right in their data allowances. *See* Dkt. No. 39-1, Ex. 1 (Order After Hearing on July 17, 2020 issued in *Csupo, et al. v. Alphabet, Inc.*, Case No. 19CV352557).[5] The unpublished *Csupo*

[5] The parties dispute whether California Rule of Court 8.1115(a) applies and if so, whether the rule prohibits plaintiffs from citing the *Csupo* order here. Nevertheless, the Court concludes that it properly may take judicial notice of the order, except as to facts stated therein that may be subject to reasonable dispute. Fed. R. Evid. 201; *Bradford v. Flagship Facility Servs., Inc.*, No. 17-cv-01245-LHK, 2017 WL 3130072, at *1 n.1 (N.D. Cal. July 24, 2017).

United States District Court
Northern District of California

order is not binding precedent, and this Court respectfully disagrees with its conclusion.[6] The *Csupo* court found analogous or persuasive several cases that this Court concludes are inapposite.

For example, in *Welco Elecs., Inc. v. Mora*, 223 Cal. App. 4th 202 (2014), the Court of Appeals affirmed that the plaintiff had a property right in his credit card account where the defendant obtained a specific amount of money through the use of the plaintiff's credit card, notwithstanding that the sums in question were not taken directly from the plaintiff, but through the third-party credit card company. *Welco Elecs, Inc.*, 223 Cal. App. 4th at 211-12. Fraudulent credit card charges, however, immediately result in a discrete loss of a specific sum of money to the credit card holder and corresponding indebtedness to the credit card company. By contrast, in the present case, the complaint is devoid of allegations that plaintiffs' right of access is or has been diminished in any way by Google's access to a cellular data network, whether through the imposition of overage charges, throttled data speeds, or anything else. Insofar as plaintiffs contend that their interest in "disgorging Google's unjust enrichment" is sufficient under *Facebook Tracking Litigation* to establish an injury sufficient to support a claim for conversion, as well as Article III standing (*see* Dkt. No. 39 at 13-14), their arguments presuppose that a property interest exists in the first place. For the reasons stated in this order, this Court concludes that no such property right exists. Moreover, the complaint does not allege facts demonstrating that Google's alleged unjust enrichment from use of cellular data networks is an injury to plaintiffs' right of access to those networks, which the complaint's allegations indicate remained unimpaired. *See generally Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1348 (2003) (concluding that plaintiff's trespass to chattels claim failed because such claims "may not, in California, be proved without evidence of an injury to the plaintiff's personal property or legal interest therein," and the consequential damage plaintiff claimed to have suffered was not an injury to the plaintiff's "interest in its computers—which worked as intended and were unharmed by the [defendant's

[6] At the motion hearing, the Court inquired about any potential preclusive effect of the state court proceedings on the present action. Dkt. No. 46. Although plaintiffs believe there is the possibility for issue preclusion on final judgment in the state court action (the parties advised that they currently are conducting discovery in the state court case), no one noted any current proceedings in the state court action that would have preclusive effect here.

emails].")

Plaintiffs' cellular data allowances are also not comparable to *DIRECTV, Inc. v. Pahnke*, 405 F.Supp.2d 1182 (E.D. Cal. 2005), in which the plaintiff satellite broadcaster's television programming (i.e., content) was found to be "personal property" subject to conversion through pirating devices.

*Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559 (1996), is factually closer on point. That case concerned the plaintiff telephone company's conversion claim based on automated searches of its telephone system for long-distance authorization codes, which overburdened plaintiff's system and resulted in some subscribers being denied access to phone lines. However, the alleged personal property in *Thrifty-Tel* was not telephone services or minutes, but "the intangible computer access code . . . and the tie-up of Thrifty–Tel's system." *Id.* at 1565-66. Moreover, the court did not reach the question whether such matters could be the subjects of a conversion claim because it concluded that the evidence supported liability under a trespass theory. *Id.* at 1566.

In sum, plaintiffs have not alleged facts demonstrating that their cellular data allowances are "personal property" capable of exclusive possession or control that properly may support a claim for conversion. Accordingly, Google's motion to dismiss the conversion claim is granted on that ground, and the Court finds it unnecessary to address whether plaintiffs satisfy the remaining requirements for a conversion claim.

**2. Quantum Meruit Claim**

Google argues that plaintiffs' quantum meruit claim must be dismissed on that ground that it is a common count derivative of their conversion claim. In any event, Google contends that the complaint does not plead sufficient facts to support a standalone claim for quantum meruit.

"A common count is not a specific cause of action . . . rather, it is a simplified form of pleading normally used to aver the existence of various forms of monetary indebtedness, including that arising from an alleged duty to make restitution under an assumpsit theory." *McBride v. Boughten*, 123 Cal. App. 4th 379, 394 (2004). "When a common count is used as an alternative way of seeking the same recovery demanded in a specific cause of action, and is based on the

same facts, the common count is demurrable if the cause of action is demurrable." *Id.*; *see also McAfee v. Francis,* No. 5:11-CV-00821-LHK, 2011 WL 3293759, at *2 (N.D. Cal. Aug. 1, 2011) (same). "This rule only applies to prevent a plaintiff from relying on different facts in the common count." *Crocker-Anglo Nat. Bank v. Kuchman*, 224 Cal. App. 2d 490, 497 (1964). "A plaintiff may rely on a different theory of recovery in the common count as long as that theory is fully supported in the specific facts pleaded in the other counts." *Id.*

While acknowledging that some facts are common to both the conversion and quantum meruit claims, plaintiffs contend that the quantum meruit claim is not derivative of their conversion claim because it "also turns on independent facts and legal theories" (Dkt. No. 39 at 27), namely that Google was unjustly enriched when it allegedly "used Plaintiffs' cellular data allowances to collect and transmit information through passive transfers to develop and support its advertising business and other ventures" (Dkt. No. 1 ¶ 69). The quantum meruit claim, however, indisputably is based on all the same facts as the conversion claim. Indeed, the claim simply realleges and incorporates by reference all of the preceding allegations in the complaint. Dkt. No. 1 ¶ 67. Moreover, the quantum meruit claim appears to seek precisely the same monetary recovery as the conversion claim, i.e., the value of the cellular data used by Google. Dkt. No. 1 at 21. Insofar as it thus appears to be merely derivative of plaintiffs' now dismissed conversion claim, plaintiffs' quantum meruit claim must also be dismissed.

Plaintiffs nonetheless argue that the quantum meruit claim is distinct that in that it is also based on "recover[y] [of] the reasonable value of Plaintiffs' personal information" that Google allegedly collects and exploits for its own benefit. Dkt. No. 1 ¶ 75. However, nowhere in their complaint do plaintiffs plead facts stating what that "personal information" is, how it is used, or any other facts that might support a plausible claim for relief. Indeed, other than the one reference to "personal information" plaintiffs highlight in paragraph 75 of the complaint, their pleading contains nothing more than two passing references to "personal information." *See* Dkt. No. 1 ¶ 5 (referencing "certain transfers of personal information when [users] are actively engaged with their devices"); ¶ 7 (seeking compensation for "the value of the personal information" that Google allegedly has acquired). Plaintiffs did not address this purported basis for their quantum meruit

claim in their written opposition to Google's motion to dismiss. When probed by the Court at oral argument about the basis for the personal information portion of their claim (apart from the one sentence in paragraph 75 of the complaint), plaintiffs simply referred to general allegations concerning the alleged purpose of the passive data transfers. Plaintiffs have therefore provided no basis for the Court to conclude that there are additional facts could be alleged to state a plausible claim for relief.

Accordingly, the Court concludes that plaintiffs' have failed to state a claim for quantum meruit. Google's motion to dismiss this claim is granted.

## III. LEAVE TO AMEND

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," because "the court must remain guided by the underlying purpose of Rule 15 . . . to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (alterations and internal quotation marks omitted). "The decision of whether to grant leave to amend nevertheless remains within the discretion of the district court," which may deny leave to amend if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the party seeking amendment has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiffs have not articulated any additional facts that could be alleged on an amendment to support a plausible claim for conversion. For the reasons stated above, the Court doubts whether they can do so. Nevertheless, as the law generally favors resolving matters on the merits, the Court will permit plaintiffs to amend their conversion claim. The Court also gives plaintiffs leave to amend their quantum meruit claim to the extent plaintiffs believe they plausibly can assert such a claim based on their cellular data allowances. However, the Court does not give plaintiffs leave to amend their quantum meruit claim based on the alleged use of "personal information," as to which plaintiffs have not only failed to articulate additional facts that could be asserted on amendment, but have also not explained why they did not plead those allegations in their original complaint.

United States District Court
Northern District of California

## IV. CONCLUSION

Based on the foregoing, Google's motion to dismiss the complaint is granted with leave to amend the claims for conversion and quantum meruit, consistent with the rulings in this order. Plaintiffs' amended complaint shall be filed by October 18, 2021. The Court will separately address a case schedule and will provide notice if it believes a further case management conference is necessary.

**IT IS SO ORDERED.**

Dated: October 1, 2021

Virginia K. DeMarchi
VIRGINIA K. DEMARCHI
United States Magistrate Judge

ANN RAVEL (62139)
aravel@mcmanislaw.com
McMANIS FAULKNER
a Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone: (408) 279-8700
Facsimile: (408) 279-3244

GLEN E. SUMMERS (176402)
glen.summers@bartlitbeck.com
KARMA M. GIULIANELLI (184175)
karma.giulanelli@bartlitbeck.com
ALISON G. WHEELER (180748)
alison.wheeler@bartlitbeck.com
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140

GEORGE A. ZELCS (*pro hac vice*)
ROBERT E. LITAN (*pro hac vice*)
RYAN Z. CORTAZAR (*pro hac vice*)
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

MICHAEL E. KLENOV (277028)
CAROL O'KEEFE (*pro hac vice*)
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

*Attorneys for Plaintiffs,*
*Joseph Taylor, Edward Mlakar, Mick Cleary, and Eugene Alvis*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

JOSEPH TAYLOR, EDWARD MLAKAR, MICK CLEARY, and EUGENE ALVIS individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

GOOGLE LLC,

Defendant.

Case No. 5:20-cv-07956-VKD

**PLAINTIFFS' OPPOSITION TO GOOGLE LLC'S MOTION TO DISMISS**

Date: March 30, 2021
Time: 10:00 a.m.
Judge: Hon. Virginia K. DeMarchi

device uses is tallied and allocated specifically to that device. And no byte attributed to that device is available to any other device, unless that device's owner affirmatively consents to another device using it as a hotspot.

Google makes much of the fact that Plaintiffs depend on carriers' networks to access their data, and that carriers broadly make vast quantities of cellular data available to all of their customers. (Mot. at 12–13). But that is an entirely unremarkable commercial arrangement. For example, it describes just about every kind of public utility (e.g., electricity, natural gas, water),[6] where the seller broadly makes its products available for customers to access on demand, such as by turning on an appliance or a gas-powered furnace. Once accessed, however, that generally available product becomes the property of the customer to whose account it has been allocated and who will be charged for its consumption.

The communal delivery system does not rob the product of its status as property capable of exclusive possession. Accordingly, a free-riding neighbor would be liable to a homeowner for conversion if, without authorization, he ran an extension cord from a socket in the homeowner's house and siphoned electricity to power his bitcoin-mining operation. So, too, with Google's siphoning of Android users' cellular data. *E.g., Good Sports of New York, Inc. v. Llorente*, 280 A.D.2d 261, 262 (N.Y. App. Div. 1st Dept. 2001) (upholding award of punitive damages against landlord for conversion of commercial tenant's electrical services where building's common areas were wired to tenant's meter). Google's rule would leave the homeowner defenseless simply because she lacked the ability to exclusively possess the power lines, transformers, and generating stations that delivered the electricity to her house.

**Claim to Exclusivity.** To establish a personal claim to exclusivity, "[n]either legal title nor absolute ownership of the property is necessary." *Farmers Ins. Exch. v. Zerin*, 53 Cal. App. 4th 445, 452 (Cal. App. 3d Dist. 1997). A party need allege only that it is "*entitled to immediate possession at the time of conversion.*" *Id.* (quoting *Bastanchury v. Times–Mirror Co.* 68 Cal.App.2d 217, 236 (Cal. App. 4th

---

[6] Notably, under California law, wireless carriers are considered public utilities. Cal. Pub. Util. Code § 216(a) (defining "public utility" as "every … telephone corporation … where the service is performed for, or the commodity is delivered to, the public or any portion thereof").

Dist. 1945)) (emphasis in original). The alleged facts, as well as commonsense experience, establish beyond doubt that wireless customers are entitled to immediate and exclusive possession of the cellular data that passes to and from their devices.

Once a customer purchases cellular data from a carrier through either a prepaid, limited, or unlimited plan, only that customer has the right to dictate whether and how cellular data can be consumed through her device and her account. After all, no customer would expect that the cellular data consumed by a stranger's Netflix binge would surreptitiously pass through her SIM card and appear on her bill. *See G.S. Rasmussen*, 958 F.2d at 903 (exclusivity factor looks at "reasonable … expectations that give rise to a legitimate claim of exclusive control"). That would be evidence of theft.

True, wireless customers can share their cellular data with friends and family, either by letting them borrow their devices, by adding them to their plans, or by turning their devices into mobile hotspots that let others consume the cellular data tied to their accounts. But, contrary to Google's assertion (Mot. at 13), this capacity to share is wholly consistent with the right to immediate and exclusive possession—not at odds with it. The right to share derives from the right to exclude, as seen when a user refuses to add a line to the plan, or requires that a mobile hotspot be accessed by a password given only to authorized users. *See People v. Kwok*, 63 Cal. App. 4th 1236, 1251 (Cal. App. 1st Dist. 1998) (an essential corollary to the exclusionary right in property is "the right to control the intangible benefit conferred by ownership"). Each circumstance cited by Google requires affirmative action by the owner or possessor to consent to others' use of their cellular data. Under Google's pained logic, homeowners who share their houses with family, friends, or paying boarders forfeit their rights to keep out trespassers.

The personal-information cases Google relies on are not to the contrary. In *In re iPhone Application Litigation*, 844 F. Supp. 2d 1040 (N.D. Cal. 2012), the court rejected plaintiffs' claims because "a user's location, zip code, device identifier, and other data" were not capable of exclusive possession and control. *Id.* at 1075. Unlike the information in that case, Plaintiffs' individual bytes of cellular data are used once and exclusively by their devices; they cannot be copied and multiplied.

ANN RAVEL (62139)
aravel@mcmanislaw.com
McMANIS FAULKNER
a Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone: (408) 279-8700
Facsimile: (408) 279-3244

GLEN E. SUMMERS (176402)
glen.summers@bartlitbeck.com
KARMA M. GIULIANELLI (184175)
karma.giulanelli@bartlitbeck.com
ALISON G. WHEELER (180748)
alison.wheeler@bartlitbeck.com
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140

GEORGE A. ZELCS (*pro hac vice*)
ROBERT E. LITAN (*pro hac vice*)
RYAN Z. CORTAZAR (*pro hac vice*)
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

MICHAEL E. KLENOV (277028)
CAROL O'KEEFE (*pro hac vice*)
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

*Attorneys for Plaintiffs, Joseph Taylor, Edward Mlakar, Mick Cleary, and Eugene Alvis*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| JOSEPH TAYLOR, EDWARD MLAKAR, MICK CLEARY, and EUGENE ALVIS individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 5:20-cv-07956-VKD<br><br>**DECLARATION OF RYAN CORTAZAR IN SUPPORT OF PLAINTIFFS' OPPOSITION TO GOOGLE LLC'S MOTION TO DISMISS**<br><br>Date: March 30, 2021<br>Time: 10:00 a.m.<br>Judge: Hon. Virginia K. DeMarchi |

I, Ryan Z. Cortazar, declare:

1. I am an attorney licensed to practice law in the State of Illinois and admitted pro hac vice to practice in this Court. I am an attorney at Korein Tillery LLC and represent Plaintiffs Joseph Taylor, Edward Mlakar, Mick Cleary, and Eugene Alvis in this action. I submit this declaration in support of Plaintiffs' Opposition to Google's Motion to Dismiss Plaintiffs' Complaint. I have personal knowledge of the facts below. If called to testify, I could and would testify competently thereto.

2. Attached as Exhibit 1 is a true and correct copy of the Order issued by the Superior Court of California, County of Santa Clara, overruling Google's Demurrer in *Csupo v. Alphabet, Inc.*, No. 19CV352557 (Super. Ct. Cal. Aug. 24, 2020).

3. Attached as Exhibit 2 is a true and correct copy of Alphabet, Inc.'s Form 10-K filed with the Securities Exchange Commission and available on Alphabet's website at https://abc.xyz/investor/static/pdf/20210203_alphabet_10K.pdf?cache=b44182d (last visited March 1, 2021).

4. Attached as Exhibit 3 is a true and correct copy of the Auto Update policy for Google Chrome Enterprise, available at https://support.google.com/chrome/a/answer/6220366?hl=en (last visited March 1, 2021).

5. Attached as Exhibit 4 is a true and correct copy of a Google website advertising the technical specifications of its Pixelbook Go product, available at https://store.google.com/product/pixelbook_go_specs (last visited March 1, 2021).

6. Attached as Exhibit 5 is a true and correct copy of a Google Chrome Enterprise website support page instructing users how to customize auto-updates, available at https://support.google.com/chrome/a/answer/6350036#outsideworkhours&zippy=%2Cstagger-updates-to-reduce-bandwidth (last visited March 1, 2021).

///

///

///

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 1, 2021, in Chicago, Illinois.

By: /s/ Ryan Z. Cortazar
Ryan Z. Cortazar
*Attorney for Plaintiffs Joseph Taylor, Edward Mlakar, Mick Cleary, and Eugene Alvis*

**ATTESTATION**

I, Michael E. Klenov, hereby attest that Ryan Z. Cortazar has concurred in my filing of the foregoing document.

By: Michael E. Klenov
Michael E. Klenov

*Attorney for Plaintiffs Joseph Taylor, Edward Mlakar, Mick Cleary, and Eugene Alvis*

# EXHIBIT 1

FILED
AUG 2 4 2020
Clerk of the Court
Superior Court of CA County of Santa Clara
BY ____________ DEPUTY
Jee Joe Vizconde
Envelope: 4812514

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

| | |
|---|---|
| ATTILA CSUPO, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>ALPHABET, INC.,<br><br>Defendant. | Case No.: 19CV352557<br><br>**ORDER AFTER HEARING ON JULY 17, 2020**<br><br>**Demurrer by Defendant Alphabet, Inc. to the First Amended Complaint** |

The above-entitled matter came on regularly for hearing on Friday, July 17, 2020 at 9:00 a.m. in Department 1 (Complex Civil Litigation), the Honorable Brian C. Walsh presiding. A tentative ruling was issued prior to the hearing. The appearances are as stated in the record. Having reviewed and considered the written submissions of all parties and the oral argument presented at the hearing, and being fully advised, the Court orders as follows:

This is a putative class action for conversion and quantum meruit, alleging that defendant Alphabet, Inc.'s ("Google") Android operating system and mobile phone applications passively transfer data using class members' cellular data allowances without their consent.

///

Before the Court is Google's demurrer to both claims alleged in the operative Amended Complaint for failure to state a claim. (See Code Civ. Proc., § 430.10, subd. (e).) Plaintiffs oppose the demurrer.

I. Allegations of the Operative Complaint

Google owns and programs the most popular mobile platform in the world, the Android operating system. (Amended Complaint, ¶ 17.) Android works on a variety of mobile devices, including smartphones and tablets. (*Ibid.*) Many of the most popular mobile device manufacturers preinstall Android and a suite of Google's mobile applications, or "apps," on devices they sell. (*Id.*, ¶ 22.)

Plaintiffs are California residents who purchased Android mobile devices that they use with monthly cellular data plans from different carriers (namely, AT&T, T-Mobile, Verizon, and Sprint). (Amended Complaint, ¶¶ 8-10.) The devices they purchased were preloaded with Google's Android operating system and a suite of its mobile apps and widgets. (*Id.*, ¶ 23.) Under their cellular data plans, plaintiffs pay their carriers each month for data allowances, which are either unlimited or fixed. (*Id.*, ¶ 26.) When users have a fixed cellular data allowance and exceed it, they are typically charged an overage fee; with a so-called "unlimited" plan, they are still typically subject to usage quotas and will have their cellular connection speeds throttled if they exceed such quotas, destroying some functionality (such as video streaming) and significantly impairing overall performance. (*Ibid.*) When users do not wish to use their cellular networks or are unable to use them, mobile devices can also transfer and receive information over the internet through Wi-Fi connections. (*Id.*, ¶ 25.) Many cost-conscious users maximize their time on Wi-Fi and use their cellular networks only when Wi-Fi connections are unavailable in order to "save" the cellular data allowances available under their monthly carrier plans. (*Ibid.*)

Plaintiffs allege that they have property interests in their cellular data allowances. (Amended Complaint, ¶ 27.) Each quantum of an allowance has a fair market value determined by market forces, and plaintiffs have the right to exclude others from using their allowances and to determine how to use their allowances and grant access to others through their mobile device

activity. (*Ibid.*) For example, users can grant others access to their data allowances and even sell unused allowances through mobile "hotspots." (*Id.*, ¶ 28.)

While users impliedly consent to the use of their cellular data allowances in many situations—for example, when they actively engage with applications that require internet access while connected only by their cellular plan—plaintiffs allege that Google misappropriates their data allowances through "passive transfers," meaning information transfers that occur in the background and do not result from users' direct engagement with Google products on their devices. (Amended Complaint, ¶¶ 29-31.) The information acquired by Google through this practice supports the company's product development and lucrative targeted advertising business. (*Id.*, ¶ 7.) Plaintiffs allege that none of the policies governing individuals' use of Google's operating system, apps, or widgets disclose that Google appropriates users' cellular data allowances to transmit information when they are not actively using its products. (*Id.*, ¶¶ 32-37.) Nevertheless, Google designed its operating system and applications to extract large volumes of information from users' devices in this fashion. (*Id.*, ¶ 38.) These passive transfers occur in a variety of ways, including when mobile devices are in a completely idle state, meaning they are stationary, untouched, and with all apps closed. (*Id.*, ¶¶ 39-47.) Such transfers are significantly more frequent on Android devices than during comparable use of an iPhone without Android or Google applications installed. (*Id.*, ¶¶ 42-47.) Although Google could program its software to allow users to enable passive transfers only when they are on Wi-Fi connections, it instead has chosen to simply take advantage of users' cellular data allowances. (*Id.*, ¶ 40.)

Based on these allegations, plaintiffs bring claims for (1) conversion and (2) quantum meruit on behalf of a putative class of Californians "who have used mobile devices running the Android operating system to access the internet through cellular data plans provided by mobile carriers." (Amended Complaint, ¶ 49.) They seek an award of the value of the cellular data allowances Google used to obtain information for its own benefit. (*Id.*, ¶ 72.)

/ / /

/ / /

/ / /

II. Legal Standard

The function of a demurrer is to test the legal sufficiency of a pleading. (*Trs. Of Capital Wholesale Elec. Etc. Fund v. Shearson Lehman Bros.* (1990) 221 Cal.App.3d 617, 621.) Consequently, "[a] demurrer reaches only to the contents of the pleading and such matters as may be considered under the doctrine of judicial notice." (*South Shore Land Co. v. Petersen* (1964) 226 Cal.App.2d 725, 732, internal citations and quotations omitted; see also Code Civ. Proc., § 430.30, subd. (a).) "It is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he describes the defendant's conduct. … Thus, … the facts alleged in the pleading are deemed to be true, however improbable they may be." (*Align Technology, Inc. v. Tran* (2009) 179 Cal.App.4th 949, 958, internal citations and quotations omitted.)

In ruling on a demurrer, the allegations of the complaint must be liberally construed, with a view to substantial justice between the parties. (*Glennen v. Allergan, Inc.* (2016) 247 Cal.App.4th 1, 6.) Nevertheless, while "[a] demurrer admits all facts properly pleaded, [it does] not [admit] contentions, deductions or conclusions of law or fact." (*George v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 1112, 1120.) A demurrer will lie where the allegations and matters subject to judicial notice clearly disclose a defense or bar to recovery. (*Casterson v. Superior Court (Cardoso)* (2002) 101 Cal.App.4th 177, 183.)

III. Request for Judicial Notice

In support of its demurrer, Google requests judicial notice of its Terms of Service and certain incorporated policies and disclosures. This request, which is unopposed, is GRANTED. (Evid. Code, § 452, subd. (h); *Marina Tenants Assn. v. Deauville Marina Development Co.* (1986) 181 Cal.App.3d 122, 130 [judicial notice of a complete lease was appropriate where complaint relied on portions of the lease].)

///

///

///

IV. Analysis

Google urges that plaintiffs fail to state a claim for conversion because they consented to the alleged data use and fail to allege a cognizable property interest in their data allowances, interference with any such interest by Google, or damages resulting from Google's practices. It contends that because plaintiffs' claim for quantum meruit is derivative of their claim for conversion, the quantum meruit claim fails as well.

A. Consent

As an initial matter, Google contends that plaintiffs consented to the data use at issue by accepting Google's Privacy Policy, which is incorporated by reference in its Terms of Service. As alleged in the Amended Complaint, these documents govern the use of the Google services at issue and form a contract between the parties. (Amended Complaint, ¶¶ 32-33.) The Privacy Policy states:

> We collect information about the apps, browsers, and devices you use to access Google services. … We collect this information when a Google service on your device contacts our servers—for example, when you install an app from the Play Store or when a service checks for automatic updates. ***If you're using an Android device with Google apps, your device periodically contacts Google servers to provide information about your device and connection to our services.***

(Amended Complaint, ¶ 34, emphasis added.)

Google contends that the emphasized language constitutes an "overarching consent" to Google periodically sending data from a user's Android device to Google's server. However, as urged by plaintiffs, such consent is limited to the sending of "information about [a user's] device and connection to [Google's] services," which the Privacy Policy goes on to explain "includes things like your device type, carrier name, crash reports, and which apps you've installed." The allegations of the Amended Complaint suggest that a much broader range of information is collected by Google, and plaintiffs urge in their opposition that this is so.[1] (See Opp., p. 18, fn. 5.) Users' consent to some data transfers does not establish that any and all transfers by Google

[1] Indeed, Google's Privacy Policy itself confirms that Google collects other categories of information. While the assertedly "overarching consent" discussed above is set forth in a section of the Privacy Policy discussing Google's collection of information about "Your apps, browsers, and devices," other sections of the policy address Google's collection of information about "Your activity" and "Your location information."

were authorized. (See *Duke v. Superior Court (Klis)* (2017) 18 Cal.App.5th 490, 506 ["If a defendant is authorized to make a specific use of a plaintiff's property, use in excess of that authorized may subject the defendant to liability for conversion, if such use seriously violates another's right to control the use of the property."], quoting Thomas et al., Cal. Civil Practice Guide: Torts (2017) Methods of Converting Property, § 15:8.) Google further argues that plaintiffs agreed to a range of more specific data transfers as set forth in other terms and disclosures (for example, that Google's Chrome web browser may automatically send information to Google in order to check for updates and that users' devices will send usage and crash reports to Google to help improve the Android system). Again, however, whether these disclosures, taken together, address ***all*** of the data transfers that Google carries out is a factual issue that cannot be resolved based on the allegations of the Amended Complaint alone, and one that Google does not attempt to comprehensively address in the memoranda supporting its demurrer.

Because a demurrer does not lie as to a portion of a cause of action (*Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1167), Google's demurrer on the ground that plaintiffs consented to the data transfers at issue must fail. Google correctly notes that lack of consent is an element of a conversion claim that plaintiffs will ultimately bear the burden to prove (CACI No. 2100 (2020 rev.)); however, at this juncture they need only allege the ultimate fact that they did not consent to the transfers at issue (see *Birke v. Oakwood Worldwide* (2009) 169 Cal.App.4th 1540, 1548 [with limited exceptions, the rules of pleading require no more than "general allegation[s] of ultimate fact"]). Because Google's demurrer on this ground fails for the reasons discussed above, the Court need not address plaintiffs' arguments that any consent they provided to data transfers was limited to transfers initiated by active use of their devices or to transfers over Wi-Fi, as opposed to using cellular data allowances.

B. Property Interest

Google also demurs on the ground that cellular data allowances are not property capable of conversion.

As recently described by the Supreme Court of California, "[c]onversion is an 'ancient theory of recovery' with roots in the common law action of trover" (a remedy against a finder of lost goods who refused to return them to the owner). (*Voris v. Lampert* (2019) 7 Cal.5th 1141, 1150, citations omitted.) Today, the tort "is understood more generally as 'the wrongful exercise of dominion over personal property of another.' " (*Ibid.*) "As it has developed in California, the tort comprises three elements: '(a) plaintiff's ownership or right to possession of personal property, (b) defendant's disposition of property in a manner inconsistent with plaintiff's property rights, and (c) resulting damages.' " (*Ibid.*)

California's Civil Code defines property rights "very broadly" (*G.S. Rasmussen & Associates, Inc. v. Kalitta Flying Service, Inc.* (9th Cir. 1992) 958 F.2d 896, 902) to constitute "the right of one or more persons to possess [a thing] and use it to the exclusion of others." (Civ. Code, § 654; see also Civ. Code, § 655 ["There may be ownership of all inanimate things which are capable of appropriation or of manual delivery; of all domestic animals; of all obligations; of such products of labor or skill as the composition of an author, the good will of a business, trade marks and signs, and of rights created or granted by statute."]; Civ. Code, § 663 ["Every kind of property that is not real is personal."].) "Although the question was once the matter of some controversy, California law now holds that property subject to a conversion claim need not be tangible in form; intangible property interests, too, can be converted." (*Voris v. Lampert*, *supra,* 7 Cal.5th at pp. 1151.) "Neither legal title nor absolute ownership of the property is necessary." (*Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 452.) To state a claim for conversion, "[a] party need only allege it is *entitled to immediate possession at the time of conversion*." (*Ibid.*, italics original, internal citations and quotations omitted.)

Thus, when it comes to intangible property, the key question is "whether someone is entitled to exclusive use or possession of the thing in question." (*G.S. Rasmussen & Associates, Inc. v. Kalitta Flying Service, Inc.*, *supra,* 958 F.2d at p. 902.) "[T]he 'specific thing' at issue must be a thing to which the plaintiff has a right of ownership or possession—a right with which the defendant has interfered by virtue of its own disposition of the property." (*Voris v. Lampert*, *supra,* 7 Cal.5th at p. 1151.) Interpreting California law, the Court of Appeals for the Ninth

Circuit has identified "three criteria [that] must be met before the law will recognize a property right: First, there must be an interest capable of precise definition; second, it must be capable of exclusive possession or control; and third, the putative owner must have established a legitimate claim to exclusivity." (*G.S. Rasmussen & Associates, Inc. v. Kalitta Flying Service, Inc.*, *supra,* 958 F.2d at p. 903.) California courts have found that rights including a state liquor license, rights to water and electricity, rights in a professional football franchise, and rights to a book title constitute property rights. (*Id.* at pp. 902–903; see also *Hernandez v. Lopez* (2009) 180 Cal.App.4th 932 [restaurant owners stated a claim for conversion or trespass against prospective buyers of a restaurant who purported to resell the restaurant to a third party without satisfying the terms of their own purchase].) Similarly, federal cases hold that rights to operate a modified plane pursuant to a "Supplemental Type Certificate" (*G.S. Rasmussen & Associates, Inc. v. Kalitta Flying Service, Inc.*, *supra,* 958 F.2d 896) and rights afforded to a registrant of an internet domain name (*Kremen v. Cohen* (9th Cir. 2003) 337 F.3d 1024, 1030) are property rights supporting a claim for conversion. (But see *In re Forchion* (2011) 198 Cal.App.4th 1284, 1308 [stating in dictum that "a domain name is not property, but rather the product of a contract for services between the registrant and the registrar"].) By contrast, in *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, the California Supreme Court held that where a patient "clearly did not expect to retain possession of his cells following their removal" and had no ownership interest in the cells or derivative products under applicable law, the patient did not have a property interest in the cells that would support a claim for conversion. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 136–137.)

In deciding whether to apply "a very general theory of liability [such as conversion] in a new context" (*Moore v. Regents of University of California*, *supra,* 51 Cal.3d at pp. 135–136), courts have considered the policy concerns raised (*ibid.*) as well as the availability of other remedies for the harm alleged (*Voris v. Lampert*, *supra,* 7 Cal.5th at pp. 1156–1157). While recognizing that it may be inappropriate to recognize a claim for conversion where "newer economic torts have developed that may better take into account the nature and uses of intangible property, the interests at stake, and the appropriate measure of damages," courts have confirmed

that "if the law of conversion can be adapted to particular types of intangible property and will not displace other, more suitable law, it may be appropriate to do so." (*Welco Electronics, Inc. v. Mora* (2014) 223 Cal.App.4th 202, 210, quoting *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 124–125.)

One type of intangible property that commonly supports a claim for conversion in California is money.

> But the law has been careful to distinguish proper claims for the conversion of money from other types of monetary claims more appropriately dealt with under other theories of recovery. Thus, although our law has dispensed with the old requirement that "each coin or bill be earmarked," it remains the case that "money cannot be the subject of an action for conversion unless a specific sum capable of identification is involved."

(*Voris v. Lampert, supra,* 7 Cal.5th at p. 1151, citations omitted.) The simple failure to pay money owed does not constitute conversion; rather, "cases recognizing claims for the conversion of money typically involve those who have misappropriated, commingled, or misapplied specific funds held for the benefit of others." (*Ibid.* at pp. 1151–1152, internal citations and quotations omitted.) Thus, "a mere contractual right of payment, without more, will not suffice" to create a property interest supporting a claim for conversion. (*Farmers Ins. Exchange v. Zerin, supra,* 53 Cal.App.4th at p. 452.) "Contractual provisions may, of course, determine whether the plaintiff has a possessory right to certain funds in the defendant's hands." (*Voris v. Lampert, supra,* 7 Cal.5th at p. 1152 [holding that an employee's claim to earned wages is not one for conversion; "The employee's claim is not that the employer has wrongfully exercised dominion over a specifically identifiable pot of money that already belongs to the employee.... Rather, the employee's claim is that the employer failed to reach into its own funds to satisfy its debt."].)

Here, plaintiffs allege they have property interests in their data allowances and have the right to exclude others from using them. (Amended Complaint, ¶ 27.) The terms of their contracts with their carriers, which may or may not support these allegations, are not before the Court.[2] Google contends that a mere contractual right can never support a claim for conversion,

[2] Google's attempts to characterize the nature of cell phone data plans and their features are unsupported by any request for judicial notice and must be disregarded at this juncture.

citing authority addressing a "contractual right ***of payment***." (*Farmers Ins. Exchange v. Zerin*, *supra,* 53 Cal.App.4th at p. 452, emphasis added.) However, as stated above, "[c]ontractual provisions may," in fact, "determine whether the plaintiff has a possessory right" to certain property, including intangible property such as money. (*Voris v. Lampert*, *supra,* 7 Cal.5th at p. 1152.)

*Welco Electronics, Inc. v. Mora* (2014) 223 Cal.App.4th 202 is illustrative in this regard. There, the Court of Appeal affirmed a judgment of conversion against a service provider who wrongfully made charges to plaintiff's credit card account, which were paid to the service provider. The Court of Appeal explained:

> Plaintiff had a property right in its credit card account because plaintiff's interest was specific, plaintiff had control over its credit card account, and plaintiff had an exclusive claim to the balance in the account. (See *Kremen v. Cohen, supra,* 337 F.3d at p. 1030.) Defendant obtained the money from the credit card company. As a result, plaintiff became indebted to the credit card company. ***Thus, … part of plaintiff's credit balance with the credit card company was taken by defendant, and what resulted was an "unauthorized transfer" to defendant of plaintiff's property rights—i.e., money from the available credit line belonging to plaintiff with the credit card company.*** [(Citation.)] That the taking was something that affected plaintiff's rights with a third party does not mean that there has not been a conversion of intangible property.

(*Welco Electronics, Inc. v. Mora*, *supra,* 223 Cal.App.4th at pp. 211–212, emphasis added.)

*Welco* specifically rejected the argument that the defendant's actions were akin to a dispute over monies owed under a contract:

> Without citing to legal authority, defendant contends that if the misappropriation of a credit card that occurred here constitutes a conversion, then any transaction involving a credit card that leads to a dispute is subject to a cause of action for conversion. Defendant gives examples of what might be conversions under this hypothesis: persons using a credit card to purchase or pay for goods, medical bills, or lawyer bills, and disputes later arise regarding the quality of the goods, fault concerning the medical treatment, or the appropriateness of the legal bills. This argument lacks merit. A person's willing use of a credit card to pay for goods or services has no relationship to what occurred here. Plaintiff did not consent to its credit card or its information being used by or on behalf of defendant. This case does not involve "the simple failure to pay money owed[, which] does not constitute conversion", nor does it concern a simple overcharge, which also does not constitute a conversion.

(*Welco Electronics, Inc. v. Mora*, *supra,* 223 Cal.App.4th at p. 215, citations omitted.)

Here, assuming that plaintiffs correctly characterize their rights to their data allowances, they are akin to the credit balance at issue in *Welco*. (See also *Fremont Indemnity Co. v. Fremont General Corp.*, *supra*, 148 Cal.App.4th at pp. 125–126 [recognizing claim for conversion of a net operating loss; on demurrer "we need not decide whether in these circumstances the cause of action should differ in any material respect from a traditional conversion action"]; *In re Easysaver Rewards Litigation* (S.D. Cal. 2010) 737 F.Supp.2d 1159, 1180 [plaintiffs stated a claim for conversion based on the misappropriation of their payment information, which was used to make unauthorized debits from their financial accounts]; *Izsak v. Draftkings, Inc.* (N.D. Ill. 2016) 191 F.Supp.3d 900, 909, fn. 6 [dismissing conversion claim based on the receipt of unsolicited text messages without prejudice, applying a *de minimis* doctrine, but noting that with different allegations as to injury—such as data overage charges—a plaintiff might be able to state such a claim].) While intangible, the allowances are capable of precise definition, at least conceptually,[3] and are alleged to be subject to plaintiffs' exclusive control.

To take a simpler example than the theory alleged by plaintiffs, if a defendant gained totally unauthorized access to plaintiffs' data allowances and used them for its own benefit, these actions would support a claim for conversion. (See *Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559 [phone company's judgment against plaintiffs whose teenage sons used plaintiffs' account information to make long distance phone calls without paying for them upheld on a theory of trespass to chattels, if not conversion]; see also *DIRECTV, Inc. v. Pahnke* (E.D. Cal. 2005) 405 F.Supp.2d 1182, 1189–1190 [defendant liable for conversion based on unauthorized interception of satellite broadcast].) It is unclear what other, "more suitable law" (*Welco Electronics, Inc. v. Mora*, *supra*, 223 Cal.App.4th at p. 210) would apply in such a case, and no policy concerns would appear to caution against the adaptation of the tort of conversion to this context.

---

[3] Google itself states in its reply brief that "[l]ike money, the purported property at issue is an intangible right measured in discrete units—in this case, the amount of Plaintiffs' cellular data allowances used for 'passive' data transfers to Google."

The theory alleged by plaintiffs is less straightforward, because it acknowledges that plaintiffs consented to Google's use of their data allowances for some purposes. Google analogizes plaintiffs' theory to an overcharge theory, an analogy which some courts have relied on to reject a conversion claim with little analysis. (See *McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1492 [stating that "Plaintiffs cite no authority for the proposition that a cause of action for conversion may be based on an overcharge" and apparently deeming the argument waived].) In the Court's view, these authorities simply recognize the proposition that circumstances "involv[ing] a simple creditor-debtor relationship, in which defendants are alleged to have violated their obligations to repay the subject debts" or disputes over a mere contractual right to payment do not support a claim of conversion. (*Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 285; see also *Worldwide Travel, Inc. v. Travelmate US, Inc.* (S.D. Cal., Mar. 9, 2015, No. 14-CV-00155-BAS DHB) 2015 WL 1013704, at *10 [distinguishing *Welco* where plaintiffs alleged a dispute over the amount and appropriateness of charges they generally authorized defendants to collect in exchange for advertising services].) In such cases, the plaintiff can pursue a claim for breach of contract or other more appropriate cause of action to recover monies owed. Here, by contrast, no monetary debt or financial transaction between the parties is at issue, and it is not apparent what remedy plaintiffs would have for Google's unauthorized use of their data allowances, if not an action for conversion. The Court is not persuaded that simply because the scope of plaintiffs' consent to Google's use of their data allowances is disputed, plaintiffs cannot state a claim for conversion. (See *Bally v. State Farm Life Insurance Company* (N.D. Cal., Aug. 19, 2019, No. 18-CV-04954-CRB) 2019 WL 3891149, at *4 [recognizing conversion claim despite dispute over which deductions were authorized by the parties' contract]; *Brighton Trustees v. Transamerica Life Insurance Company* (C.D. Cal., Nov. 4, 2019, No. 219CV04210CASGJSX) 2019 WL 5784925, at *10-11 [dispute over scope of consent did not prevent plaintiffs from stating a claim for conversion; "This is therefore not a case where, like the relationship between a bank and depositor, the relationship between plaintiffs and Transamerica 'is that of a debtor and creditor.' "]; *Wells Fargo Bank, National Association v. Transamerica Life Insurance*

*Company* (C.D. Cal., Feb. 19, 2020, No. 219CV06478CASGJSX) 2020 WL 833518, at *12 [following *Brighton Trustees*].)

Finally, analogizing to cases involving the conversion of money, Google contends that plaintiffs have not identified the exact amount of data at issue in their complaint. The Court assumes without deciding that, as in cases involving monetary conversion, plaintiffs must identify the quantity of data allowances converted by Google in order to obtain a judgment on their claim. However, Google cites only an unpublished federal decision to support its argument that such a showing must be made at the pleading stage.[4] The Court concludes that this requirement is not properly imposed until plaintiffs have had the benefit of some discovery.

Accepting plaintiffs' characterization of their rights in their data allowances—as it must at this juncture—the Court finds that plaintiffs plead an intangible property interest supporting their claim for conversion.

C. Interference with Plaintiffs' Property Rights and Resulting Harm

Google further contends that plaintiffs fail to allege it interfered with any property interest in their data allowances or caused damage as a result. It correctly notes that plaintiffs do not allege whether they have unlimited or fixed data allowances, and urges that even if they have fixed allowances, plaintiffs would not be damaged by Google's conduct unless it caused them to incur overage fees or actually interfered with their own use of data.[5] Plaintiffs respond that,

---

[4] California authorities have applied this requirement at summary judgment. (See *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP* (2007) 150 Cal.App.4th 384, 396–397 [affirming summary adjudication of conversion claim in favor of defendant where evidence of the sum removed from a residence "reflects amounts varying by millions of dollars"]; *Vu v. California Commerce Club, Inc.* (1997) 58 Cal.App.4th 229, 235 [affirming summary judgment for defendant in card-cheating case due to failure to identify specific sums converted: "[T]he gist of plaintiffs' case was that much of the money they lost was taken by persons other than the club or its employees. Any amounts the club may have taken (e.g., Pan-Nine bets confiscated upon discovery of cheating) also were not identified."].)

[5] Consistent with Google's argument, plaintiffs allege two potential theories of interference and/or harm in only hypothetical terms:

> When users have a fixed cellular data allowance and exceed it, they are typically charged an overage fee. When users have a so-called "unlimited" plan, they are still typically subject to quotas on their usage and will have their cellular connection speeds throttled if they exceed such quotas. When throttled to reduced speeds, a number of functionalities can be lost entirely (such as video streaming), and the overall performance of the device can be significantly impaired.

because Civil Code section 3336 establishes the market value of the property converted as the presumptive measure of damages in an action for conversion, they need not allege that they suffered monetary damages or suffered any degradation in their service quality.

Google's argument is addressed to both the second and third elements of conversion: (2) defendant's disposition of property in a manner inconsistent with plaintiff's property rights and (3) resulting damages. (*Voris v. Lampert*, *supra,* 7 Cal.5th at p. 1150.) With regard to the second element, conversion requires "substantial interference or 'an exertion of wrongful dominion over the personal property of another in denial of or inconsistent with his rights therein.' " (*Heaps v. Heaps* (2004) 124 Cal.App.4th 286, 292, quoting *George v. Bekins Van & Storage Co.* (1949) 33 Cal.2d 834, 837.) "An action for conversion will lie only where the interference is substantial in nature, so that a plaintiff may be able to recover the full value of the property, in essence forcing a defendant to buy the property." (See *Gregory v. City of Vallejo* (E.D. Cal. 2014) 63 F.Supp.3d 1171, 1180, citing *Zaslow v. Kroenert,* 29 Cal.2d 541, 550.) "Where the conduct complained of does not amount to a substantial interference with possession or the right thereto, but consists of intermeddling with or use of or damages to the personal property, the owner has a cause of action for trespass or case, and may recover only the actual damages suffered by reason of the impairment of the property or the loss of its use." (*Zaslow v. Kroenert*, *supra,* 29 Cal.2d at pp. 551–552; see also *Thrifty-Tel, Inc. v. Bezenek*, *supra,* 46 Cal.App.4th at pp. 1566–1567; *Jordan v. Talbot* (1961) 55 Cal.2d 597, 610.)

Plaintiffs do not squarely address this second element of conversion in their opposition papers. However, they argue that conversion does not require interference that entirely prevents a property owner from using his or her property, pointing to cases involving the conversion of licenses and other intangible property capable of concurrent use. (See *G.S. Rasmussen & Associates, Inc. v. Kalitta Flying Service, Inc.*, *supra,* 958 F.2d at p. 906 [Supplemental Type Certificate holder stated a claim for conversion where he was "denied a return on his investment as a condition for granting [the defendant] the right to use his STC"]; *DIRECTV, Inc. v. Pahnke*,

---

(Amended Complaint, ¶ 26.) In their opposition, plaintiffs make it clear that they do not rely on these potential theories of injury at this time, but take the position that Google's use of their data allowances constitutes conversion even in the absence of such interference or harm.

*supra,* 405 F.Supp.2d at pp. 1189–1190 [wrongful interception of satellite broadcast which plaintiff had the right to distribute constituted conversion].) Google correctly notes that these cases reflect little reasoning with regard to the issue of substantial interference. Still, they support plaintiffs' position that the use of data allowances plaintiffs' have the exclusive right to control, without their consent, satisfies the second element of the tort of conversion. The Court finds that this requirement is satisfied: plaintiffs allege that Google has substantially interfered with their data allowances by using them without plaintiffs' consent, contrary to plaintiffs' rights to control the use of their allowances.

Plaintiffs still must allege the separate, third element of injury or "damages."

> Although the words "injury" and "damage" often are used interchangeably, a distinction may be made. "Injury" refers to the fact of harm suffered by the plaintiff due to the defendant's conduct. "Damages" refers to the monetary sum that the plaintiff may be awarded as compensation for the injury. To recover in tort, the plaintiff must prove the fact of proximately caused injury with reasonable certainty. ... [Otherwise], the plaintiff cannot recover regardless of how much evidence was introduced to show the measure of the recovery sought by the plaintiff.

(*Lueter v. State of California* (2002) 94 Cal.App.4th 1285, 1302–1303; see also *Donahue Schriber Realty Group, Inc. v. Nu Creation Outreach* (2014) 232 Cal.App.4th 1171, 1184 ["damage is not an essential element of a cause of action for trespass to real property," although harm is].)

Civil Code section 3336 provides that "[t]he detriment caused by the wrongful conversion of personal property is presumed to be:"

> First--The value of the property at the time of the conversion, with the interest from that time, or, an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted; and
>
> Second--A fair compensation for the time and money properly expended in pursuit of the property.

"Civil Code section 3336 sets out the presumptive measure of ***damages*** in conversion, which is rebuttable…." (*Dakota Gardens Apartment Investors B v. Pudwill* (1977) 75

Cal.App.3d 346, 351, emphasis added.) Section 3336 "does not provide that a plaintiff alleging conversion is entitled to a presumption of injury. A conversion plaintiff in California court must still prove 'the fact of proximately caused injury' " or harm. (*Opperman v. Path, Inc.* (N.D. Cal. 2015) 84 F.Supp.3d 962, 990, citing *Lueter v. State of California, supra,* 94 Cal.App.4th at p. 1303.)

" 'Harm,' under the Restatement Second of Torts means 'the existence of loss or detriment in fact *of any kind* to a person ....' (Rest.2d Torts, § 7, subd. (2), italics added.)" (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1006.) Having reviewed the authorities discussed by plaintiffs at oral argument, the Court is persuaded that the harm required to support a claim for conversion is slight, and plaintiffs have satisfied this element here by alleging that they were prevented from using themselves, sharing, or even selling the data used by Google. (See Amended Complaint, ¶ 27–28.) As noted by plaintiffs, in *Lueter v. State of California*, the Court of Appeal affirmed a judgment of $1.50 on a conversion claim against a law enforcement agency that investigated a motor vehicle accident, whose employees had taken a piece of plaintiffs' tire tread from the scene of the accident and discarded it. (See *Lueter v. State of California, supra,* 94 Cal.App.4th at pp. 1288–1289.) While the court held that the plaintiffs were not entitled to "spoliation damages" flowing from their inability to use the evidence to defend themselves against a lawsuit by other motorists injured in the crash, it confirmed that an award of "the value of the converted property" is generally an appropriate measure of damages in a conversion action. (*Id.* at p. 1302.) Although this issue was not addressed by the Court of Appeal, plaintiffs correctly note that the piece of tire tread at issue in *Leuter* would have had little practical value to the plaintiffs in that case, other than as evidence in the lawsuit against them. Still, an award of damages in the amount of $1.50—presumably, the value of the tread as determined by the jury—was supported.

In addition to *Lueter*, plaintiffs again cite the federal cases involving the conversion of a Supplemental Type Certificate (*G.S. Rasmussen & Associates, Inc. v. Kalitta Flying Service, Inc., supra,* 958 F.2d at p. 906) and a right to distribute satellite broadcasting *(DIRECTV, Inc. v. Pahnke*, *supra,* 405 F.Supp.2d at pp. 1189–1190) to support their position. The Court observes

that those cases involve essentially unique forms of intangible property that the plaintiffs were in the business of selling to others, such that the injury inflicted by a potential customer's conversion of the property without paying for it is apparent. Still, injury was found in these cases even though the plaintiffs presumably retained access to some version of the certificate and satellite feed at issue, similar to the potentially unlimited data allowances here. In any event, here, as in these federal cases, plaintiffs allege that there is a market for the property at issue.

Plaintiffs accordingly allege the interference and harm required to state a claim for conversion. Google's demurrer to the first cause of action will accordingly be overruled.

Finally, plaintiffs argue at length that Civil Code section 3337[6] "does not permit Google to escape liability for conversion by claiming it applied the converted property to Plaintiffs' benefit." Under that section, "a defendant cannot rebut the presumption [of the measure of damages established by section 3336] by claiming that he applied the converted property to plaintiff's benefit when he took unlawful possession of the property from the beginning." (*Dakota Gardens Apartment Investors B v. Pudwill*, *supra*, 75 Cal.App.3d at p. 352.) "Consequently, the effect of section 3337 ***is to prevent mitigation*** when property is stolen from the plaintiff and subsequently applied to his benefit." (*Ibid.*, emphasis added.) While it may otherwise be relevant to this case, section 3337 does not impact the requirement that plaintiffs plead the element of injury or harm to state a claim for conversion, and the Court does not rely on this provision in overruling Google's demurrer.

D. Quantum Meruit

Finally, Google urges that plaintiffs' second cause of action for quantum meruit must stand or fall with the first cause of action. (See *McBride v. Boughton* (2004) 123 Cal.App.4th 379, 394 ["When a common count is used as an alternative way of seeking the same recovery demanded in a specific cause of action, and is based on the same facts, the common count is demurrable if the cause of action is demurrable."].) However, the first cause of action survives

---

[6] Section 3337 provides that "[t]he presumption declared by the last section cannot be repelled, in favor of one whose possession was wrongful from the beginning, by his subsequent application of the property to the benefit of the owner, without his consent."

for the reasons discussed above. As Google raises no other grounds in support of its demurrer to plaintiffs' claim for quantum meruit, the demurrer must be overruled as to this claim as well.

V. Conclusion and Order

Google's demurrer to the Amended Complaint is OVERRULED.

IT IS SO ORDERED.

Dated: August 21, 2020

Honorable Brian C. Walsh
Judge of the Superior Court



**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SANTA CLARA**
DOWNTOWN COURTHOUSE
191 NORTH FIRST STREET
SAN JOSÉ, CALIFORNIA 95113
CIVIL DIVISION

FILED
AUG 24 2020
Clerk of the Court
Superior Court of CA County of Santa Clara
BY Joe Jee Vizconde DEPUTY

**FILE COPY**

RE: **Csupo, et al. v. Alphabet, Inc.**
Case Number: **19CV352557**

**PROOF OF SERVICE**

**ORDER AFTER HEARING ON JULY 17, 2020 ( Demurrer by Defendant Alphabet, Inc. to the First Amended Complaint )** was delivered to the parties listed below the above entitled case as set forth in the sworn declaration below.

---

If you, a party represented by you, or a witness to be called on behalf of that party need an accommodation under the American with Disabilities Act, please contact the Court Administrator's office at (408) 882-2700, or use the Court's TDD line (408) 882-2690 or the Voice/TDD California Relay Service (800) 735-2922.

**DECLARATION OF SERVICE BY MAIL:** I declare that I served this notice by enclosing a true copy in a sealed envelope, addressed to each person whose name is shown below, and by depositing the envelope with postage fully prepaid, in the United States Mail at San Jose, CA on August 24, 2020. CLERK OF THE COURT, by Ann Vizconde, Deputy.

**cc:** Ann M Ravel Fairmont Plaza10th Floor 50 West San Fernando Street San Jose CA 95113
Whitty Somvichian 101 California St 5th Fl San Francisco CA 94111-5800

ANN RAVEL (62139)
aravel@mcmanislaw.com
McMANIS FAULKNER
a Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone: (408) 279-8700
Facsimile: (408) 279-3244

GLEN E. SUMMERS (176402)
glen.summers@bartlitbeck.com
KARMA M. GIULIANELLI (184175)
karma.giulanelli@bartlitbeck.com
ALISON G. WHEELER (180748)
alison.wheeler@bartlitbeck.com
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140

*Attorneys for Plaintiffs, Joseph Taylor, Edward Mlakar, Mick Cleary, and Eugene Alvis*

GEORGE A. ZELCS (*pro hac vice* application forthcoming)
gzelcs@koreintillery.com
ROBERT E. LITAN (*pro hac vice* application forthcoming)
rlitan@koreintillery.com
RYAN Z. CORTAZAR (*pro hac vice* application forthcoming)
rcortazar@koreintillery.com
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

MICHAEL E. KLENOV (277028)
mklenov@koreintillery.com
CAROL O'KEEFE (*pro hac vice* application forthcoming)
cokeefe@koreintillery.com
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

JOSEPH TAYLOR, EDWARD MLAKAR, MICK CLEARY, and EUGENE ALVIS, individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

GOOGLE LLC,

Defendant.

Case No.:

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1. Defendant Google LLC ("Google") has a dirty little secret. It designed the Android operating system to collect vast amounts of information about users, which Google uses to generate billions in profit annually by selling targeted digital advertisements. There are privacy implications for an operating system specifically designed to surveil mobile device users in order to refine Google's targeted advertising business. But in the course of mobile surveillance, there is also an unlawful taking of Android users' property—namely, their cellular data. Google effectively forces these users to subsidize its surveillance by secretly programming Android devices to constantly transmit user information to Google in real time, thus appropriating the valuable cellular data users have purchased. Google does this, in large measure, for its own financial benefit, and without informing users or seeking their consent.

2. This case involves the application of long-standing common law principles to seek redress for Google's secret appropriation of Android users' cellular data allowances. Pursuing claims for conversion and quantum meruit, Plaintiffs seek to represent a nationwide class of consumers (excluding California residents) who own Android mobile devices that secretly use their costly cellular data plans to enable Google's surveillance activities.

3. Much of this information-gathering by Google takes place without any action at all by Android device owners. While Plaintiffs' Android devices are in their purses and pockets, and even while sitting seemingly idle on Plaintiffs' nightstands as they sleep, Google's Android operating system secretly appropriates cellular data paid for by Plaintiffs to perform "passive" information transfers which are not initiated by any action of the user and are performed without their knowledge. The transmission of this data to and from Google is not time-sensitive and could be delayed until Plaintiffs are in Wi-Fi range to avoid consuming Plaintiffs' cellular data allowances. However, Google deliberately designed and coded its Android operating system and Google applications to indiscriminately take advantage of Plaintiffs' data allowances and passively transfer information at all hours of the day—even after Plaintiffs move Google apps to the background, close the programs completely, or disable location-sharing.

4. Plaintiffs had no say in Google's continual misappropriation of their cellular data allowances and remain largely powerless to stop it. Google designed its Android operating system and apps to prevent users from changing the settings to disable these transfers completely or to restrict them to Wi-Fi networks. Because of Google's deliberate design decisions, these passive information transfers using cellular data allowances purchased by Plaintiffs are mandatory and unavoidable burdens shouldered by Android device users for Google's financial benefit.

5. Plaintiffs at no time consented to these transfers, and were given no warning or option to disable them. Google has crafted its various terms of service and policies in ways that purport to create binding contracts with the users of its technologies. But Plaintiffs and other consumers purchased their Android devices with little choice but to accept Google's terms and policies, which are contracts of adhesion. Even if Google's policies and terms of service are valid contracts, they do not alert users that Android devices will needlessly consume their cellular data allowances. While Google informs the users of certain transfers of personal information when they are actively engaged with their devices, its extensive "privacy" policies are silent on mandatory, passive information transfers and the means by which they occur.

6. These information transfers are not mere annoyances—they interfere with Plaintiffs' property interests, depriving them of data for which they, not Google, paid. Each month, mobile device users pay their mobile carriers for cellular data allowances that enable them to transmit and receive information on the carriers' cellular data networks. Whether Plaintiffs pay for a specific number of gigabytes or unlimited access subject to speed restrictions above a certain data usage threshold, the contracts between Plaintiffs and their mobile carriers create for Plaintiffs concrete property interests in their purchased data allowances. When it initiates passive transfers of information utilizing Plaintiffs' cellular allowances, Google wrongfully interferes with Plaintiffs' property and commits the longstanding tort of conversion.

7. In addition to misappropriating Plaintiffs' property, the passive transfers confer a valuable benefit to Google at Plaintiffs' expense. Google sends and receives information without bearing the cost of transferring that information between consumers and Google. Indeed, the

information transmitted through this practice supports the company's product development and lucrative targeted advertising business. In the absence of contractual provisions disclosing and permitting Google's appropriation of Plaintiffs' property, Google must compensate Plaintiffs for the fair market value of the data allowances Google has misappropriated, as well as the value of the personal information which Google has thereby acquired.

## PARTIES

8. Plaintiff Joseph Taylor, who is a resident and domiciliary of Illinois, bought an Android mobile device that he uses with a monthly unlimited cellular data plan purchased from carrier Metro by T-Mobile. Plaintiff Taylor was injured in fact and has been deprived of his property as a result of Google's unlawful conversion of his cellular data.

9. Plaintiff Edward Mlakar, who is a resident and domiciliary of Illinois, bought an Android mobile device that he uses with a monthly unlimited cellular data plan purchased from carrier Sprint Solutions, Inc. Plaintiff Mlakar was injured in fact and has been deprived of his property as a result of Google's unlawful conversion of his cellular data.

10. Plaintiff Mick Cleary, who is a resident and domiciliary of Wisconsin, bought an Android mobile device that he uses with a monthly unlimited cellular data plan purchased from carrier Verizon. Plaintiff Cleary was injured in fact and has been deprived of his property as a result of Google's unlawful conversion of his cellular data.

11. Plaintiff Eugene Alvis, who is a resident and domiciliary of Iowa, bought Android mobile devices that he has used with a monthly limited cellular data plan purchased from carrier Verizon and a monthly unlimited cellular data plan from U.S. Cellular. Plaintiff Alvis was injured in fact and has been deprived of his property as a result of Google's unlawful conversion of his cellular data.

12. Defendant Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Google created the Android operating system and continues to control all aspects of Android's programming and operation.

**JURISDICTION**

13. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), because (1) this action is a "class action," which contains class allegations and expressly seeks certification of a proposed class of individuals; (2) the Class defined below consists of more than one hundred proposed class members; (3) the citizenship of at least one class member is different from Google's citizenship;[1] and (4) the aggregate amount in controversy of the claims of Plaintiffs and the putative Class exceeds $5,000,000, exclusive of interest and costs.

14. This Court has personal jurisdiction over Google because it maintains its headquarters in California and in this District, and the illegal conduct alleged herein was conceived and implemented in whole or in part within California and this District.

15. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c).

16. Google's terms of service provide that all claims arising out of or relating to Google's products and services will be litigated in federal or state courts in Santa Clara County, California, USA, and that Google consents to personal jurisdiction in those courts.

## I. GOOGLE'S ANDROID SYSTEM IS UBIQUITOUS

17. Google owns and programs the most popular mobile platform in the world, the Android operating system. Android works on a variety of mobile devices, including smartphones and tablets.

[1] Because jurisdiction is based on the Class Action Fairness Act, 28 U.S.C. § 1332(d), even though Google LLC is a limited liability company, it is a citizen of the states "where it has its principal place of business and…under whose laws it is organized." 28 U.S.C. § 1332(d)(10). In other words, while in traditional non-class diversity cases the citizenship of a limited liability company would be determined by the citizenship of its members, that principle does not apply to this case. *See, e.g., Erie Ins. Exch. V. Erie Indemn. Co.*, 722 F.3d 154, 161 n.7 (3d Cir. 2013) (explaining that the Class Action Fairness Act "evinces an intent that suits by unincorporated associations be treated like suits by corporations in that the citizenship of the association for diversity purposes is determined by the entity's principal place of business and not by the citizenship of its members").

18. The Android operating system includes an interface that provides the principal means by which users interact with their devices. The interface allows consumers to access and to use applications and widgets on the devices.

19. In addition to the Android operating system, Plaintiffs' devices come with various Google applications and widgets pre-installed, including the Google search application, Chrome browser, Gmail email application, Google Maps, and YouTube.

20. Android has been available on mobile devices since 2008 and has been the most dominant mobile operating system since 2011.[2] It currently has about a 54.4 percent share of the U.S. smartphone market.[3]

21. All or virtually all mobile carriers offer cellular data plans that allow Android devices to connect to their cellular networks in order to send and receive internet communications. These mobile carriers sell mobile devices directly to consumers. Among the mobile carriers that sell Android devices for connection to their cellular networks are Verizon, AT&T, Sprint, T-Mobile, and U.S. Cellular.

22. Many of the most popular mobile-device manufacturers sell devices with Android preinstalled as the operating system and often with a suite of Google's mobile apps preinstalled. These manufacturers include Samsung, Motorola, LG, Kyocera, Sonim, Huawei, ZTE, and HTC.

## II. PLAINTIFFS HAVE A PROPERTY INTEREST IN THEIR CELLULAR DATA PLANS

23. Plaintiffs purchased mobile devices preloaded with Google's Android operating system and suite of mobile apps and widgets.

---

[2] Charles Arthur, *The History of Smartphones: Timeline*, GUARDIAN (Jan. 24, 2012), https://www.theguardian.com/technology/2012/jan/24/smartphones-timeline.

[3] *Subscriber Share Held by Smartphone Operating Systems in the United States: 2012 to 2018*, STATISTA, https://www.statista.com/statistics/266572/market-share-held-by-smartphone-platforms-in-the-united-states/.

24. To use their mobile devices, Plaintiffs contracted with mobile carriers. As part of these contracts, plaintiffs purchased cellular data plans that provided them with data allowances. These plans allow plaintiffs to access the carriers' cellular data networks, thereby providing users with the ability to send and receive information over the internet without a Wi-Fi connection. In this way, cellular data plans provide the essential capability that allows a mobile device to be truly mobile.

25. Though cellular data networks provide a critical resource for mobile devices, they are not necessary for the mobile device to send and receive information through the internet. When users do not wish to use their cellular networks or when they are unable to use them, mobile devices can also transfer and receive information over the internet through Wi-Fi connections. Indeed, many cost-conscious users maximize their time on Wi-Fi whenever possible and use their cellular networks only when Wi-Fi connections are unavailable in order to "save" the cellular data allowances available under their monthly carrier plans.

26. Cellular data plans vary by carrier, but they function in essentially the same way. The users pay the carrier a certain price each month for cellular data allowances, which provide the users with the right to send and receive information on their devices through the carrier's cellular network. Some cellular data plans provide users with an unlimited cellular data allowance, while others provide users with a fixed allowance, which grants them the right to send and receive a maximum amount of data (e.g., 10 gigabytes) each month. When users have a fixed cellular data allowance and exceed it, they are typically charged an overage fee. When users have a so-called "unlimited" plan, they are still typically subject to quotas on their usage and will have their cellular connection speeds throttled if they exceed such quotas. When throttled to reduced speeds, a number of functionalities can be lost entirely (such as video streaming), and the overall performance of the device can be significantly impaired.

27. The purchase of data plans from mobile carriers creates a property interest for Plaintiffs in their cellular data allowances. Each quantum of the data allowance has a fair market value determined by market forces. By contracting for the purchase of their cellular data

allowances, Plaintiffs obtain access to send and receive information on the carriers' networks in accordance with the terms of the contract. This access includes the right to exclude other persons and entities from using Plaintiffs' cellular data allowances. Plaintiffs have the right to determine precisely how to use their data allowances and to grant others access to those allowances through their mobile device activity.

28. For example, Android users may explicitly grant others access to their cellular data allowances by creating a mobile "hotspot," in which the mobile device shares its cellular network connection with other nearby devices so that those devices can access the internet once they are given the hotspot's password. Similarly, "tethering" (either through a USB cable or a Bluetooth connection) allows users to connect their mobile device with a computer to share the device's cellular network connection and grant the computer access to their cellular data allowances. Users can also sell unused data allowances. *See, e.g.*, https://www.simplify.network/ (mobile app enabling Android users to sell their excess data allowances via hotspot).

## III. MOBILE DEVICE USERS ONLY CONSENT TO GOOGLE'S USE OF THEIR CELLULAR DATA ALLOWANCES WHEN THEY ACTIVELY USE GOOGLE'S PRODUCTS

29. Under certain circumstances, mobile device users consent to the use of their cellular data allowances. For example, when users actively engage with applications that require internet access while connected only by their cellular plan, they instruct the applications to use some of their cellular data allowance, thus authorizing such use. For example, when a user is in an area without Wi-Fi, opens a browser, and types in a web address, the user consents to use her cellular data allowance to send information to the website's server and to allow the website to send information over the mobile carrier's cellular network to the device. Similarly, when that user opens a video app and requests to view a video, she consents to allow the app to send a video to her device over her mobile carrier's cellular network and for that usage to count toward her allowance.

30. These active transfers of information that are initiated by the user engaging an application are not at issue in this lawsuit. Plaintiffs do not contest Google's right to use Plaintiffs' cellular data allowances pursuant to their consent when Plaintiffs are actively using Google's various products on their mobile devices.

31. Plaintiffs instead challenge Google's misappropriation of their cellular data allowances, without Plaintiffs' consent, based on "passive transfers," meaning information transfers that occur in the background or which do not result from Plaintiffs' direct engagement with Google products on their devices. These passive transfers, described in more detail below, occur in a variety of ways – including when Google applications are open (though not in active use) and operating in the background, and even when a user has closed out all Google applications on her device and the device is stationary and seemingly dormant. In none of the Google policies discussed below does Google notify users that its operating system, applications, and widgets cause users' mobile devices to indiscriminately consume Plaintiffs' cellular data allowances, even when users are not using an app or widget on their devices.

## IV. GOOGLE'S MISAPPROPRIATION OF PLAINTIFFS' CELLULAR DATA ALLOWANCES

32. Google designed and implemented its Android operating system and apps to extract and transmit large volumes of information between Plaintiffs' cellular devices and Google using Plaintiffs' cellular data allowances. Google's misappropriation of Plaintiffs' cellular data allowances through passive transfers occurs in the background, does not result from Plaintiffs' direct engagement with Google's apps and properties on their devices, and happens without Plaintiffs' consent.

33. These passive transfers occur in a variety of ways. First, such transfers occur when mobile devices are in a completely idle state, meaning they are stationary, untouched, and with all apps closed. To confirm this, an analysis commissioned by Plaintiffs' counsel tested a new Samsung Galaxy S7 mobile device with the standard default settings accepted and standard pre-

loaded set of apps, which was connected to a brand-new Google account and was not connected to Wi-Fi. The analysis found that when the device was left in an idle state, the device sent and received 8.88 MB/day of data, with 94% of those communications occurring between Google and the device. In all, the device transferred information to and from Google approximately 389 times in 24 hours, for an average of more than 16 times per hour. The frequency of passive information transfers in this experiment was striking given the source: a stationary and untouched Android device, with all apps closed.

34. Many of those communications were comprised of LOG files, which are automatically-produced files that contain a record of certain background information such as the networks that are available, apps that are open, and metrics about the operating system. LOG files are typically not time-sensitive, and transmission of them could easily be delayed until Wi-Fi is available. Google could also program Android to allow users to enable passive transfers only when they are on Wi-Fi connections, but it has chosen not to do so. Instead, Google has chosen to simply take advantage of Plaintiffs' cellular data allowances so that it can get information from Plaintiffs at all hours of the day, no matter where they are or what they are doing.

35. Second, a higher volume of passive transfers occurs when mobile devices are stationary and untouched, but with one or more apps open and unused. Vanderbilt University Professor Douglas C. Schmidt performed a study of Google's data collection efforts in 2018. (*See* Ex. 1, Douglas C. Schmidt, *Google Data Collection* (Aug. 15, 2018). He found that both Android and Chrome transmit information to Google "even in the absence of *any* user interaction." (*Id.* at p. 3 (emphasis in original).) Professor Schmidt conducted an experiment with an Android device that was outwardly dormant and stationary but with Chrome open and in the background, and he found passive transfers[4] to Google occurred approximately *900 times in 24 hours* (*id.* at 14), for an average of *38 times per hour*.

---

[4] Professor Schmidt consistently defined "passive" information transfers as "information exchanged in the background without any obvious notification to the user," in contrast to "active" transfers, which he defined as "information directly exchanged between the user and a

36. In comparison, a stationary and untouched iPhone device with the Safari browser open in the background communicated virtually no information to Google, and its information transfers to Apple amounted to only about 1/10th of the information transferred to Google from the Android device. (*Id.* at pp. 3, 14.)




(Ex. 1 at p. 14, Figure 6, Traffic data sent from idle Android and iPhone mobiles.)

37. The Android device passively transferred 4.4 MB of data each day, or around 130MB each month, to Google servers, while the iPhone device transferred around 1/6th that volume of data to Google servers. (*Id.* at 14.)

38. The contrast between the number of requests made to the two devices, as well as the volume of data transferred from the devices, confirms that Google's products play critical roles in passive information transfers to Google—and that the vast majority or all of these transfers are unnecessary.

---

Google product." (*Id.* at 7.)

39. Third, even more passive transfers occur once users begin moving around with their Android devices, or interacting with them by visiting web pages, or using apps, despite also eschewing the use of any preloaded Google apps such as Google Search, YouTube, Gmail, or Google Maps. (*Id.* at pp. 3, 23.) This increased activity was driven by Google's publishing and advertising products including Google Analytics, DoubleClick (now Google Ad Manager), and AdWords (now Google Ads). (*Id.* at 3, 15) Passive information transfers represented 46% of requests to Google servers from the device in the Schmidt experiment. (*Id.* at pp. 3–4.)

40. An iPhone device (again, without the Android operating system or Google's applications) in comparable active use communicated with Apple far less frequently than Android devices communicated with Google's servers. (*Id.* at 24.) (The two devices did have a comparable number of contacts with Google's advertising domains, as was expected in light of the similar usage on both devices of third party websites and apps which provide information to Google. (*Id.*)) The iPhone device also transferred a small fraction of information to Apple's servers, compared to the information transferred to Google from the Android device, as shown below: (*Id.*)



(Ex. 1 at p. 24, Figure 12, Information requests from mobile devices during a day of typical use.)

41. With active use, the Android device passively transferred to Google servers 11.6 MB of data each day, or around 350MB each month, while the iPhone device transferred around half that amount to Google servers. (*Id.* at 24.)

42. Google's publishing and advertising products drive passive data transfers from Android devices to Google in a variety of ways. For example, Android devices transmit "tokens" that identify devices and users (and provide other information) with each connection to Google's servers. Google uses this information to determine which users it communicates with on which specific devices and to serve targeted ads. (*Id.* at 16–23.) These tokens are frequently sent alongside requests to send ads to the device.

43. Google's publishing and advertising products also drive passive data transfers from Google to Android devices. For example, Google tracks and predicts user behavior to pre-load targeted ads containing text, audio, games or other interactives, and even video onto Android devices. Users often never view these pre-loaded ads, even though their cellular data was already consumed to download the ads from Google. And because these pre-loads can count as ad impressions, Google is paid for transmitting the ads.

44. Google instigates these transfers of information by designing and implementing its Android operating system and apps to mandate that transfer, regardless of whether a user has access to a Wi-Fi connection or instead has only her cellular data allowance to transmit information to and from her device.

## V. MOBILE DEVICE USERS DO NOT CONSENT TO GOOGLE'S USE OF THEIR CELLULAR DATA ALLOWANCES WHEN THEY ARE NOT USING GOOGLE'S PRODUCTS

45. Users of Android must accept standardized form contracts to use the company's various policies ("Google Agreements"). But none of those agreements discloses that Google

appropriates Plaintiffs' cellular data allowances to transmit information when Plaintiffs are not actively using Google's products. Instead, they notify Plaintiffs that they may incur charges to third parties (the wireless carriers) when they *use* Google's products.

46. The Google Agreements include four general policies relevant to this suit: the Terms of Service; the Privacy Policy; the Managed Google Play Agreement; and the Google Play Terms of Service.[5] Google's master policy is its Terms of Service. The Terms of Service themselves incorporate by reference the company's Privacy Policy. In addition, according to the Managed Google Play Agreement, use of the Android operating system is governed by the Google Play Terms of Service. Nothing in these policies suggests that Google uses Plaintiffs' data allowances to transmit information when Plaintiffs are not actively engaged with Google's products.

47. Specifically, Google's Privacy Policy states, "We collect information about the apps, browsers, and devices you use to access Google services… We collect this information when a Google service on your device contacts our servers—for example, when you install an app from the Play Store or when a service checks for automatic updates. If you're using an Android device with Google apps, your device periodically contacts Google servers to provide information about your device and connection to our services."[6]

48. The Google Play Terms of Service is the only policy that even mentions cellular data usage. It applies to the company's Google Play online store, where users can download software applications for their mobile devices. The policy has a disclaimer targeted specifically at Google Play's usage of cellular data allowances. The disclaimer, however, applies only to active usage in connection with the use of Google Play and apps available through Google Play. The Play terms provide: "You are responsible for any access or data fees incurred from third parties (such

---

[5] These policies are posted online at: https://policies.google.com/terms?hl=en-US (Terms of Service); https://policies.google.com/privacy (Google Privacy Policy); https://www.android.com/enterprise/terms/ (Managed Google Play Agreement); https://play.google.com/about/play-terms/index.html (Google Play Terms of Service).

[6] Google Privacy Policy, https://policies.google.com/privacy.

as your Internet provider or mobile carrier) in connection with *your use and viewing* of Content and Google Play"[7] (emphasis added). The disclaimer is silent on Google's misappropriation of cellular data allowances when users are not "using and viewing" Google's products.

49. The Google Agreements also include Google policies that apply specifically to individual mobile apps. None of those policies disclose Google's passive data usage. For example, the Google Maps terms provide that "[c]ontent you upload, submit, store, send, or receive through Google Maps/Google Earth is subject to Google's Terms of Service."[8] The policy is silent about how that information is sent and does not provide Google with the authority to use Plaintiffs' cellular data allowances for passive information transfers.

50. The same is true of the Google Chrome browser policy. Despite the policy's specificity, it still does not obtain users' consent to Google accessing users' cellular data allowances for passive information transfers. Instead, the Google Chrome policy merely discloses that Chrome unilaterally transmits various types of information to Google. For example, the policy states that Chrome "periodically sends information to Google to check for updates, get connectivity status, validate the current time, and estimate the number of active users." It further states that "information that Chrome stores [locally on your device] won't be sent to Google unless you choose to store that data in your Google Account." The policy also provides that "[s]ites and Android apps can also ask the browser to preload the pages you might visit next" when using Chrome and that "[p]reloading requests from Android apps are controlled by the same setting as Chrome-initiated predictions." Moreover, "on mobile devices, Chrome automatically shares your location with your default search engine if the Chrome app has permission to access your location and you haven't blocked geolocation for the associated website." Finally, the policy states that "usage statistics and crash reports are sent to Google to help us improve our products."[9] But again,

---

[7] Google Play Terms of Service, https://play.google.com/about/play-terms/index.html.

[8] Google Maps/Google Earth Additional Terms of Service, https://www.google.com/help/terms_maps/.

[9] Google Chrome Privacy Notice, https://www.google.com/chrome/privacy/.

no language in the policy discloses that Google accesses users' cellular data allowances to initiate passive information transfers.

## VI. GOOGLE HAS CONCEALED ITS MISAPPROPRIATION OF PLAINTIFFS' CELLULAR DATA

51. Upon information and belief, Google's misappropriation of cellular data began with the very first sale of the Android operating system. And from that time on, Google has actively and fraudulently concealed its misappropriation of Plaintiffs' cellular data.

52. Instead of notifying Plaintiffs and obtaining their consent to its usage of their cellular data, Google has misled Plaintiffs by informing them that they are responsible for access or data fees incurred from third parties (such as the mobile carriers) "in connection with *your use and viewing* of Content and Google Play"[10] (emphasis added). This provision misrepresents the true nature of Google's cellular data consumption because this purported disclosure suppresses the material fact that access or data fees may be incurred *even when users are neither using nor viewing Content or Google Play.*

53. Google's fraudulent concealment tolls the statute of limitations—Plaintiffs are entitled to recover from Google the value of their misappropriated data from the beginning of Google's scheme to use Plaintiffs' data without their consent or even knowledge.

## CLASS ALLEGATIONS

54. Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a), and 23(b)(1), 23(b)(2), 23(b)(3), and/or 23(c)(4) on behalf of the following proposed class:

> All natural persons in the United States (excluding citizens of the State of California) who have used mobile devices running the

---

[10] Google Play Terms of Service, https://play.google.com/about/play-terms/index.html.

Android operating system to access the internet through cellular data plans provided by mobile carriers.[11]

55. The Class excludes (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; and (b) any judges or justices involved in this action and any members of their immediate families or their staff.

56. Numerosity. Plaintiffs do not currently know the exact number of persons in the Class, but they number in the millions and are geographically dispersed throughout the United States. Joinder of all Class members before this Court would be impracticable. The names, contact information, and other unique identifiers of the members of the Class are readily obtainable from Google, which requires users to log in to their Google accounts to download apps from the Google Play store and sets up profiles for users of Android phones who do not have Google accounts. This information about class members is also obtainable from nonparty mobile carriers, which maintain lists of customers who have mobile devices with Android technology.

57. Typicality. Plaintiffs' claims are typical of and fairly encompass the claims of the Class members. Plaintiffs are members of the Class. Plaintiffs have used Android devices to access the internet using their cellular data plans during the Class Period, including the past three years. The members of the Class are similarly harmed by Google's conversion of their cellular data.

58. Adequacy. Plaintiffs and their counsel will fairly, adequately, and vigorously protect the interests of the members of the Class. There are no material conflicts between the claims of Plaintiffs and the members of the Class making class certification inappropriate. Counsel for the Class will vigorously assert Plaintiffs' claims and those of the members of the Class. Plaintiffs are represented by Counsel who are competent and experienced in the prosecution of consumer class action litigation.

[11] Plaintiffs reserve the right to modify this class definition before moving for class certification, whether based on information gleaned in discovery, or otherwise.

59. Superiority. A class action is superior to all other available means for the fair and efficient adjudication of the claims of the members of the Class. The damages suffered by some individual members of the Class may be relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation required to recover from Google. It would be virtually impossible or impractical for most, if not all, Class members to redress the wrongs done to them on an individual basis. Furthermore, individual litigation would be unmanageable for the Court system as it would result in thousands or millions of individual lawsuits creating the risk of inconsistent or contradictory judgments and increasing the delay and expense to all parties and the court system. In contrast, a class action would present far fewer management difficulties. Class action treatment provides the benefits of a single adjudication, economies of scale, and supervision by a single court.

60. Existence and Predominance of Common Questions of Law and Fact. Numerous questions of law and/or fact are common to Plaintiffs and all members of the Class. These common questions derive common answers for all Class members that impact the resolution of the claims on grounds equally applicable to all Class members. The common questions of law and fact for the Class include, but are not limited to:

a. Whether Google misappropriates the cellular data of Android mobile-device users to conduct passive information transfers, which occur in the background and do not result from Plaintiffs' direct engagement with their mobile devices or applications;

b. Whether the cellular data allowances that Plaintiffs purchase are property interests recognized by California law, which governs Plaintiffs' claims under the choice-of-law provision contained in the terms and conditions governing Plaintiffs' use of the Android operating system;

c. Whether Plaintiffs consent to allow Google limited access to their cellular data property through contractual terms in Google's policies;

d. Whether Google's passive transmission of information through Plaintiffs' cellular data plans exceeded the scope of any limited consent to allow Google access to the cellular data;

e. Whether Plaintiffs are entitled to recover damages for Google's conversion of their cellular data under California law;

f. Whether the passive information transfers provided Google with a valuable benefit at Plaintiffs' expense;

g. The value of data converted by Google and the benefit conferred on Google at Plaintiffs' expense;

h. The amount of damages due to individual class members, which is readily ascertainable through economic analysis of the fair market value of cellular data based on market transactions; and

i. Whether Google fraudulently concealed its scheme to misappropriate Plaintiffs' contracted for and purchased cellular data.

61. Certification is also appropriate under Fed. R. Civ. P. 23(b)(1) and/or (b)(2) because:

a. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Google.

b. The prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c. Google has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the entire Class.

## COUNTS AND REQUESTED RELIEF

## COUNT ONE: CONVERSION

62. Plaintiffs re-allege and incorporate by reference each of the allegations set forth above.

63. Plaintiffs have property interests in the cellular data allowances that they purchase from their mobile carriers.

64. Plaintiffs at no time consented to Google appropriating their cellular data allowances to transfer information between Plaintiffs' Android devices and Google when Plaintiffs were not actively using their mobile devices.

65. Google wrongfully disposed of Plaintiffs' property by causing information to be transferred between Plaintiffs' Android devices and Google using Plaintiffs' cellular data allowances without Plaintiffs' consent. Google initiated these passive transfers when Plaintiffs were not directly engaged with Google products on their devices.

66. As a result of Defendants' conversion, Plaintiffs have suffered injury and damages in an amount to be proven at trial.

## COUNT TWO: QUANTUM MERUIT

67. Plaintiffs re-allege and incorporate by reference each of the allegations set forth above.

68. Google used valuable cellular data allowances that Plaintiffs have purchased in order to send information between Plaintiffs' devices and Google.

69. Google has used Plaintiffs' cellular data allowances to collect and transmit information through passive transfers to develop and support its advertising business and other ventures.

70. The cellular data allowances usurped through the passive transfers conferred on Google a valuable benefit to its business.

71. The use of Plaintiffs' cellular data allowances was at the expense of Plaintiffs, who paid for the cellular data allowances that Google used to send and receive information between its servers and Plaintiffs' Android devices through passive transfers.

72. Plaintiffs did not consent to these passive transfers using Plaintiffs' cellular data allowances. No contract between Plaintiffs and Google authorized information transfers that benefited Google.

73. Plaintiffs suffered injury and damages when their cellular data allowances were used to transfer to Google information that benefited Google.

74. Plaintiffs are entitled to recover the reasonable value of the cellular data allowances usurped by Google to transfer information that benefited Google.

75. Plaintiffs are also entitled to recover the reasonable value of Plaintiffs' personal information which Google collects and then exploits in its targeted advertising business and other ventures.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment against Google as follows:

76. Determining that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23 and directing that reasonable notice of this action be provided to the Class pursuant to Rule 23(c)(2).

77. That the Court adjudge and decree that Google has converted Plaintiffs' property in the form of their cellular data.

78. That the Court award Plaintiffs and the Class:

A. The fair market value of the cellular data converted by Google;

B. The reasonable value of the cellular data used by Google to extract and deliver information that benefited Google;

C. Pre- and post-judgment interest on their damages;

D. Injunctive relief directing Google to stop using cellular data purchased by consumers without their consent;

E. The costs of this action and reasonable attorneys' fees; and

F. Such other and further relief as the Court deems just and proper.

**DEMAND FOR A JURY TRIAL**

In accordance with Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: November 12, 2020

Respectfully submitted,

/s/ *Michael E. Klenov*

Michael E. Klenov (277028)
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Ann Ravel
McMANIS FAULKNER
a Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone: (408) 279-8700
Facsimile: (408) 279-3244

Glen E. Summers (176402)
Karma M. Giulianelli (184175)
Alison G. Wheeler (180748)
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140

George A. Zelcs (*pro hac vice* application forthcoming)
Robert E. Litan (*pro hac vice* application forthcoming)
Ryan Z. Cortazar ((*pro hac vice* application forthcoming)
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

Carol O'Keefe (*pro hac vice* application forthcoming)
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

*Attorneys for Plaintiffs*
*Joseph Taylor, Edward Mlakar, Mick Cleary, and Eugene Alvis*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE NORTHERN DISTRICT OF CALIFORNIA

## Form 1. Notice of Appeal from a Judgment or Order of a United States District Court

U.S. District Court case number: 20-cv-07956-VKD

Notice is hereby given that the appellant(s) listed below hereby appeal(s) to the United States Court of Appeals for the Ninth Circuit.

Date case was first filed in U.S. District Court: November 12, 2020

Date of judgment or order you are appealing: September 30, 2022

Docket entry number of judgment or order you are appealing: Dkts. 74 and 75

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

◉ Yes ○ No ○ IFP was granted by U.S. District Court

**List all Appellants** *(List **each** party filing the appeal. Do not use "et al." or other abbreviations.)*

Joseph Taylor, Edward Mlakar, Mick Cleary, Eugene Alvis and Jennifer Nelson

Is this a cross-appeal? ○ Yes ◉ No

If yes, what is the first appeal case number?

Was there a previous appeal in this case? ○ Yes ◉ No

If yes, what is the prior appeal case number?

Your mailing address (if pro se):

City: State: Zip Code:

Prisoner Inmate or A Number (if applicable):

**Signature** /s/ Marc A. Wallenstein **Date** October 25, 2022

*Complete and file with the attached representation statement in the U.S. District Court*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

Joseph Taylor, Edward Mlakar, Mick Cleary, Eugene Alvis and Jennifer Nelson

Name(s) of counsel (if any):

George A. Zelcs, Marc A. Wallenstein, Ryan Z. Cortazar of Korein Tillery, LLC

Address: 205 N. Michigan Ave., Suite 1950, Chicago, IL 60601

Telephone number(s): 312-641-9750

Email(s): gzelcs@koreintillery.com, mwallenstein@koreintillery.com, rcortazar@koreintillery.com

Is counsel registered for Electronic Filing in the 9th Circuit? (X) Yes ( ) No

---

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

Google, LLC

Name(s) of counsel (if any):

Whitty Somvichian, Max A. Bernstein, Kelsey R. Spector, Liz Sanchez Santiago of Cooley LLP

Address: 3 Embarcadero Center, 20th Floor, San Francisco, CA 94111-4004

Telephone number(s): 415-693-2000

Email(s): wsomvichian@cooley.com, mbernstein@cooley.com, kspector@cooley.com, lsanchezsantiago@cooley.com

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

Continued list of parties and counsel: *(attach additional pages as necessary)*

**Appellants**

Name(s) of party/parties:

Joseph Taylor, Edward Mlakar, Mick Cleary, Eugene Alvis and Jennifer Nelson

Name(s) of counsel (if any):

Michael E. Klenov, Carol O'Keefe

Address: 505 North 7th Street, Suite 3600

Telephone number(s): 314-241-4844

Email(s): mklenov@koreintillery.com, cokeefe@koreintillery.com

Is counsel registered for Electronic Filing in the 9th Circuit? ☒ Yes ○ No

---

**Appellees**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

---

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

Joseph Taylor, Edward Mlakar, Mick Cleary, Eugene Alvis and Jennifer Nelson

Glen E. Summers, Alison G. Wheeler of Bartlit Beck, LLP

Address: 1801 Wewatta Street, Suite 1200, Denver, CO 80202

Telephone number(s): 303-592-3100

Email(s): glen.summers@bartlitbeck.com, alison.wheeler@bartlitbeck.com

Is counsel registered for Electronic Filing in the 9th Circuit? X Yes ○ No

---

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*To list additional parties and/or counsel, use next page.*

ADRMOP,APPEAL,CLOSED,CONSENT

# U.S. District Court
# California Northern District (San Jose)
# CIVIL DOCKET FOR CASE #: 5:20−cv−07956−VKD

Taylor et al v. Google LLC
Assigned to: Magistrate Judge Virginia K. DeMarchi
Demand: $500,000,000
Case in other court: 9th Circuit, 22−16654
Cause: 28:1332 Diversity−Conversion

Date Filed: 11/12/2020
Date Terminated: 09/30/2022
Jury Demand: Plaintiff
Nature of Suit: 380 Personal Property: Other
Jurisdiction: Diversity

**Plaintiff**

**Joseph Taylor** represented by

**Ann Miller Ravel**
McManis Faulkner
10th Floor
50 West San Fernando Street
10th FL
San Jose, CA 95113
408−279−8700
Fax: 408−279−3244
Email: aravel@mcmanislaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alison G. Wheeler**
Bartlit Beck LLP
1801 Wewatta Street
Suite 1200
Denver, CO 80202
303−592−3186
Email: alison.wheeler@bartlit−beck.com
*ATTORNEY TO BE NOTICED*

**Carol L. O'Keefe**
Korein Tillery
505 No 7th St.
Suite 3600
St. Louis, MO 63101
314−241−4844
Email: cokeefe@koreintillery.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**George Andrew Zelcs**
Korein Tillery LLC
205 N. Michigan Plaza
Suite 1950
Chicago, IL 60601
312−641−9750
Fax: 312−641−9751
Email: gzelcs@koreintillery.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Glen Eric Summers**
Bartlit Beck LLP
1801 Wewatta St., Suite 1200
Denver, CO 80202
(303) 592−3100
Email: glen.summers@bartlit−beck.com
*ATTORNEY TO BE NOTICED*

**Karma Micaela Giulianelli**
Bartlit Beck LLP
1801 Wewatta Street
Suite 1200
Denver, CO 80202
(303) 592−3100
Email: karma.giulianelli@bartlit−beck.com
*ATTORNEY TO BE NOTICED*

**Marc Alfred Wallenstein**
Korein Tillery, LLC
205 North Michigan Avenue
Suite 1950
Chicago, IL 60601
312−641−9750
Fax: 314−241−3525
Email: mwallenstein@koreintillery.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert E. Litan**
Korein Tillery LLC
505 N. 7th Street
Suite 3600
St. Louis, MO 63101−1625
United Sta
(314) 241−4844
Fax: (314) 241−3525
*TERMINATED: 01/06/2021*
*PRO HAC VICE*

**Ryan Z. Cortazar**
Korein Tillery
205 No. Michigan Ave.
Suite 1950
Chicago, IL 60601
United Sta
312−641−9750
Email: rcortazar@koreintillery.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael E Klenov**
Korein Tillery, LLC
505 N 7th Street
Suite 3600
St. Louis, MO 63101
United Sta
314−241−4844
Fax: 314−241−3525
Email: mklenov@koreintillery.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Edward Mlakar** represented by **Ann Miller Ravel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alison G. Wheeler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carol L. O'Keefe**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**George Andrew Zelcs**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Glen Eric Summers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karma Micaela Giulianelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc Alfred Wallenstein**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert E. Litan**
(See above for address)
*TERMINATED: 01/06/2021*
*PRO HAC VICE*

**Ryan Z. Cortazar**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael E Klenov**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mick Cleary** represented by **Ann Miller Ravel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alison G. Wheeler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carol L. O'Keefe**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**George Andrew Zelcs**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Glen Eric Summers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karma Micaela Giulianelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc Alfred Wallenstein**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert E. Litan**
(See above for address)
*TERMINATED: 01/06/2021*
*PRO HAC VICE*

**Ryan Z. Cortazar**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael E Klenov**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Eugene Alvis** represented by **Ann Miller Ravel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alison G. Wheeler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carol L. O'Keefe**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**George Andrew Zelcs**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Glen Eric Summers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karma Micaela Giulianelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc Alfred Wallenstein**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert E. Litan**
(See above for address)
*TERMINATED: 01/06/2021*
*PRO HAC VICE*

**Ryan Z. Cortazar**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael E Klenov**
(See above for address)

*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Google LLC**

represented by

**Elizabeth Sanchez Santiago**
Cooley LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111−4004
(415) 693−2182
Fax: (415) 693−2222
Email: lsanchezsantiago@cooley.com
*ATTORNEY TO BE NOTICED*

**Kelsey R. Spector**
Cooley LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111−4004
(415) 693−2000
Fax: (415) 693−2222
Email: kspector@cooley.com
*ATTORNEY TO BE NOTICED*

**Max Bernstein , Esq**
Cooley LLP
Litigation
3 Embarcadero Center
20th Floor
San Francisco, CA 94111−4004
415−693−2052
Fax: 415−693−2222
Email: mbernstein@cooley.com
*ATTORNEY TO BE NOTICED*

**Whitty Somvichian**
Cooley LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111−4004
(415) 693−2061
Fax: (415) 693−2222
Email: wsomvichian@cooley.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/12/2020 | 1 | COMPLAINT against Google LLC ( Filing fee $ 400, receipt number 0971−15181973.). Filed byMick Cleary, Edward Mlakar, Joseph Taylor, Eugene Alvis. (Attachments: # 1 Civil Cover Sheet)(Klenov, Michael) (Filed on 11/12/2020) (Entered: 11/12/2020) |
| 11/12/2020 | 2 | Case assigned to Magistrate Judge Virginia K. DeMarchi.<br><br>Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E−Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening.<br><br>Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. Counsel is required to send chambers a copy of the initiating documents pursuant to L.R. 5−1(e)(7). A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 11/27/2020. (mbcS, COURT STAFF) (Filed on 11/12/2020) (Entered: 11/12/2020) |

| | | |
|---|---|---|
| 11/12/2020 | 3 | NOTICE of Appearance by Michael E Klenov *for Plaintiffs Joseph Taylor, Edward Mlakar, Mick Cleary and Eugene Alvis* (Klenov, Michael) (Filed on 11/12/2020) (Entered: 11/12/2020) |
| 11/13/2020 | 4 | MOTION for leave to appear in Pro Hac Vice *Application for Admission of Attorney George A. Zelcs* ( Filing fee $ 310, receipt number 0971−15188408.) filed by Eugene Alvis, Mick Cleary, Edward Mlakar, Joseph Taylor. (Zelcs, George) (Filed on 11/13/2020) (Entered: 11/13/2020) |
| 11/13/2020 | 5 | **ORDER by Magistrate Judge Virginia K. DeMarchi denying without prejudice 4 Application for Admission of Attorney Pro Hac Vice. (vkdlc2S, COURT STAFF) (Filed on 11/13/2020) (Entered: 11/13/2020)** |
| 11/13/2020 | 6 | Amended MOTION for leave to appear in Pro Hac Vice *for Plaintiffs Joseph Taylor, Edward Mlakar, Mick Cleary and Eugene Alvis* ( Filing fee $ 310, receipt number 0971−15188408.) Filing fee previously paid on 11/13/2020 filed by Eugene Alvis, Mick Cleary, Edward Mlakar, Joseph Taylor. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Zelcs, George) (Filed on 11/13/2020) (Entered: 11/13/2020) |
| 11/13/2020 | 7 | MOTION for leave to appear in Pro Hac Vice *for Plaintiffs Joseph Taylor, Edward Mlakar, Mick Cleary and Eugene Alvis* ( Filing fee $ 310, receipt number 0971−15190721.) filed by Eugene Alvis, Mick Cleary, Edward Mlakar, Joseph Taylor. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(O'Keefe, Carol) (Filed on 11/13/2020) (Entered: 11/13/2020) |
| 11/13/2020 | 8 | MOTION for leave to appear in Pro Hac Vice *for Plaintiffs Joseph Taylor, Edward Mlakar, Mick Cleary and Eugene Alvis* ( Filing fee $ 310, receipt number 0971−15191712.) filed by Eugene Alvis, Mick Cleary, Edward Mlakar, Joseph Taylor. (Attachments: # 1 Exhibit A)(Cortazar, Ryan) (Filed on 11/13/2020) (Entered: 11/13/2020) |
| 11/16/2020 | 9 | **ORDER by Magistrate Judge Virginia K. DeMarchi granting 6 Amended Application for Admission of Attorney Pro Hac Vice as to George Zelec. (vkdlc2S, COURT STAFF) (Filed on 11/16/2020) (Entered: 11/16/2020)** |
| 11/16/2020 | 10 | **ORDER by Magistrate Judge Virginia K. DeMarchi granting 7 Application for Admission of Attorney Pro Hac Vice as to Carol O'Keefe. (vkdlc2S, COURT STAFF) (Filed on 11/16/2020) Modified on 11/16/2020 (vkdlc2S, COURT STAFF). (Entered: 11/16/2020)** |
| 11/16/2020 | 11 | **ORDER by Magistrate Judge Virginia K. DeMarchi granting 8 Application for Admission of Attorney Pro Hac Vice as to Ryan Cortazar. (vkdlc2S, COURT STAFF) (Filed on 11/16/2020) (Entered: 11/16/2020)** |
| 11/16/2020 | 12 | NOTICE of Appearance by Ann Miller Ravel (Ravel, Ann) (Filed on 11/16/2020) (Entered: 11/16/2020) |
| 11/17/2020 | 13 | NOTICE of Appearance by Alison G. Wheeler (Wheeler, Alison) (Filed on 11/17/2020) (Entered: 11/17/2020) |
| 11/17/2020 | 14 | NOTICE of Appearance by Glen Eric Summers (Summers, Glen) (Filed on 11/17/2020) (Entered: 11/17/2020) |
| 11/17/2020 | 15 | NOTICE of Appearance by Karma Micaela Giulianelli (Giulianelli, Karma) (Filed on 11/17/2020) (Entered: 11/17/2020) |
| 11/27/2020 | 16 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Eugene Alvis, Mick Cleary, Edward Mlakar, Joseph Taylor.. (Klenov, Michael) (Filed on 11/27/2020) (Entered: 11/27/2020) |
| 11/30/2020 | 17 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 310, receipt number 0971−15254054.) filed by Eugene Alvis, Mick Cleary, Edward Mlakar, Joseph Taylor. (Attachments: # 1 Exhibit A)(Litan, Robert) (Filed on 11/30/2020) (Entered: 11/30/2020) |
| 11/30/2020 | 18 | **ORDER by Magistrate Judge Virginia K. DeMarchi granting 17 Application for Admission of Attorney Pro Hac Vice as to Robert Litan. (vkdlc2S, COURT STAFF) (Filed on 11/30/2020) (Entered: 11/30/2020)** |

| | | |
|---|---|---|
| 12/17/2020 | 19 | WAIVER OF SERVICE Returned Executed filed by Mick Cleary, Edward Mlakar, Joseph Taylor, Eugene Alvis. Service waived by Google LLC waiver sent on 11/26/2020, answer due 1/25/2021. (Klenov, Michael) (Filed on 12/17/2020) (Entered: 12/17/2020) |
| 12/22/2020 | 20 | NOTICE of Appearance by Whitty Somvichian *for Defendant Google LLC* (Somvichian, Whitty) (Filed on 12/22/2020) (Entered: 12/22/2020) |
| 12/22/2020 | 21 | NOTICE of Appearance by Max Bernstein, Esq *for Defendant Google LLC* (Bernstein, Max) (Filed on 12/22/2020) (Entered: 12/22/2020) |
| 12/22/2020 | 22 | NOTICE of Appearance by Kelsey R. Spector *for Defendant Google LLC* (Spector, Kelsey) (Filed on 12/22/2020) (Entered: 12/22/2020) |
| 12/22/2020 | 23 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Google LLC.. (Somvichian, Whitty) (Filed on 12/22/2020) (Entered: 12/22/2020) |
| 12/22/2020 | 24 | Certificate of Interested Entities by Google LLC identifying Corporate Parent XXVI Holdings Inc., Holding Company of Google LLC, Other Affiliate Alphabet Inc., Holding Company of XXVI Holdings Inc. for Google LLC. (Somvichian, Whitty) (Filed on 12/22/2020) (Entered: 12/22/2020) |
| 12/22/2020 | 25 | STIPULATION WITH PROPOSED ORDER *TO EXTEND TIME TO RESPOND TO COMPLAINT (CIVIL L.R. 6−1(A)) AND TO SET BRIEFING SCHEDULE (CIVIL L.R. 6−2)* filed by Google LLC. (Attachments: # 1 Declaration of Whitty Somvichian iso Joint Stipulation)(Somvichian, Whitty) (Filed on 12/22/2020) (Entered: 12/22/2020) |
| 12/23/2020 | 26 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 2/9/2021. Initial Case Management Conference set for 2/16/2021 01:30 PM in San Jose, Courtroom 2, 5th Floor. (sfbS, COURT STAFF) (Filed on 12/23/2020) (Entered: 12/23/2020)** |
| 12/23/2020 | 27 | **ORDER by Magistrate Judge Virginia K. DeMarchi granting 25 Stipulation to Extend Time to Respond to Complaint and Set Briefing Schedule. Defendant's response to complaint due by 2/1/2021. Plaintiffs' opposition due by 3/1/2021. Defendant's reply due by 3/15/2021. (vkdlc2S, COURT STAFF) (Filed on 12/23/2020) (Entered: 12/23/2020)** |
| 01/26/2021 | 28 | ADR Certification (ADR L.R. 3−5 b) of discussion of ADR options *by Defendant Google LLC* (Somvichian, Whitty) (Filed on 1/26/2021) (Entered: 01/26/2021) |
| 01/26/2021 | 29 | ADR Certification (ADR L.R. 3−5 b) of discussion of ADR options *by Plaintiff Joseph Taylor* (Klenov, Michael) (Filed on 1/26/2021) (Entered: 01/26/2021) |
| 01/26/2021 | 30 | ADR Certification (ADR L.R. 3−5 b) of discussion of ADR options *by Plaintiff Edward Mlakar* (Klenov, Michael) (Filed on 1/26/2021) (Entered: 01/26/2021) |
| 01/26/2021 | 31 | ADR Certification (ADR L.R. 3−5 b) of discussion of ADR options *by Plaintiff Mick Cleary* (Klenov, Michael) (Filed on 1/26/2021) (Entered: 01/26/2021) |
| 01/26/2021 | 32 | ADR Certification (ADR L.R. 3−5 b) of discussion of ADR options *by Plaintiff Eugene Alvis* (Klenov, Michael) (Filed on 1/26/2021) (Entered: 01/26/2021) |
| 02/01/2021 | 33 | MOTION to Dismiss *Plaintiffs' Complaint* filed by Google LLC. Motion Hearing set for 3/30/2021 10:00 AM in San Jose, Courtroom 2, 5th Floor before Magistrate Judge Virginia K. DeMarchi. Responses due by 3/1/2021. Replies due by 3/15/2021. (Attachments: # 1 Declaration of Kelsey Spector iso Motion to Dismiss, # 2 Exhibit A to the Declaration of Kelsey Spector, # 3 Exhibit B to the Declaration of Kelsey Spector, # 4 Exhibit C to the Declaration of Kelsey Spector, # 5 Exhibit D to the Declaration of Kelsey Spector, # 6 Exhibit E to the Declaration of Kelsey Spector, # 7 Request for Judicial Notice iso Motion to Dismiss, # 8 Proposed Order)(Somvichian, Whitty) (Filed on 2/1/2021) (Entered: 02/01/2021) |
| 02/02/2021 | 34 | CLERK'S NOTICE Re: Consent or Declination: Defendants shall file a consent or declination to proceed before a magistrate judge. Note that any party is free to withhold consent to proceed before a magistrate judge without adverse substantive consequences. The forms are available at: http://cand.uscourts.gov/civilforms. Consent/Declination due by 2/8/2021. (pmcS, COURT STAFF) (Filed on 2/2/2021) (Entered: 02/02/2021) |

| | | |
|---|---|---|
| 02/03/2021 | 35 | CLERK'S NOTICE Full consent having previously been received from all parties, the February 2, 2021 Clerks Notice re Consent or Declination (Dkt. No. 34) is hereby withdrawn. *(This is a text−only entry generated by the court. There is no document associated with this entry.)* (pmcS, COURT STAFF) (Filed on 2/3/2021) (Entered: 02/03/2021) |
| 02/05/2021 | 36 | Certificate of Interested Entities by Eugene Alvis, Mick Cleary, Edward Mlakar, Joseph Taylor (Klenov, Michael) (Filed on 2/5/2021) (Entered: 02/05/2021) |
| 02/09/2021 | 37 | JOINT CASE MANAGEMENT STATEMENT filed by Google LLC. (Somvichian, Whitty) (Filed on 2/9/2021) (Entered: 02/09/2021) |
| 02/10/2021 | 38 | CLERK'S NOTICE RE INITIAL CASE MANAGEMENT CONFERENCE. Please take notice that the initial case management conference has been continued to March 30, 2021, to be held immediately following the 10:00 a.m. hearing on defendant's motion to dismiss. Unless the parties have any material updates, they need not file another joint case management statement prior to the conference. *(This is a text−only entry generated by the court. There is no document associated with this entry.)* (vkdlc2S, COURT STAFF) (Filed on 2/10/2021) (Entered: 02/10/2021) |
| 03/01/2021 | 39 | OPPOSITION/RESPONSE (re 33 MOTION to Dismiss *Plaint,jfs' Complaint* ) *Plaint,jfs' Cpposition to Google LLC's Motion to Dismiss* filed byEugene Alvis, Mick Cleary, Edward Mlakar, Joseph Taylor. (Attachments: # 1 Declaration Declaration of Ryan Cortazar ISO Opposition to Google LLC's Motion to Dismiss, # 2 Declaration Request for Judicial Notice ISO Plaintiffs' Opposition to Google LLC's Motion to Dismiss)(Klenov, Michael) (Filed on 3/1/2021) (Entered: 03/01/2021) |
| 03/05/2021 | 40 | CLERK'S NOTICE RE MOTION HEARING AND INITIAL CASE MANAGEMENT CONFERENCE. The motion hearing re 33 defendant's motion to dismiss and the initial case management conference have been continued to 4/20/2021 10:00 AM before Magistrate Judge Virginia K. DeMarchi. *(This is a text−only entry generated by the court. There is no document associated with this entry.)* (vkdlc2S, COURT STAFF) (Filed on 3/5/2021) (Entered: 03/05/2021) |
| 03/05/2021 | 41 | **ORDER FOR CHAMBERS COPIES. Parties are requested to submit chambers copies re 33 defendant's motion to dismiss by 3/31/2021. Signed by Magistrate Judge Virginia K. DeMarchi on 3/5/2021. (vkdlc2S, COURT STAFF) (Filed on 3/5/2021) (Entered: 03/05/2021)** |
| 03/15/2021 | 42 | REPLY (re 33 MOTION to Dismiss *Plaint,jfs' Complaint* ) filed byGoogle LLC. (Somvichian, Whitty) (Filed on 3/15/2021) (Entered: 03/15/2021) |
| 03/25/2021 | 43 | STATEMENT OF RECENT DECISION pursuant to Civil Local Rule 7−3.d filed byEugene Alvis, Mick Cleary, Edward Mlakar, Joseph Taylor. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Klenov, Michael) (Filed on 3/25/2021) (Entered: 03/25/2021) |
| 04/13/2021 | 44 | CLERKS NOTICE SETTING ZOOM HEARING. Initial Case Management Conference and Motion to Dismiss 33 Hearing set for 4/20/2021 10:00 AM in San Jose, − Videoconference Only before Magistrate Judge Virginia K. DeMarchi. This proceeding will be held via a Zoom webinar.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/vkd<br><br>**Court Ap pearances:** Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. A list of names and emails must be sent to the CRD at vkdcrd@cand.uscourts.gov no later than 4/19/21 10:00AM.<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/. |

| | | |
|---|---|---|
| | | Initial Case Manageme nt Conference set for 4/20/2021 10:00 AM in San Jose, – Videoconference Only. Motion Hearing set for 4/20/2021 10:00 AM in San Jose, – Videoconference Only before Magistrate Judge Virginia K. DeMarchi. (Related documents(s) 40 , 33 ) *(This is a text–only entry generated by the court. There is no document associated with this entry.)* (pmcS, COURT STAFF) (Filed on 4/13/2021) (Entered: 04/13/2021) |
| 04/19/2021 | 45 | CASE MANAGEMENT STATEMENT *Supplemental Joint Initial Case Management Statement* filed by Eugene Alvis, Mick Cleary, Edward Mlakar, Joseph Taylor. (Ravel, Ann) (Filed on 4/19/2021) (Entered: 04/19/2021) |
| 04/20/2021 | 46 | **Minute Entry for proceedings held before Magistrate Judge Virginia K. DeMarchi: Motion Hearing held by Zoom on 4/20/2021 re 33 MOTION to Dismiss *Plaintiffs' Complaint* filed by Google LLC**<br><br>Hearing held. Court to issue written order.<br><br>Total Time in Court: 1 hour 21 minutes. Court Reporter: Summer Fisher.<br><br>Plaintiff Attorney: Ryan Cortazar.<br>Defendant Attorney: Whitty Somvichian; Kelsey Spector.<br><br>*(This is a text–only entry generated by the court. There is no document associated with this entry.)* (pmcS, COURT STAFF) (Date Filed: 4/20/2021) (Entered: 04/20/2021) |
| 04/20/2021 | 47 | **Minute Entry for proceedings held before Magistrate Judge Virginia K. DeMarchi: Initial Case Management Conference held by Zoom on 4/20/2021.**<br><br>Hearing held. Court to issue scheduling order after the Motion to Dismiss 33 has been decided.<br><br>Total Time in Court: 12 minutes. Court Reporter: Summer Fisher.<br><br>Plaintiff Attorney: Michael Klenov.<br>Defendant Attorney: Whitty Somvichian; Kelsey Spector.<br><br>*(This is a text–only entry generated by the court. There is no document associated with this entry.)* (pmcS, COURT STAFF) (Date Filed: 4/20/2021) (Entered: 04/20/2021) |
| 06/03/2021 | 48 | NOTICE of Change of Address by Whitty Somvichian (Somvichian, Whitty) (Filed on 6/3/2021) (Entered: 06/03/2021) |
| 06/07/2021 | 49 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number 0971–16050641.) filed by Eugene Alvis, Mick Cleary, Edward Mlakar, Joseph Taylor. (Attachments: # 1 DC Certificate of Good Standing)(Wallenstein, Marc) (Filed on 6/7/2021) (Entered: 06/07/2021) |
| 06/07/2021 | 50 | **ORDER by Magistrate Judge Virginia K. DeMarchi granting 49 Application for Admission of Attorney Pro Hac Vice as to Marc A. Wallenstein. (vkdlc2S, COURT STAFF) (Filed on 6/7/2021) (Entered: 06/07/2021)** |
| 10/01/2021 | 51 | **ORDER by Magistrate Judge Virginia K. DeMarchi granting 33 Defendant's Motion to Dismiss Complaint. (vkdlc2S, COURT STAFF) (Filed on 10/1/2021) (Entered: 10/01/2021)** |
| 10/05/2021 | 52 | TRANSCRIPT ORDER for proceedings held on 04/20/2021 before Magistrate Judge Virginia K. DeMarchi by Eugene Alvis, Mick Cleary, Edward Mlakar, Joseph Taylor, for Court Reporter Summer Fisher. (Cortazar, Ryan) (Filed on 10/5/2021) (Entered: 10/05/2021) |
| 10/06/2021 | 53 | TRANSCRIPT ORDER for proceedings held on April 20, 2021 before Magistrate Judge Virginia K. DeMarchi by Google LLC, for Court Reporter Summer Fisher. (Spector, Kelsey) (Filed on 10/6/2021) (Entered: 10/06/2021) |

| | | |
|---|---|---|
| 10/14/2021 | 54 | STIPULATION WITH PROPOSED ORDER *STIPULATION TO EXTEND TIME TO FILE AMENDED COMPLAINT (CIVIL L.R. 6−1(b) and 6−2); AND [PROPOSED] ORDER* filed by Eugene Alvis, Mick Cleary, Edward Mlakar, Joseph Taylor. (Attachments: # 1 Declaration)(Ravel, Ann) (Filed on 10/14/2021) (Entered: 10/14/2021) |
| 10/15/2021 | 55 | **STIPULATION AND ORDER re 54 Extending Time to File Amended Complaint. Amended complaint due by 11/29/2021. Deadline for Google's motion to dismiss: 1/20/2022. Signed by Magistrate Judge Virginia K. DeMarchi. (vkdlc2S, COURT STAFF) (Filed on 10/15/2021) (Entered: 10/15/2021)** |
| 10/15/2021 | 56 | Transcript of Proceedings held on 04/20/2021, before Judge Virginia K. Demarchi. Court Reporter/Transcriber Summer Fisher, telephone number summer_fisher@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 52 Transcript Order ) Redaction Request due 11/5/2021. Redacted Transcript Deadline set for 11/15/2021. Release of Transcript Restriction set for 1/13/2022. (Related documents(s) 52 ) (Fisher, Summer) (Filed on 10/15/2021) (Entered: 10/15/2021) |
| 11/17/2021 | 57 | NOTICE by Eugene Alvis *of Subpoena Issued to Verizon Wireless* (Attachments: # 1 Exhibit Subpoena)(Wheeler, Alison) (Filed on 11/17/2021) (Entered: 11/17/2021) |
| 11/29/2021 | 58 | STIPULATION WITH PROPOSED ORDER *STIPULATION TO EXTEND TIME TO FILE AMENDED COMPLAINT (CIVIL L.R. 6−1(b) and 6−2); and [PROPOSED] ORDER* filed by Eugene Alvis, Mick Cleary, Edward Mlakar, Joseph Taylor. (Ravel, Ann) (Filed on 11/29/2021) (Entered: 11/29/2021) |
| 11/30/2021 | 59 | **SECOND STIPULATION AND ORDER re 58 Extending Time to File Amended Complaint. Plaintiffs' amended complaint due by 12/13/2021. Defendant's motion to dismiss due by 1/31/2022. Signed by Magistrate Judge Virginia K. DeMarchi. (vkdlc2, COURT STAFF) (Filed on 11/30/2021) (Entered: 11/30/2021)** |
| 12/13/2021 | 60 | COMPLAINT *FIRST AMENDED CLASS ACTION COMPLAINT − JURY TRIAL DEMANDED* against All Defendants. Filed byMick Cleary, Edward Mlakar, Joseph Taylor, Eugene Alvis. (Ravel, Ann) (Filed on 12/13/2021) (Entered: 12/13/2021) |
| 01/06/2022 | 61 | NOTICE of Change In Counsel by Carol L. O'Keefe *on behalf of Robert E. Litan* (O'Keefe, Carol) (Filed on 1/6/2022) (Entered: 01/06/2022) |
| 01/21/2022 | 62 | STIPULATION WITH PROPOSED ORDER *To Set Briefing Schedule* filed by Google LLC. (Attachments: # 1 Declaration of Whitty Somvichian)(Somvichian, Whitty) (Filed on 1/21/2022) (Entered: 01/21/2022) |
| 01/24/2022 | 63 | **ORDER by Magistrate Judge Virginia K. DeMarchi granting 62 Stipulation re Briefing Schedule. Plaintiffs' opposition to motion to dismiss due by 2/21/2022. Reply due by 3/10/2022. Motion hearing set for 3/29/2022, 10:00 AM. (vkdlc2, COURT STAFF) (Filed on 1/24/2022) (Entered: 01/24/2022)** |
| 01/31/2022 | 64 | NOTICE of Appearance by Elizabeth Sanchez Santiago (Sanchez Santiago, Elizabeth) (Filed on 1/31/2022) (Entered: 01/31/2022) |
| 01/31/2022 | 65 | MOTION to Dismiss *Plaintiffs' First Amended Complaint* filed by Google LLC. Motion Hearing set for 3/29/2022 10:00 AM in San Jose, Courtroom 2, 5th Floor before Magistrate Judge Virginia K. DeMarchi. Responses due by 2/21/2022. Replies due by 3/10/2022. (Attachments: # 1 Request for Judicial Notice iso Motion to Dismiss Plaintiffs' First Amended Complaint, # 2 Proposed Order)(Somvichian, Whitty) (Filed on 1/31/2022) (Entered: 01/31/2022) |
| 02/08/2022 | 66 | **ORDER FOR CHAMBERS COPIES re 65 MOTION to Dismiss *Plaintiffs' First Amended Complaint*. Signed by Magistrate Judge Virginia K. DeMarchi on 2/8/2022. (vkdlc2, COURT STAFF) (Filed on 2/8/2022) (Entered: 02/08/2022)** |
| 02/21/2022 | 67 | OPPOSITION/RESPONSE (re 65 MOTION to Dismiss *Plaintiffs' First Amended Complaint* ) filed byEugene Alvis, Mick Cleary, Edward Mlakar, Joseph Taylor. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Declaration Declaration of Marc A. Wallenstein in Support of Plaintiffs' Opposition to Google LLC's Motion to Dismiss Plaintiffs' First Amended Complaint)(Wallenstein, Marc) (Filed on 2/21/2022) (Entered: 02/21/2022) |
| 03/10/2022 | 68 | REPLY (re 65 MOTION to Dismiss *Plaintiffs' First Amended Complaint* ) filed byGoogle LLC. (Somvichian, Whitty) (Filed on 3/10/2022) (Entered: 03/10/2022) |
| 03/21/2022 | 69 | CLERKS NOTICE CONVERTING HEARING TO ZOOM HEARING. Motion 65 to Dismiss Hearing is set for 3/29/2022 10:00 AM in San Jose − Videoconference Only before Magistrate Judge Virginia K. DeMarchi. This proceeding will be held via a Zoom webinar remotely.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/vkd<br><br>**Court Appearances:** Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argument at the hearing. A list of names and emails specifying main speaker(s) must be sent to the CRD at VKDcrd@cand.uscourts.gov no later than 3/23/2022 at 3:00 PM PST.<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>(Related documents(s) 65 ) *(This is a text−only entry generated by the court. There is no document associated with this entry.)* (amk, COURT STAFF) (Filed on 3/21/2022) (Entered: 03/21/2022) |
| 03/29/2022 | 70 | **Minute Entry for proceedings held before Magistrate Judge Virginia K. DeMarchi: Motion Hearing re 65 Motion to Dismiss *Plaintiffs' First Amended Complaint* held on 3/29/2022 via Zoom webinar.**<br><br>The Court heard oral argument and took the matter under submission. The Court to issue order.<br><br>Plaintiffs' Attorney: Marc Wallenstein.<br>Defendant's Attorney: Whitty Somvichian.<br><br>Court Reporter: Zoom Recording: 10:00−11:20 am. Total Time in Court: 1 Hour 20 Minutes.<br><br>*(This is a text−only entry generated by the court. There is no document associated with this entry.)* (amk, COURT STAFF) (Date Filed: 3/29/2022) (Entered: 03/29/2022) |
| 03/29/2022 | 71 | TRANSCRIPT ORDER for proceedings held on 03/29/2022 before Magistrate Judge Virginia K. DeMarchi by Google LLC, for Court Reporter FTR − San Jose. (Spector, Kelsey) (Filed on 3/29/2022)**TRANSCRIBER − Echo Reporting (Email: echoreporting@yahoo.com)** Modified on 3/29/2022 (sp, COURT STAFF). (Entered: 03/29/2022) |
| 04/04/2022 | 72 | TRANSCRIPT ORDER for proceedings held on 3/29/2022 before Magistrate Judge Virginia K. DeMarchi by Joseph Taylor, for Court Reporter FTR − San Jose. (Wallenstein, Marc) (Filed on 4/4/2022) (Entered: 04/04/2022) |
| 04/05/2022 | 73 | Transcript of Proceedings held on 03/29/22, before Judge Magistrate Judge Virginia DeMarchi. Court Reporter/Transcriber Echo Reporting, Inc., telephone number echoreporting@yahoo.com. Tape Number: FTR 10:00 − 11:20. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 71 Transcript Order, ) |

| | | |
|---|---|---|
| | | Redaction Request due 4/26/2022. Redacted Transcript Deadline set for 5/6/2022. Release of Transcript Restriction set for 7/5/2022. (Related documents(s) 71 ) (Jauregui, Tara) (Filed on 4/5/2022) (Entered: 04/05/2022) |
| 09/30/2022 | 74 | **ORDER by Magistrate Judge Virginia K. DeMarchi granting 65 Defendant's Motion to Dismiss First Amended Complaint Without Leave to Amend. Clerk shall enter judgment and close this file. (vkdlc2, COURT STAFF) (Filed on 9/30/2022) (Entered: 09/30/2022)** |
| 09/30/2022 | 75 | **JUDGMENT. Signed by Magistrate Judge Virginia K. DeMarchi on 9/30/2022. (vkdlc2, COURT STAFF) (Filed on 9/30/2022) (Entered: 09/30/2022)** |
| 10/25/2022 | 76 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Eugene Alvis, Mick Cleary, Edward Mlakar, Joseph Taylor. Appeal of Judgment 75 , Order on Motion to Dismiss 74 (Appeal fee of $505 receipt number ACANDC−17662510 paid.) (Wallenstein, Marc) (Filed on 10/25/2022) (Entered: 10/25/2022) |
| 10/26/2022 | 77 | USCA Case Number 22−16654 9th Circuit for 76 Notice of Appeal to the Ninth Circuit, filed by Edward Mlakar, Eugene Alvis, Joseph Taylor, Mick Cleary. (far, COURT STAFF) (Filed on 10/26/2022) (Entered: 10/26/2022) |
| 11/22/2022 | 78 | Transcript Designation Form for proceedings held on 04.20.2021 and 03.29.2022 before Judge Virginia Demarchi, *(Dkt. Nos. 56 and 73)* (Wallenstein, Marc) (Filed on 11/22/2022) (Entered: 11/22/2022) |